IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 22-12996-A

UNITED STATES OF AMERICA,

Appellee,

v.

ABY RAUL RIVERA TORRES,

Appellant.

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

APPENDIX

A. FITZGERALD HALL, ESQ.
Federal Defender

MICHELLE R. YARD, BCS
Research and Writing Attorney
Florida Bar Number 14085
201 S. Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338
E-mail: Michelle_Yard@fd.org

# INDEX OF APPENDIX

Docket Sheet ............................................................................ Docket Sheet

Indictment ................................................................................. 15

Motion to Suppress ................................................................... 27

Motion for Hearing on Defendant's Motion to Suppress ......................... 28

Response in Opposition ............................................................ 33

Order Denying Motion to Suppress ......................................... 38

Status Report ............................................................................ 40

Order Setting Stipulated Facts ................................................. 42

Superseding Indictment ........................................................... 44

Notice of Essential Elements of Offense ................................ 46

Trial Brief ................................................................................. 53

Stipulation of the Parties .......................................................... 55

Waiver of Right to Trial ........................................................... 60

Court Verdict ............................................................................ 68

Non-Jury Trial Transcript ........................................................ 91

Sentencing Memorandum ......................................................... 74

Government Sentencing Memorandum ..................................... 75

Sentencing Transcript ................................................................... 96

Judgment ..................................................................................... 78

Certificate of Service


**FILED SEPARATELY UNDER SEAL**

Presentence Investigation Report .............................................. 72

Statement of Reasons ................................................................. 79

# DOCKET SHEET

APPEAL, CLOSED, CUSTODY, SL DOC

## U.S. District Court
## Middle District of Florida (Tampa)
## CRIMINAL DOCKET FOR CASE #: 8:21–cr–00397–MSS–JSS–1

Case title: USA v. Torres

Magistrate judge case number:  8:21–mj–02126–SPF

Date Filed: 12/15/2021

Date Terminated: 09/02/2022

---

Assigned to: Judge Mary S. Scriven
Referred to: Magistrate Judge Julie S.
Sneed

Appeals court case number:
22–12996–A 11th Circuit

### Defendant (1)

| | |
|---|---|
| **Aby Raul Rivera Torres**<br>*TERMINATED: 09/02/2022* | represented by **Adam Joseph Nate**<br>Federal Public Defender's Office<br>400 N Tampa St Ste 2700<br>Tampa, FL 33602–4726<br>813/228–2715<br>Fax: 813/228–2562<br>Email: Adam_Nate@fd.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community*<br>*Defender Appointment*<br><br>**Michelle Rachel Yard**<br>Federal Public Defender's Office<br>201 S Orange Ave., Ste 300<br>Orlando, FL 32801–3417<br>407–648–6338<br>Email: michelle_yard@fd.org<br>*ATTORNEY TO BE NOTICED* |

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN<br>(1s) | Imprisonment: 1320 MONTHS. This term consists of a 360–month term as to Count One and a 240–month term as to Counts Two, Three, Four, and Five, all such terms to run consecutively to each other; Supervised Release: 10 YEARS. This term consists of a 10–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently; Fine is waived; Restitution: To be determined at a later date; Special Assessment: $500.00, to be paid immediately. |
| 18:2252A.F ACTIVITIES RE MATERIAL CONSTITUTING/CONTAINING CHILD PORNO<br>(2s–5s) | Imprisonment: 1320 MONTHS. This term consists of a 360–month term as to Count One and a 240–month term as to Counts Two, Three, Four, and Five, all such terms to run consecutively to each other; Supervised Release: 10 YEARS. This term consists of a 10–year term as to Counts One, Two, Three, |

Four, and Five, all such terms to run
concurrently; Fine is waived; Restitution: To
be determined at a later date; Special
Assessment: $500.00, to be paid immediately.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:2251.F SEXUAL EXPLOITATION OF CHILDREN (1) | Dismissed on the motion of the United States. |
| 18:2252.F SEXUAL EXPLOITATION OF MINORS (2–4) | Dismissed on the motion of the United States. |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| 18:2251A.F SELLING OR BUYING OF CHILDREN | |

**Plaintiff**

| **USA** | represented by | **Lisa Marie Thelwell** |
| --- | --- | --- |
| | | US Attorney's Office – FLM |
| | | Suite 3200 |
| | | 400 N Tampa St |
| | | Tampa, FL 33602–4798 |
| | | 813–274–6000 |
| | | Email: Lisa.Thelwell@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |
| | | |
| | | **Suzanne C. Nebesky** |
| | | US Attorney's Office – FLM |
| | | Suite 3200 |
| | | 400 N Tampa St |
| | | Tampa, FL 33602–4798 |
| | | 813/274–6000 |
| | | Email: suzanne.nebesky@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

| Date Filed | # | Docket Text |
| --- | --- | --- |
| 11/13/2021 | 1 | COMPLAINT as to Aby Raul Rivera Torres (1). (EJC) [8:21–mj–02126–SPF] (Entered: 11/15/2021) |
| 11/13/2021 | 3 | **ORDER as to Aby Raul Rivera Torres: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/1/2020. (EJC) [8:21–mj–02126–SPF]** (Entered: 11/15/2021) |

| 11/15/2021 | | Arrest of Aby Raul Rivera Torres on 11/13/2021. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
|---|---|---|
| 11/15/2021 | [4](#) | ***CJA 23 Financial Affidavit by Aby Raul Rivera Torres. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | 5 | ORAL MOTION to Appoint Counsel by Aby Raul Rivera Torres. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | 6 | ORAL MOTION for Preliminary Hearing by Aby Raul Rivera Torres. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | 7 | ORAL MOTION for Detention by USA as to Aby Raul Rivera Torres. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | 8 | **ORAL ORDER as to Aby Raul Rivera Torres: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Magistrate Judge Elizabeth A. Jenkins on 11/15/2021. (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021)** |
| 11/15/2021 | [9](#) | Notice of substitution of AUSA. Lisa Marie Thelwell substituting for David Pardo. (Thelwell, Lisa) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | [10](#) | Minute Entry for in−person proceedings held before Magistrate Judge Elizabeth A. Jenkins: Oral order granting 5 Oral Motion to Appoint Counsel; Oral order granting 6 Oral Motion for Preliminary Hearing as to Aby Raul Rivera Torres ; Oral Order granting 7 Oral Motion by USA for Detention as to Aby Raul Rivera Torres. Initial Appearance, Preliminary Hearing, and Detention Hearing held on 11/15/2021. (DIGITAL) (Interpreter/Language: n/a) (KR) [8:21−mj−02126−SPF] (Entered: 11/15/2021) |
| 11/15/2021 | [13](#) | ARREST Warrant Returned Executed on 11/13/2021 as to Aby Raul Rivera Torres. (LSS) [8:21−mj−02126−SPF] (Entered: 11/16/2021) |
| 11/16/2021 | [11](#) | **ORDER OF DETENTION PENDING TRIAL as to Aby Raul Rivera Torres. Signed by Magistrate Judge Elizabeth A. Jenkins on 11/16/2021. (KR) [8:21−mj−02126−SPF] (Entered: 11/16/2021)** |
| 11/19/2021 | [14](#) | NOTICE OF ATTORNEY APPEARANCE: Adam Joseph Nate appearing for Aby Raul Rivera Torres (Nate, Adam) [8:21−mj−02126−SPF] (Entered: 11/19/2021) |
| 12/15/2021 | [15](#) | INDICTMENT returned in open court as to Aby Raul Rivera Torres (1) count(s) 1−4. (ABC) (Additional attachment(s) added on 12/16/2021: # [1](#) Restricted Unredacted Indictment) (ABC). (Entered: 12/16/2021) |
| 12/17/2021 | [17](#) | NOTICE OF HEARING as to Aby Raul Rivera Torres: Arraignment set for 1/4/2022 at 01:30 PM in Zoom Video Conference before Magistrate Judge Julie S. Sneed. Note: Defendant and counsel are not required to appear provided the appropriate waiver and entry of plea of not guilty are filed in a timely manner (Sample waiver attached). Defense counsel is hereby directed to consult with the Defendant regarding the following prior to the hearing: whether the Defendant consents to having the hearing proceed by video. Counsel will receive a Zoom video hearing invitation via e−mail separately. You are hereby reminded that under Local Rule 5.01 the taking of photographs, the operation of recording or transmission devices, and the broadcasting or televising of proceedings in any courtroom or hearing room of this Court, or the environs thereof, either while the Court is in session or at recesses between sessions when Court officials, lawyers, jurors, witnesses or other persons connected with judicial proceedings of any kind are prohibited(CDR) (Entered: 12/17/2021) |
| 12/17/2021 | [18](#) | NOTICE OF ATTORNEY APPEARANCE Suzanne C. Nebesky appearing for USA. (Nebesky, Suzanne) (Entered: 12/17/2021) |
| 01/03/2022 | [19](#) | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Aby Raul Rivera Torres. Motion referred to Julie S. Sneed. (Nate, Adam) (Entered: 01/03/2022) |

| 01/04/2022 | 20 | **ENDORSED ORDER granting <u>19</u> Waiver of Presence at Arraignment as to Aby Raul Rivera Torres (1). Signed by Magistrate Judge Julie S. Sneed on 1/4/2022. (CDR)** (Entered: 01/04/2022) |
|---|---|---|
| 01/04/2022 | 21 | NOTICE canceling Arraignment hearing scheduled for 1/4/2022 as to Aby Raul Rivera Torres (Waiver accepted). (CDR) (Entered: 01/04/2022) |
| 01/04/2022 | <u>22</u> | <span style="color:green">**PRETRIAL DISCOVERY ORDER and notice**</span> **as to Aby Raul Rivera Torres. This case is set before the Honorable Mary S. Scriven; United States District Judge for the February 2022 trial term beginning 1/31/2022 at 09:00 AM. In lieu of a scheduled stats conference, the parties shall file a joint status report on or before the 15th day of each month. Signed by Magistrate Judge Julie S. Sneed on 1/4/2022. (CDR)** (Entered: 01/04/2022) |
| 01/11/2022 | <u>23</u> | STATUS REPORT by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 01/11/2022) |
| 01/16/2022 | <u>24</u> | Unopposed MOTION to Continue trial *to the Court's April 2022 Trial Term* by Aby Raul Rivera Torres. (Nate, Adam) (Entered: 01/16/2022) |
| 01/25/2022 | <u>25</u> | WAIVER of speedy trial through April 30, 2022 by Aby Raul Rivera Torres (Nate, Adam) (Entered: 01/25/2022) |
| 01/27/2022 | <u>26</u> | **ORDER granting <u>24</u> Motion to Continue as to Aby Raul Rivera Torres (1) Jury Trial continued to the APRIL 2022 TRIAL TERM, which commences APRIL 4, 2022, with a more precise trial date to follow. It is further ORDERED that the parties shall file a Joint Status Report on or before the fifteenth (15th) day of each month. Signed by Judge Mary S. Scriven on 1/27/2022. (CRB)** (Entered: 01/27/2022) |
| 02/04/2022 | <u>27</u> | MOTION to Suppress by Aby Raul Rivera Torres. (Attachments: # <u>1</u> Supplement, # <u>2</u> Supplement, # <u>3</u> Supplement)(Nate, Adam) (Entered: 02/04/2022) |
| 02/04/2022 | <u>28</u> | MOTION for Hearing *on Defendant's Motion to Suppress (Doc. 27)* by Aby Raul Rivera Torres. (Nate, Adam) (Entered: 02/04/2022) |
| 02/09/2022 | <u>29</u> | WAIVER of speedy trial through April 30, 2022 by Aby Raul Rivera Torres (Nate, Adam) (Entered: 02/09/2022) |
| 02/15/2022 | <u>30</u> | JOINT STATUS REPORT for February 2022 by USA as to Aby Raul Rivera Torres. (Thelwell, Lisa) Modified text on 2/16/2022 (ABC). (Entered: 02/15/2022) |
| 02/18/2022 | <u>31</u> | Unopposed MOTION to Extend Time to Time to Respond by USA as to Aby Raul Rivera Torres. (Thelwell, Lisa) Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 02/18/2022) |
| 02/22/2022 | 32 | **ENDORSED ORDER GRANTING <u>31</u> United States' Motion for Extension of Time. The Government shall have up to and including March 1, 2022 to respond to Defendant's Motion to Suppress Unlawful Seizure and Search of Cellphone. (Dkt. 27) Signed by Judge Mary S. Scriven on 2/22/2022. (APF)** (Entered: 02/22/2022) |
| 03/01/2022 | <u>33</u> | RESPONSE in Opposition by USA as to Aby Raul Rivera Torres re <u>27</u> MOTION to Suppress (Thelwell, Lisa) (Entered: 03/01/2022) |
| 03/14/2022 | <u>34</u> | STATUS REPORT *Joint* by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 03/14/2022) |
| 03/31/2022 | <u>35</u> | **APRIL 2022 TERM TRIAL CALENDAR. Signed by Judge Mary S. Scriven on 3/31/2022. (CRB)** (Entered: 03/31/2022) |
| 04/05/2022 | <u>36</u> | WAIVER of speedy trial through May 31, 2022 by Aby Raul Rivera Torres (Nate, Adam) (Entered: 04/05/2022) |
| 04/06/2022 | <u>37</u> | Unopposed MOTION to Continue trial by Aby Raul Rivera Torres. (Nate, Adam) (Entered: 04/06/2022) |
| 04/13/2022 | <u>38</u> | **ORDER DENYING <u>27</u> Defendant's Motion to Suppress Unlawful Seizure and Search of Cellphone; DENYING <u>28</u> Defendant's Motion for Evidentiary Hearing and Oral Argument on the Defendant's Motion to Suppress Unlawful Seizure and** |

| | | |
|---|---|---|
| | | Search of Cellphone. Signed by Judge Mary S. Scriven on 4/13/2022. (APF) (Entered: 04/13/2022) |
| 04/15/2022 | 39 | **ORDER granting 37 Motion to Continue as to Aby Raul Rivera Torres (1) Jury Trial continued to the May 2022 TRIAL TERM, which commences May 2, 2022, with a more precise trial date to follow. It is further ORDERED that the parties shall file a Joint Status Report on or before the fifteenth (15th) day of each month. Signed by Judge Mary S. Scriven on 4/15/2022. (CRB)** (Entered: 04/15/2022) |
| 04/15/2022 | 40 | STATUS REPORT *Joint* by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 04/15/2022) |
| 04/27/2022 | 41 | BILL of particulars as to Aby Raul Rivera Torres. (Nebesky, Suzanne) (Entered: 04/27/2022) |
| 04/29/2022 | 42 | **ORDER Setting Stipulated Facts Bench Trial as to Aby Raul Rivera Torres: Bench Trial set for 5/23/2022 at 09:30 AM in Tampa Courtroom 7 A before Judge Mary S. Scriven. The Government is directed to file a Notice of Essential Elements of the Offense on or before May 16, 2022. Signed by Judge Mary S. Scriven on 4/29/2022. (See Order for further details and deadlines)(CRB)** (Entered: 04/29/2022) |
| 04/29/2022 | 43 | **MAY 2022 TRIAL CALENDAR as to Aby Raul Rivera Torres: Bench Trial specially set for 5/23/2022 at 09:30 AM in Tampa Courtroom 7 A before Judge Mary S. Scriven. Signed by Judge Mary S. Scriven on 4/29/2022. (CRB)** (Entered: 04/29/2022) |
| 05/04/2022 | 44 | SUPERSEDING INDICTMENT returned in open court as to Aby Raul Rivera Torres (1) count(s) 1s, 2s–5s. (Attachments: # 1 Restricted Unredacted Indictment) (SEG) (Entered: 05/05/2022) |
| 05/05/2022 | 46 | NOTICE *of Essential Elements of Offense* by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 05/05/2022) |
| 05/05/2022 | 47 | NOTICE OF ATTORNEY APPEARANCE: Adam Joseph Nate appearing for Aby Raul Rivera Torres (Nate, Adam) (Entered: 05/05/2022) |
| 05/06/2022 | 48 | NOTICE OF HEARING as to Aby Raul Rivera Torres: Arraignment set for 5/20/2022 at 10:00 AM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. Note: Defendant and counsel are not required to appear provided the appropriate waiver of arraignment and entry of plea of not guilty are filed in a timely manner (Sample waiver attached).(CDR) (Entered: 05/06/2022) |
| 05/06/2022 | 49 | WAIVER of Personal Appearance at Arraignment and Entry of Plea of Not Guilty by Aby Raul Rivera Torres. Motion referred to Julie S. Sneed. (Nate, Adam) (Entered: 05/06/2022) |
| 05/09/2022 | 50 | **ENDORSED ORDER granting 49 Waiver of Presence at Arraignment as to Aby Raul Rivera Torres (1). Signed by Magistrate Judge Julie S. Sneed on 5/9/2022. (CDR)** (Entered: 05/09/2022) |
| 05/09/2022 | 51 | NOTICE canceling Arraignment hearing scheduled for 5/20/2022 as to Aby Raul Rivera Torres (Waiver Accepted). (CDR) (Entered: 05/09/2022) |
| 05/09/2022 | 52 | **PRETRIAL DISCOVERY ORDER and notice as to Aby Raul Rivera Torres. This case is set before the Honorable Mary S. Scriven, United States District Judge, for the June 2022 trial term beginning 6/6/2022 at 09:00 AM in Tampa Courtroom 7 A. In lieu of a scheduled status conference, the parties shall file on or before the 15th day of each month a joint status report. Signed by Magistrate Judge Julie S. Sneed on 5/9/2022. (CDR)** (Entered: 05/09/2022) |
| 05/09/2022 | 53 | TRIAL BRIEF by USA as to Aby Raul Rivera Torres (Nebesky, Suzanne) (Entered: 05/09/2022) |
| 05/09/2022 | 54 | NOTICE *of Filing Forfeiture Finding* by USA as to Aby Raul Rivera Torres (Nebesky, Suzanne) (Entered: 05/09/2022) |

| 05/09/2022 | 55 | STIPULATION by USA as to Aby Raul Rivera Torres *Stipulation of the Parties*. (Thelwell, Lisa) (Entered: 05/09/2022) |
|---|---|---|
| 05/17/2022 | 56 | STATUS REPORT *Joint Status Report May 2022* by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 05/17/2022) |
| 05/18/2022 | 57 | EXHIBIT LIST by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 05/18/2022) |
| 05/23/2022 | 58 | WITNESS LIST by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 05/23/2022) |
| 05/23/2022 | 59 | MINUTE ENTRY for 5/23/2022 in−person Bench Trial of Aby Raul Rivera Torres before Judge Mary S. Scriven. Court Reporter: Bill Jones (GSO) (Entered: 05/23/2022) |
| 05/23/2022 | 60 | WAIVER of Right to Trial by Jury as to Aby Raul Rivera Torres. (GSO) (Entered: 05/23/2022) |
| 05/23/2022 | 61 | ORAL MOTION to Admit Exhibits 1−7, by USA as to Aby Raul Rivera Torres. (GSO) (Entered: 05/23/2022) |
| 05/23/2022 | 62 | **ORAL ORDER granting 61 United States' Oral Motion to Admit Exhibits 1−7 as to Aby Raul Rivera Torres. Signed by Judge Mary S. Scriven on 5/23/2022. (GSO)** (Entered: 05/23/2022) |
| 05/23/2022 | 63 | ORAL MOTION for Judgment of Acquittal by Aby Raul Rivera Torres. (GSO) (Entered: 05/23/2022) |
| 05/23/2022 | 64 | **ORAL ORDER denying 63 Defendant's Oral Motion for Acquittal as to Aby Raul Rivera Torres (1). Signed by Judge Mary S. Scriven on 5/23/2022. (GSO)** (Entered: 05/23/2022) |
| 05/23/2022 | 65 | NOTICE OF HEARING as to Aby Raul Rivera Torres: Sentencing scheduled for August 24, 2022 at 9:30 AM in Tampa Courtroom 7A before Judge Mary S. Scriven. Counsel are reminded of the requirement to contact the Courtroom Deputy if this hearing is anticipated to take longer than thirty (30) minutes. Sentencing memoranda SHALL BE FILED IN EACH CASE and shall be filed no later than ten (10) business days prior to the date of the sentencing hearing. (GSO) (Entered: 05/23/2022) |
| 05/24/2022 | 66 | PROPOSED verdict form filed by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 05/24/2022) |
| 06/02/2022 | 67 | EXHIBIT LIST, filed by USA at the 5/23/2022 Bench Trial. Because Exhibits 1−6 contain sensitive materials, a CD of the exhibits is located in the Clerk's Office. (Attachments: # 1 Exhibit 7) (GSO) (Entered: 06/02/2022) |
| 06/08/2022 | 68 | **COURT VERDICT as to Aby Raul Rivera Torres (1) Guilty on Count 1s, 2s−5s,: Signed by Judge Mary S. Scriven on 5/23/2022.(MEJ)** (Entered: 06/08/2022) |
| 06/29/2022 | 69 | MOTION for Forfeiture of a Preliminary Order by USA as to Aby Raul Rivera Torres. (Nebesky, Suzanne) (Entered: 06/29/2022) |
| 07/18/2022 | 70 | **PRELIMINARY ORDER OF FORFEITURE granting 69 Motion for Preliminary Order of Forfeiture as to Aby Raul Rivera Torres (1). Signed by Judge Mary S. Scriven on 7/18/2022. (KAC)** (Entered: 07/18/2022) |
| 08/12/2022 | 74 | SENTENCING MEMORANDUM by Aby Raul Rivera Torres (Nate, Adam) (Entered: 08/12/2022) |
| 08/12/2022 | 75 | SENTENCING MEMORANDUM by USA as to Aby Raul Rivera Torres (Thelwell, Lisa) (Entered: 08/12/2022) |
| 08/24/2022 | 77 | Minute Entry for In Person proceedings held before Judge Mary S. Scriven: SENTENCING held on 8/24/2022 for Aby Raul Rivera Torres, Underlying Indictment is dismissed on the motion of the United States. Counts 1s, 2s−5s, Imprisonment: 1320 MONTHS. This term consists of a 360−month term as to Count One and a 240−month term as to Counts Two, Three, Four, and Five, all such terms to run consecutively to each other; Supervised Release: 10 YEARS. This term consists of a 10−year term as to Counts One, Two, Three, Four, and Five, all such terms to run |

| | | |
|---|---|---|
| | | concurrently; Fine is waived; Restitution: To be determined at a later date; Special Assessment: $500.00, to be paid immediately. Court Reporter: David Collier (MEJ) (Entered: 08/26/2022) |
| 08/25/2022 | 76 | PROOF OF PUBLICATION as to Aby Raul Rivera Torres newspaper: Official Government Internet Site (www.forfeiture.gov) dates of publication: 30 consecutive days from July 19, 2022 through August 17, 2022. (Nebesky, Suzanne) (Entered: 08/25/2022) |
| 09/02/2022 | 78 | **JUDGMENT as to Aby Raul Rivera Torres (1),Count(s) 1s, 2s–5s, Imprisonment: 1320 MONTHS. This term consists of a 360–month term as to Count One and a 240–month term as to Counts Two, Three, Four, and Five, all such terms to run consecutively to each other; Supervised Release: 10 YEARS. This term consists of a 10–year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently; Fine is waived; Restitution: To be determined at a later date; Special Assessment: $500.00, to be paid immediately. Underlying Indictment is dismissed on the motion of the United States. Signed by Judge Mary S. Scriven on 9/2/2022. (MEJ)** (Entered: 09/02/2022) |
| 09/06/2022 | 80 | NOTICE OF APPEAL by Aby Raul Rivera Torres re 78 Judgment. Filing fee not paid (Nate, Adam) (Entered: 09/06/2022) |
| 09/07/2022 | 84 | TRANSMITTAL of initial appeal package as to Aby Raul Rivera Torres to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 80 Notice of Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (LSS) (Entered: 09/07/2022) |
| 09/09/2022 | | USCA Case Number as to Aby Raul Rivera Torres. USCA Number: 22–12996–A for 80 Notice of Appeal filed by Aby Raul Rivera Torres. (AG) (Entered: 09/09/2022) |
| 09/14/2022 | 85 | NOTICE OF ATTORNEY APPEARANCE: Michelle Rachel Yard appearing for Aby Raul Rivera Torres *for Appellate Purposes Only* (Yard, Michelle) (Entered: 09/14/2022) |
| 09/14/2022 | 86 | TRANSCRIPT information form filed by Aby Raul Rivera Torres for proceedings held on 05/23/2022 before Judge Mary S. Scriven re 80 Notice of Appeal. USCA number: 22–12996. (Yard, Michelle) (Entered: 09/14/2022) |
| 09/14/2022 | 87 | TRANSCRIPT information form filed by Aby Raul Rivera Torres for proceedings held on 08/24/2022 before Judge Mary S. Scriven re 80 Notice of Appeal. USCA number: 22–12996. (Yard, Michelle) (Entered: 09/14/2022) |
| 09/16/2022 | 88 | TRANSCRIPT information form filed by Aby Raul Rivera Torres for proceedings held on 11/15/2021 before Judge Elizabeth A. Jenkins re 80 Notice of Appeal. USCA number: 22–12996. (Yard, Michelle) (Entered: 09/16/2022) |
| 09/20/2022 | 89 | MOTION for Forfeiture of a Final Order by USA as to Aby Raul Rivera Torres. (Nebesky, Suzanne) (Entered: 09/20/2022) |
| 09/26/2022 | 90 | COURT REPORTER ACKNOWLEDGMENT by Bill Jones re 80 Notice of Appeal as to Aby Raul Rivera Torres. Estimated transcript filing date: 10–14–22. USCA number: 22–12996–A. (HWJ) (Entered: 09/26/2022) |
| 10/18/2022 | 91 | TRANSCRIPT of Non–Jury Trial for dates of 05–23–22 held before Judge Mary S. Scriven, re: 80 Notice of Appeal as to Aby Raul Rivera Torres. Court Reporter/Transcriber Bill Jones, Telephone number 8133016158. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/8/2022 Redacted Transcript Deadline set for 11/18/2022 Release of Transcript Restriction set for 1/17/2023. (HWJ) (Entered: 10/18/2022) |
| 10/18/2022 | 92 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any |

| | | |
|---|---|---|
| | | party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Aby Raul Rivera Torres. Court Reporter: Bill Jones (HWJ) (Entered: 10/18/2022) |
| 10/19/2022 | 93 | TRANSCRIPT of Initial Appearance/Detention Hearing for dates of 11–15–21 held before Judge Elizabeth Jenkins, re: 80 Notice of Appeal as to Aby Raul Rivera Torres. Court Reporter/Transcriber Bill Jones, Telephone number 8133016158. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/9/2022 Redacted Transcript Deadline set for 11/21/2022 Release of Transcript Restriction set for 1/17/2023. (HWJ) (LSS). (Entered: 10/19/2022) |
| 10/19/2022 | 94 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Aby Raul Rivera Torres. Court Reporter: Bill Jones (HWJ) (Entered: 10/19/2022) |
| 10/21/2022 | 95 | COURT REPORTER ACKNOWLEDGMENT by David J. Collier re 80 Notice of Appeal as to Aby Raul Rivera Torres. Estimated transcript filing date: 10–16–2022. USCA number: 22–12996–A. (DJC) (Entered: 10/21/2022) |
| 10/21/2022 | 96 | TRANSCRIPT of sentencing hearing for date of August 24, 2022 held before District Judge Mary S. Scriven, re: 80 Notice of Appeal as to Aby Raul Rivera Torres. Court Reporter David Walker–Collier, Telephone number (813) 301–5575. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 11/14/2022 Redacted Transcript Deadline set for 11/21/2022 Release of Transcript Restriction set for 1/19/2023. (DJC) (Entered: 10/21/2022) |
| 10/21/2022 | 97 | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal as to Aby Raul Rivera Torres. Court Reporter: David Collier (DJC) (Entered: 10/21/2022) |
| 10/21/2022 | 98 | NOTIFICATION that transcript has been filed by David J. Collier re: 80 Notice of Appeal as to Aby Raul Rivera Torres USCA number: 22–12996–A (DJC) (Entered: 10/21/2022) |
| 11/21/2022 | 99 | MOTION to Extend Time to file Stipulation of Restitution by USA as to Aby Raul Rivera Torres. (Thelwell, Lisa) Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 11/21/2022) |
| 12/07/2022 | 100 | **ENDORSED ORDER granting 99 Joint Motion for Extension of Time by United States as to Aby Raul Rivera Torres. The United States may file its stipulation of restitution no later than January 24, 2023. Signed by Judge Mary S. Scriven on 12/7/2022. (CRB)** (Entered: 12/07/2022) |
| 01/06/2023 | 101 | **FINAL ORDER OF FORFEITURE granting 89 Motion for Forfeiture of Property as to Aby Raul Rivera Torres (1). Signed by Judge Mary S. Scriven on 1/6/2023. (CRB)** (Entered: 01/06/2023) |

# Doc. 15

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2021 DEC 15  PM 3:41

UNITED STATES OF AMERICA

v.

CASE NO. 8:21 cr 397 MSS - JSS

18 U.S.C. § 2251(a)
18 U.S.C. § 2252(a)(2)

ABY RAUL RIVERA TORRES

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

On or about August 2, 2021, in the Middle District of Florida, and elsewhere,
the defendant,

ABY RAUL RIVERA TORRES,

did employ, use, persuade, induce, entice, and coerce a minor to engage in any

sexually explicit conduct for the purpose of producing a visual depiction of such

conduct, knowing and having reason to know that such visual depiction would be

transported and transmitted using any means and facility of interstate and foreign

commerce and the visual depiction was actually transported and transmitted using

any means and facility of interstate and foreign commerce.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT TWO

On or about July 20, 2021, in the Middle District of Florida, and elsewhere,
the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate

and foreign commerce, when the production of the visual depiction involved the use

of a minor engaging in sexually explicit conduct, and the visual depiction was of

such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## COUNT THREE

On or about July 22, 2021, in the Middle District of Florida, and elsewhere,

the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate

and foreign commerce, when the production of the visual depiction involved the use

of a minor engaging in sexually explicit conduct, and the visual depiction was of

such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## COUNT FOUR

On or about August 2, 2021, in the Middle District of Florida, and elsewhere,

the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate

and foreign commerce, when the production of the visual depiction involved the use

of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## FORFEITURE

1.     The allegations contained in Counts One through Four are incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 2253.

2.     Upon conviction of a violation of 18 U.S.C. §§ 2251(a) and 2252(a)(2), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 2253:

a.   Any visual depiction described in 18 U.S.C. §§ 2251, 2251A, or 2252, 2252A, 2252B, or 2260 of chapter 110 of Title 18, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of chapter 110;

b.   Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

c.   Any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

3.     The property to be forfeited includes, but is not limited to, the following: a black Samsung cellphone.

4.     If any of the property described above, as a result of any act or omission of the defendant:

3

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third person;

   c.  has been placed beyond the jurisdiction of the Court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be
      subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant

to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2253(b).

        A TRUE BILL,

        Foreperson

KARIN HOPPMANN
Acting United States Attorney

By: 

Lisa M. Thelwell
Assistant United States Attorney

By: 

Christopher F. Murray
Assistant United States Attorney
Deputy Chief, Criminal Division

4

FORM OBD-34
December 21

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.

## ABY RAUL RIVERA TORRES

## INDICTMENT

Violations:   18 U.S.C. § 2251(a)
18 U.S.C. § 2252(a)(2)

A true bill,

███████████████████████

Foreperson

Filed in open court this 15th day
of December, 2021.

_____

Clerk

Bail $_____

GPO 863 525

# DOC. 27

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **Case No: 8:21-cr-397-MSS-JSS**

**ABY RAUL RIVERA TORRES**

———————————————— __ ————/

## DEFENDANT'S MOTION TO SUPPPRESS
## UNLAWFUL SEIZURE AND SEARCH OF CELLPHONE

The Defendant, Mr. Aby Raul Rivera Torres ("Mr. Rivera Torres"), by and through his undersigned counsel, Mr. Adam J. Nate, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Rule 12(b)(3)(C) of the Fed. R. Crim. P., respectfully moves this Honorable Court to enter an order suppressing the following evidence unlawfully seized and searched in this case, to wit: Black Samsung Cellphone, IMEI: 355464111349022 (i.e., "TARGET CELLPHONE") and any and all evidence, information, records, materials, data, documentation, storage, applications, software, programs, logs, internet searches, browsing history, and any other items in whatever form and by whatever means they may have been created or stored (including any form of electronic storage such as on a SIM card and any photographic or video forms) and the like that was found, discovered, extracted, removed, and/or observed and the like as a result of the cellphone's unlawful seizure and search.

As grounds in support of this motion, Mr. Rivera Torres states the following:

1.     On November 13, 2021, at approximately 1:00 p.m., law enforcement officers were conducting surveillance of the residence located at 2282 Opal Lane, Spring Hill, FL, 34608 ("Target Residence").

2.     Mr. Rivera Torres, his girlfriend Nicole Elaine Acosta ("Acosta"), and minor children live at the Target Residence.

3.     Acosta has two minor children who primarily reside with her at the Target Residence but spend some weekends at the home of their biological father, Acosta's ex-boyfriend, who lives in Tampa, FL.

4.     Mr. Rivera Torres and Acosta have known one another for approximately sixteen years, maintained a romantic relationship for one year, and Mr. Rivera Torres lived with Acosta at the Target Residence on weekends and other times when he was not working as a truck driver, sleeping in his truck, or staying with his father in Tampa, FL.

5.     Acosta confirmed that Mr. Rivera Torres sometimes watched the minor children when she is away from the Target Residence.

6.     During an interview with law enforcement officers one of Acosta's minor children who reside at the Target Residence stated that Mr. Rivera Torres began living at the Target Residence about one year ago.

7.     Mr. Rivera Torres purchased and owns a boat that he stores at the Target Residence.

8.     Mr. Rivera Torres also owns a Suzuki motorcycle which he often drives to and from work, and stored approximately $3,000 in cash at the Target Residence.

9.     Law enforcement officers were conducting surveillance of the Target Residence based on alleged probable cause to arrest Mr. Rivera Torres, who lived at the Target Residence, for allegations related to the production of child pornography in violation of 18 U.S.C. § 2251.

10.    Law enforcement officers were conducting surveillance of the Target Residence while awaiting judicial telephonic/electronic authorization for three federal search warrant applications:

- Search Warrant One: for a cellphone ("Target Cellphone") belonging to Mr. Rivera Torres (Attachment 1);

- Search Warrant Two: for the person of Mr. Rivera Torres (Attachment 2); and

- Search Warrant Three: for the Target Residence (Attachment 3).

11.    While conducting surveillance of the Target Residence, law enforcement officers observed Mr. Rivera Torres outside of the Target Residence inside of a boat that was secured to a trailer in the driveway outside of the Target Residence.

12.     Three minor children, all under the age of 13, were standing on the ground outside the Target Residence near and around the boat.

13.     Law enforcement officers approached Mr. Rivera Torres, seized him, ordered him out of the boat, detained him, handcuffed him, searched him, and placed him into the rear passenger seat of the vehicle from which the law enforcement officers were conducting surveillance of the Target Residence.

14.     Law enforcement officers began interrogating Mr. Rivera Torres in the vehicle.

15.     At approximately 1:30 p.m., the three search warrant applications referenced in paragraph 10, above, received telephonic/electronic judicial authorization.

16.     Sometime shortly after 1:30 p.m., a law enforcement officer ("LEO 1") exited the vehicle where he and other law enforcement officers were interrogating Mr. Rivera Torres and walked toward the front of the Target Residence and began the execution of the search warrant of the Target Residence.

17.     While standing outside the Target Residence, LEO 1 asked the three minor children, who were still near and around the outside of the Target Residence, if any one of them had seen Mr. Rivera Torres with his cellphone.

18.     Upon being questioned by LEO 1 the three minor children claimed that they had seen Mr. Rivera Torres with his cellphone inside the Target Residence and, with the permission and authorization of law enforcement officers, entered the Target Residence to attempt to show law enforcement officers where they had allegedly seen Mr. Rivera Torres using the cellphone inside the Target Residence.

19.     More specifically, the minor children aided law enforcement officers in executing the search warrant of the Target Residence by directing law enforcement officers to search the living room couches and the recliners inside the Target Residence.

20.     Neither of the three minor children were able to locate the Target Cellphone inside the Target Residence on behalf of and for law enforcement officers.

21.     While none of the three minor children were able to locate the Target Cellphone inside the Target Residence, one of the minor children verbally stated to law enforcement officers she knew where to look for the Target Cellphone next, left the Target Residence, entered the boat that was parked in the driveway outside of the Target Residence, and located and seized the Target Cellphone inside the boat near the helm.

22.     Law enforcement officers took possession of the seized Target Cellphone from the minor child.

23.     LEO 1 confronted Mr. Torres inside the vehicle where he was being interrogated, informed him law enforcement officers had found the seized Target Cellphone, and confirmed he wished to continue the interrogation.

24.     After being confronted with the seized Target Cellphone, Mr. Rivera Torres provided law enforcement officers with the design password for the Target Cellphone.

25.     LEO 1 called the number he believed was associated with the seized Target Cellphone and it rang.

26.     Later, during his interrogation at a Federal Bureau of Investigation office, Mr. Rivera Torres was allegedly "willing" to aid law enforcement officers with a search of the seized Target Cellphone.  For example, Mr. Rivera Torres unlocked the seized Target Cellphone and allowed a law enforcement officer to change a passcode.

## **MEMORANDUM OF LAW**

27.     The Defendant has standing to challenge the unlawful search of his boat that led to the discovery of the Target Cellphone, the unlawful seizure of the Target Cellphone, and the subsequent unlawful search of the Target Cellphone and its contents.

28.   "A defendant has standing to challenge a warrantless search if the defendant had a 'legitimate expectation of privacy' in the property when it was searched."   *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, (1978)).

29.   Where a defendant does not own or lease the property that was searched, the defendant must "demonstrate a significant and current interest in the searched premises[.]"   *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984). Courts look to various factors to determine whether there is a sufficient interest, including whether the defendant (1) stores belongings at the property, (2) has a "measure of control" and ability to exclude others, and (3) stays at the property for extended periods of time, such as an overnight guest.   *See United States v. Bossio*, 824 Fed.Appx. 818, 821 – 822 (11th Cir. 2020).

30.   Mr. Rivera Torres possessed a sufficiently reasonable expectation of privacy in the Target Residence and the boat.  Mr. Rivera Torres was in a long-term romantic relationship with Acosta (who lived at the Target Residence full-time) for approximately one year, he lived at the Target Residence for approximately one year on most weekends and other occasions while he was not working, he sometimes supervised Acosta's minor children when she was away, he stored his motorcycle and cash and other belongings at the Target Residence, and stored his boat outside

the Target Residence, all of which establishes that Mr. Rivera Torres' standing in this case. *See United States v. Chaves*, 169 F.3d 687, 690 – 691 (11th Cir. 1999).

31.     The boat in the driveway of the Target Residence was not named in the search warrant for the Target Residence, the boat was not subject to search by law enforcement officers as they did not have judicial authorization to search the boat in absence of a search warrant, and no exceptions to the warrant requirement apply.

32.     "In order to have evidence suppressed based on a violation of the Fourth Amendment, a claimant has the burden of proving (1) that the search was unlawful and (2) that the claimant had a legitimate expectation of privacy." *United States v. McKennon*, 814 F.2d 1539, 1542 (11th Cir. 1987) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)).

33.     The Fourth Amendment requires that a search warrant "particularly describ[e] the place to be searched." U.S. CONST., amend. IV.

34.     The search warrant related to the Target Residence (Attachment 3) repeatedly identified the place to be searched as the "Target Residence" and offered the following description of the location to be searched:

> The location is known as 2282 Opal Lane, Spring Hill, FL 34608 **("TARGET RESIDENCE"),** and is identified as follows: The **TARGET RESIDENCE** is brown in color with a white iron entrance gate and two-car driveway. The numbers "2282" are displayed in the top center of the two-car garage. The **TARGET RESIDENCE** is located in Spring Hill, Hernando County, Florida, which is in the Middle District of Florida [emphasis original].

35.     A photograph attached to the search warrant for the Target Residence (Attachment 3) shows a boat on a trailer parked outside the Target Residence in the driveway but never identifies the boat as subject to the scope of the search warrant.

36.     The Fourth Amendment's particularity requirement is designed to prevent "general searches." *Maryland v. Garrison*, 480 U.S. 79, 83 (1987). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.*

37.     When Mr. Rivera Torres' boat was searched it was done so outside the scope of the search warrant for the Target Residence (Attachment 3), and was therefore illegal. The boat, a spatially separate unit situated outside the Target Residence in an open and unenclosed area of the driveway, was not part of the Target Residence, the home, or the "curtilage," and no exceptions to the warrant requirement exist, including but not limited to the automobile exception or the inevitable discovery exception.[1]

---

[1] Driveways can be considered part of the curtilage of a home, but should not automatically be deemed so. *See Collins v. Virginia*, 138 S. Ct. 1663, 1670 – 1671 (2018) (holding that a partially enclosed area at the top of a driveway adjacent to the home was curtilage where the area was located behind the front perimeter of the house, was enclosed on two sides by a brick wall and on the third side by the house, had direct access to the house through a side door that formed part of the enclosure, and was not part of the path that a visitor would take from the street to the front door of the house); *United States v. Stephen*, 823 Fed.Appx. 751, 755 (11th Cir. 2020) (no clear error in court's determination that the portion of the driveway where the defendant was detained and

38.   The Fourth Amendment proscribes only governmental action. Accordingly, it does not apply to a search conducted by a private individual, even if that search constitutes an invasion of another individual's privacy. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

39.   The Fourth Amendment is implicated, however, where a private individual acts as a government agent or instrument. *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).

40.   Courts consider two factors when determining if a private person should be regarded as a government agent: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *Id.*

41.   As to what constitutes knowledge or acquiescence of the government, especially where an individual obtains evidence and provides evidence after speaking with and/or aiding law enforcement officers, the Eleventh Circuit has cited approvingly a Tenth Circuit opinion recognizing that the "knowledge and acquiesce"

---

searched was not part of the home's curtilage); *United States v. Alexander*, 888 F.3d 628, 633 – 634 (2d Cir. 2018) (holding the driveway area in front of defendant's backyard shed that was just a few steps from the back door of the defendant's residence was curtilage). A driveway may not be curtilage in instances where it is "adjacent to a home, not enclosed, abutting a sidewalk or alley, with no steps taken to obstruct the view of passersby." *United States v. Coleman*, 923 F.3d 450, 456 – 457 (6th Cir. 2019) (citing *United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011)); *See also United States v. Estes*, 343 Fed.Appx. 97, 101 (6th Cir. 2009) (the driveway was not curtilage because it was not enclosed, the defendant had not taken any steps to protect it from observation by passersby, and it was used as a point of entry to the defendant's residence).

factor "encompass[es] the requirement that the government agent must affirmatively encourage, initiate or instigate the private action." *See United States v. Emile*, 618 Fed.Appx. 953, 955 (11th Cir. 2015) (quoting *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996)).

42. The Eleventh Circuit approach follows that of other circuits to confront this issue. *See, e.g., United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003) ("[W]e have required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship."); *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir. 1988) ("It is only by the exercise of some form of control that the actions of one may be attributed to another. Mere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control."); *Walther v. United States*, 652 F.2d 788, 792 (9th Cir. 1981) ("Mere governmental authorization of a particular type of private search in the absence of more active participation or encouragement is similarly insufficient to require the application of Fourth Amendment standards.").

43. In considering whether a private individual is acting as a government agent, the Court should consider "whether the Government was involved directly as a participant in the search or seizure or involved indirectly by compelling or substantially encouraging the private party's actions." *See United States v. Goldin*,

1996 WL 294366, at 13 (S.D. Ala. 1996) (citing *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)).

44.   In Mr. Rivera Torres' case, law enforcement officers obviously knew of and acquiesced to the intrusive conduct at issue.  Law enforcement officers originally and actively initiated contact with the three minor children outside the Target Residence, questioned them, and specifically recruited them to help search for the Target Cellphone inside the Target Residence.  When that search for the Target Cellphone by the minor children and law enforcement officers was not successful, law enforcement officers then heard the verbal intent of one of the minor children to continue the search for the Target Cellphone elsewhere and acquiesced to the conduct of that minor child leaving the Target Residence and conducting the unlawful search of the boat in the driveway.

45.   As to whether the private actor's purpose was to assist law enforcement efforts rather than to further their own ends, the minor children in Mr. Rivera Torres' case who assisted law enforcement officers in the execution of the search warrant did not do so to further their own ends.  It was law enforcement officers who first initiated contact with the minor children outside the Target Residence, it was law enforcement officers who questioned the minor children as to their knowledge of the possible whereabouts of the Target Cellphone within the Target Residence, and it was law enforcement officers who coordinated the search of the Target Residence

for the Target Cellphone with the minor children.  One of the minor children then continued helping law enforcement officers executing the search warrant – while having no legitimate and independent motive do so other than to continue fulfilling the original request of law enforcement officers to help search – and in doing so exceeded the scope of the search warrant when the minor child, as a government agent, unlawfully entered the boat and searched it for the Target Cellphone.  *See United States v. Walther*, 652 F.2d 788, 792 (9th Cir. 1981); *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994); *United States v. Cleveland*, 38 F.3d 1092, 1094 (9th Cir. 1994).

46.     Therefore, during the search of the Target Residence and the search of the boat the minor children were acting as government agents, and because the search of Mr. Rivera Torres' boat by the minor child exceeded the scope of the search warrant it was unlawful under the Fourth Amendment, the minor child-government agent seizure of the Target Cellphone inside the boat was unlawful as "fruit of the poisonous tree," and both the seizure and subsequent search of the Target Cellphone should be suppressed.

## CONCLUSION

47.     Based on the violations of Mr. Rivera Torres' Fourth and Fourteenth Amendment rights related to the boat in the driveway outside of the Target Residence, this Court should enter an order suppressing the following evidence

unlawfully seized and searched: the Target Cellphone, which is a Black Samsung

Cellphone (IMEI: 355464111349022), and any and all evidence, information,

records, materials, data, documentation, storage, applications, software, programs,

logs, internet searches, browsing history, and any other items in whatever form and

by whatever means they may have been created or stored (including any form of

electronic storage such as on a SIM card and any photographic or video forms) and

the like that was found, discovered, extracted, removed, and/or observed and the like

as a result of the cellphone's unlawful seizure and search.

      Respectfully submitted this 4th day of February, 2022.

**A. FITZGERALD HALL, ESQ.**
**FEDERAL DEFENDER**

**_/s/ Adam J. Nate_**

Adam J. Nate
Florida Bar No.0077004
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida  33602
Telephone:  (813) 228-2715
E-mail:     Adam_Nate@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of February, 2022, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Ms. Lisa M. Thelwell, Assistant United States Attorney

**<u>/s/ Adam J. Nate</u>**

Adam J. Nate
Assistant Federal Defender

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH
OF A CELLPHONE WITH PHONE
NUMBER 832-570-3410 BELONGING
TO ABY RAUL RIVERA TORRES

Case No. **8:21MJ2123SPF**

**Filed Under Seal**

## MOTION TO SEAL

The United States of America respectfully moves to seal (1) the application for

search warrant and attached affidavit, (2) the warrant, (3) this motion to seal, and (4)

any resulting orders, and in support thereof says as follows:

These documents relate to an ongoing investigation. Disclosure of the contents

of these documents may cause the targets of the related investigation to take steps to

thwart investigative techniques, destroy evidence, identify and retaliate against

witnesses, and/or flee from prosecution.

WHEREFORE, the United States respectfully moves the Court to seal (1) the

application for search warrant and attached affidavit, (2) the warrant, (3) this motion

to seal, and (4) any resulting orders, until an arrest of a target of the investigation, or

for a period of one year, whichever comes first.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By: _____
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 0100809
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lisa.Thelwell@usdoj.gov

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH
OF A CELLPHONE WITH PHONE
NUMBER 832-570-3410 BELONGING
TO ABY RAUL RIVERA TORRES

Case No.   **8:21MJ2123 SPF**

**Filed Under Seal**

## ORDER

Upon the written motion of the United States of America to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders:

The Court finds that the interests of justice require that the documents be sealed; therefore

IT IS ORDERED that the Motion to Seal is Granted;

IT IS FURTHER ORDERED that (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders, be sealed until the arrest of a target of the investigation, or for a period of one year, whichever comes first;

DONE AND ORDERED at TAMPA, Florida this 13th day of November, 2021.

THE HONORABLE SEAN P. FLYNN
United States Magistrate Judge

Copy to:  AUSA Lisa M. Thelwell

---

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

A cellphone with phone number 832-570-3410
belonging to Aby Raul Rivera Torres

Case No.   **8:21MJ2123 SPF**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1

located in the _____ Middle _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of Child Pornography |
| 18 U.S.C. § 2252(a)(2) | Distribution of Child Pornography |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of Child Pornography |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Goodhue Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  11/13/2021

*Judge's signature*

City and state:   Tampa, Florida      SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Michael R. Goodhue, being sworn to tell the truth, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2008. I am presently assigned to the Tampa Division's Child Exploitation and Human Trafficking Task Force. In this capacity, I am responsible for conducting criminal investigations of statutes contained in Title 18 of the United States Code, including crimes related to child sex trafficking, child pornography and the sexual exploitation of children, among other violations of federal law.

2.     From March 2009 to the present, I have worked crimes against children violations in various capacities in the Philadelphia Division, FBI Headquarters Violent Crimes Against Children Unit, and the Miami Division. I have participated in investigations of persons suspected of violating federal child pornography and child sex trafficking laws, including 18 U.S.C. §§ 2251, 2252, 2422, and 1591. These investigations have included the use of surveillance techniques, the interviewing of subjects and witnesses, and the planning and execution of arrest, search, and seizure warrants. In the course of these investigations, I have reviewed images and videos containing child pornography and images depicting minor children engaged in sexually explicit conduct on various forms of electronic media including computers, digital cameras, and wireless telephones, and have discussed and reviewed these materials with other law enforcement officers. I have also received and provided training on crimes against children matters at various conferences and venues.

1

3.     This affidavit is submitted in support of an application for the issuance of three search warrants: (1) a cellphone belonging to Aby Raul Rivera Torres ("**TARGET CELLPHONE**"); (2) the person of Aby Raul Rivera Torres ("**TORRES**"); and 2282 Opal Lane, Spring Hill, FL 34608 ("**TARGET RESIDENCE**"); all of which are more fully described in separate Attachments A-1, A-2, and A-3. As set forth in more detail below, there is probable cause to believe that **TORRES** has violated 18 U.S.C. §§ 2251(A), (production of child pornography), 2252(a)(2) (distribution of child pornography), and 2252(a)(4) (possession of child pornography).

4.     I am requesting authority to search the person of **TORRES** for the purpose of seizing the **TARGET CELLPHONE**. I am also requesting authority to search the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as well as any cellular telephone device, computer and computer media, and electronic storage devices located therein. I am also requesting authority to seize all items listed in Attachment B-1 and B-3 as instrumentalities, fruits, and/or evidence of criminal activity.

5.     The facts contained in this affidavit are drawn from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law-enforcement officers, information from agency reports, and the review of documents provided to me by witnesses and by law enforcement officers. Because this affidavit is being submitted for the limited purpose

2

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 37 of 221

of seeking authorization to search **TORRES**, the **TARGET CELLPHONE**, and **TARGET RESIDENCE**, I have not set forth each and every fact learned during the course of this investigation.

## DEFINITIONS

6.     The following definitions apply to this Affidavit and Attachment B-1 and B-3:

a.     The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of 18.

b.     "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly in a format that resembles an oral conversation. This feature distinguishes "chatting" from other text-based online communications, such as, internet forums and email.

c.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

d.     "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) to include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or

DISC-00268

computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.

e.     "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means that are capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

f.     "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

g.     "Computer passwords and data security devices," as used herein, consists of information or items designed to restrict access to or to hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (*i.e.*, a string of alphanumeric and/or other characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress,

DISC-00269

hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h.    "Fingerprint sensor-enabled device" refers to the automated method of verifying a match between two human fingerprints. Fingerprints are one of many forms of biometrics used to identify individuals and to verify their identity.

i.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, electronic mail ("email"), remote storage, and co-location of computers and other communications equipment.

j.    "Mobile applications," as used herein, are specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including, such as, engaging in online chat, reading a book, or playing a game.

k.    "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

### BACKGROUND ON COMPUTERS, CELLPHONES, AND CHILD PORNOGRAPHY

7.    Computer technology has revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornography was once produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to

DISC-00270

develop and to reproduce the images. There were definable costs involved with the production of pornographic images. Consequently, distributing such media on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  Distribution, accordingly, was accomplished through a combination of personal contacts, mailings, and telephone calls. The development of computers has changed this.  Now, computers serve multiple functions in connection with child pornography, including, principally: production, communication, distribution, and storage.

8.    Child pornographers can now transfer photographs onto a computer-readable format with a scanner. With the advent of digital cameras, they can now also transfer such images directly onto a computer. A device known as a modem allows any computer to connect to another computer by telephone, cable, or wireless connection. Such electronic contact can connect literally millions of computers around the world.

9.    The computer's and cellphone's ability to store images in digital form makes the computer, itself, an ideal repository for child pornography. Within the last decade, the size of the electronic storage media, commonly known as a hard drive, on home computers has grown tremendously. Consequently, hard drives can now easily store thousands of images at very high resolution.

10.    The Internet affords collectors of child pornography several different venues to obtain, view, and/or trade child pornography in a relatively secure and anonymous fashion.

DISC-00271

11.     Collectors and distributors of child pornography also use online resources to retrieve and to store child pornography, including services offered by Internet Portals such as Google, Yahoo!, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Often, evidence of such online storage of child pornography is also found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can still be found on the user's computer in most cases.

12.     Digital files, such as, movies and pictures, can also be easily transferred between computers, smart phones, and other devices, or stored simultaneously on multiple devices. Collectors of child pornography often keep their child pornography in multiple places, including on multiple devices.

13.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*e.g.*, by saving an e-mail as a file on the computer or by saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be unintentionally retained (*e.g.*, traces of a path of an electronic communication may be automatically stored in many places, such as, in temporary files or ISP client software). In addition to electronic communications, a computer user's activities on the Internet generally leave traces, "footprints," and/or history files of the browser used. A forensic examiner often can recover evidence

suggesting whether a computer contains wireless software, whether it was using Yahoo! Messenger, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

14.     Cellular phones and cellular phone technology have further revolutionized the way in which individuals interested in child pornography interact with each other. Today's cellular phones, many of which are called "smart phones," are typically capable of storing a wide variety of data. Such data includes not only telephone numbers, contact lists, addresses, voicemails, and/or text messages, but also images, videos, documents, and programs (often referred to as "applications" or "apps") in much the same way a desktop or laptop computer does.

15.     Data can also be stored on a cellular phone, particularly when it has a high-storage capacity, just like a computer. The storage capacity for a cellular phone includes both internal and removable digital memory. Today's cellular phones can offer up to 128 gigabytes of storage, or more. Removable memory storage can significantly increase, if not double, that storage capacity. As a result, cellular phones can store thousands of high-resolution images and videos. Further, the phones have the ability to be synced with, or connected to, a computer, which allows the user to transfer files between the devices.

16.     Cellular phones are also typically able to access the Internet through either a wireless data plan and/or through a wireless (also known as "wi-fi") Internet connection. This allows cellular phone users to perform many Internet functions on

their phones, such as, downloading and uploading data (*e.g.*, images, videos) from the Internet, sending and receiving emails, accessing web pages, browsing the Internet, using instant messaging services, and conducting live video chat. Consequently, cellular phones—given their ability to access the Internet and to download images and/or videos onto its internal and removable digital memory—are ideal repositories for child pornography, just like computers, and provide child pornographers with an additional method to share and to trade their child pornography collections.

17. Cellular phones can also take pictures or "images," which are stored as image files, such as, "JPEGs" or "TIFFs." Image files often contain Exchangeable Image File Format ("EXIF") data. EXIF data can include a variety of information about the image, including, for example, the time and date that the image was taken, the place where an image was taken (also known as "geolocation data"), the settings that the device used to capture the image, the model of the camera phone that was used to take the image, the focal length of the lens, aperture settings, shutter speed, and ISO speed.

## BACKGROUND ON KIK

18. Kik is a web-based instant messaging mobile application that allows users to transmit and receive messages, photos, and videos. Users can communicate privately with other users or in groups.

19. Unlike many other smartphone messaging services that are based on a user's phone number, Kik uses usernames as the unique identifier. By using usernames instead of phone numbers, users' personal information is never shared by Kik.

20. Kik usernames have the following characteristics: are unique; can never be replicated; can never be changed; may include lower and uppercase letters, numbers and/or periods and underscores; and will never contain spaces, emoticons or special characters.

21. Kik is available for download through the iOS App Store and the Google Play store on most iOS (iPhone/iPod/and iPad) and Android (including Kindle Fire) devices. Users may also be using Kik on their Windows, Symbian-based or BlackBerry OS.

## PROBABLE CAUSE

22. On or about July 26, 2021, the FBI Oklahoma City Division, Tulsa Resident Agency (Tulsa RA) arrested and charged an individual ("Defendant 1") with child pornography related charges in the Northern District of Oklahoma. During a post-*Miranda* interview, Defendant 1 provided consent allowing agents to access his Kik account. An FBI Knoxville Online Covert Employee ("OCE") later accessed the Defendant 1's Kik account and observed membership to an administrator-only private Kik group with a title indicative of incestual child sexual abuse. There were several listed members of this group, to include the Kik account "Rainchexes".

23. Based on my training and experience, administrators of Kik groups who are involved in the trading of produced child sexual abuse material ("CSAM"), will often create private or separate group chats within Kik to communicate with each other to verify prospective members through a vetting process and to ensure they have

genuine access to a child for the purpose of producing and sharing CSAM with the other members.

24. On or about October 27, 2021, FBI Tulsa RA obtained a search warrant in the Northern District of Oklahoma for multiple Kik accounts who were members of the aforementioned private Kik group, including the Kik account "Rainchexes".

25. On or about November 1, 2021, FBI Tulsa RA and FBI Atlanta reviewed the search warrant return received from Kik, which included a voluminous amount of data and information, and began identifying suspected producers and traders of CSAM on the Kik platform.

26. On or about November 12, 2021, I received information from the FBI Tulsa RA, they located CSAM images on the search warrant return of the account "Rainchexes", which were posted to a Kik group by the Kik account "puchot" and a display name of "Pucho Torres" and received by "Rainchexes". Several of the images described below were posted while using the Kik live "camera" function, which typically indicates the image was produced live, on that date, using the Kik application as the camera, instead of an image posted from a gallery of previously taken images. Based on my training and experience, offenders who utilize Kik for the purpose of producing CSAM images will use the Kik live "camera" function to gain credibility and bona fides when trying to obtain membership into private Kik groups associated with CSAM production and distribution. A detail of the images posted are listed below:

a. On or about July 20, 2021, Kik account "puchot" posted a series of five images of what appear to be a light skinned female child, approximately 8 to 12 years old from the waist down wearing floral print shorts. The child is lying in bed with pink colored sheets with a unicorn and rainbow print. There is also a heart shaped, green colored pillow in the background. The last image in the series is the same child with her buttocks exposed and an adult male's hand is present and manipulated the buttocks to expose her anus.

b. On or about July 22, 2021, Kik account "puchot" posted a series of six images of what appear to be the same child and the same sheets described above. However, the child is now wearing a green colored shirt and green colored shorts with a heart and dolls printed on them. Two of the images in this series depict an adult male's hand pulling the green colored shorts to the side and exposing the anus and vaginal area of the child.

c. On or about August 2, 2021, Kik account "puchot" posted a single image of what appears to be an adult male's penis exposed through tan colored shorts penetrating the vaginal area of the same child, with the buttocks exposed and facing the camera.

27. On or about November 9, 2021, FBI Tulsa RA obtained an emergency disclosure request response from Kik for the subscriber information associated with the Kik account "puchot". The name on the account was registered as Pucho Torres, with an email address of pucho.torres@yahoo.com.

28. Kik also provided records of several IP address logs between on or about October 10, 2021 and on or about November 9, 2021. An analysis of the IP logs indicated the user is accessing the internet through a mobile internet service, most commonly used through a cellular device, and residential based Wi-Fi connections.

29. On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure to Charter Communications, who verbally provided subscriber information for the IP address 173.170.54.57, which was used to access the "puchot" Kik account

as recently as November 7, 2021 at 20:21:13 UTC. The subscriber for the Charter Communications account is listed as C.E. and is registered at the **TARGET RESIDENCE**. It should be noted, during the 30-day period of IP logs provided by Kik, the Wifi at the **TARGET RESIDENCE** was utilized to access the Kik account "Puchot" on 15 separate days.

30.    I searched a law enforcement database and located a police report with the Hernando County Sheriff's Office, dated July 15, 2020. The report described that N.A. had been walking a dog when it separated from the leash and attacked another dog. N.A. provided her address as the **TARGET RESIDENCE** and indicated the actual dog owner was C.E., who was her ex-boyfriend who lives in Tampa, Florida. A search of the Florida Driver and Vehicle Identification Database (DAVID) revealed C.E. has a current address listed in Tampa, Florida, with a recent driver's license renewal at that address in May of 2021.

31.    During a search of social media for C.E., I identified a Facebook account of a C.E. from Tampa, Florida, who posted an image on or about March 24, 2020, of a young girl approximately 6 to 10 years old standing next to an older boy and C.E. commented "..yes those are two of my kids". Further analysis revealed an older Facebook account for C.E. that had an image posted on January 11, 2018 that appears to be the same two children, but younger and sitting in car seats. Also in the photo is a heart shaped, green pillow which appears to match the same pillow in paragraph 26 describing the CSAM images.

DISC-00278

32.    During a search of social media accounts affiliated with **TORRES**, I found a YouTube posting dated May 8, 2021 for "Aby Raul Rivera Torres HCV" and depicts a skydiving jump at a Skydiving center located in Zephyrhills, Pasco County, Florida. (https://www.youtube.com/watch?v=2A3-DgvoxS8). In the beginning of the video, a female who appeared to be N.A. can be observed. During the video, the female believed to be N.A. says, "happy anniversary honey." Based on my investigation, it appears N.A., and **TORRES** are in a relationship and N.A. may be the mother and/or stepmother of the possible child victim. Additionally, a tattoo on **TORRES'** left forearm is partially visible and appears to have similar coloring and location to a tattoo visible in one of the CSAM images identified and noted in paragraph 26.

33.    On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for the IP address 174.211.169.250 used to access the "puchot" Kik on or about October 21, 2021 at 10:42:24 UTC, port number 1528 and 174.211.163.25 on or about October 20, 2021 at 4:02:24 UTC, port number 2954. The listed subscribers were Ady Rivera, 4016 Bismarck Palm Dr, Tampa, Florida, mobile telephone number 832-570-3410, and also listed on this account is Abyraul Rivera Torres (**TORRES**).

34.    On or about November 12, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for periodic location updates of **TORRES'**

DISC-00279

mobile telephone number 832-570-3410. A response from Verizon Wireless revealed the cellular device is within the radius of certainty of the **TARGET RESIDENCE**.

35.   On or about November 12, 2021, I conducted surveillance at the **TARGET RESIDENCE**. No vehicles were observed in the driveway.

36.   A criminal history search of **TORRES** revealed an arrest on or about July 17, 2020 by Texas City Police Department for the Aggravated Sexual Assault of a Child, and additional charges by the Galveston Texas Police Department for Possession of Child Pornography related offenses on December 16, 2020. An open-source search of the criminal cases revealed a bond of approximately $150,000 was posted and it appears **TORRES** was released from custody on or about August 10, 2020. There are no pending wants or warrants in the NCIC system for **TORRES**.

37.   DAVID record indicate **TORRES** has an expired Florida driver's license and has not updated his registration since June of 2014. FBI Tulsa RA obtained a Texas Driver's License, which indicated **TORRES** has an active driver's license which does not expire until May 2025.

38.   Based on my training and experience, I know that mobile devices such as the **TARGET CELLPHONE** are small, compact, and usually carried on an individual's person, or within stored within arm's reach inside a pocket, bag, backpack, fanny pack, briefcase, or suitcase.

DISC-00280

## CELLPHONE AND COMPUTER DATA

39.   As detailed above, there is probable cause to believe that **TORRES** used the **TARGET CELLPHONE** to produce and distribute child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(2), and that records and information will be stored on the **TARGET CELLPHONE**. There is also probable cause to believe **TORRES** utilized the **TARGET RESIDENCE** to produce child pornography images and evidence of this crime will be located at this residence. Thus, the warrant applied for would authorize the seizure of the **TARGET CELLPHONE** and **TARGET RESIDENCE** under Federal Rule of Criminal Procedure 41(e)(2)(B).

40.   One place in which the records might be found is on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

41.   Based on my knowledge, training, and experience, and consultation with other law-enforcement agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

DISC-00281

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 45 of 221

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten, also known as free space or slack space. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

42.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. It is technically possible, however, to delete this information.

43.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard-drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

44.     As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

45.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as, word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence, such as, the following:

a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when they were used, as described further in Attachment B-1, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user

DISC-00282

DISC-00283

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

     c.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's knowledge or intent.

### UNLOCKING MOBILE DEVICES USING BIOMETRIC DATA

    46.   Many cellphones have the capability to be can be unlocked using biometric data, in particular, fingerprint and facial recognition technology. Accordingly, if the **TARGET CELLPHONE** requires biometric data to unlock the device, I request that this Court authorize law enforcement officers to present **TORRES'** fingerprints, face and irises to the **TARGET CELLPHONE** cameras, screen, or fingerprint reader in an attempt to unlock the **TARGET CELLPHONE** for the purpose of executing the searches authorized by this warrant.[1]

---

[1]    Based on my training and experience, I know that a person's "identifying physical characteristic[s]" are not testimonial and thus fall "outside [the] protection" of the Fifth Amendment to the U.S. Constitution. *Gilbert v. California*, 388 U.S. 263, 267 (1967). The privilege against self-incrimination is not violated by an order compelling a person to submit to photographing and

19

    47.   Given their ability to store uniquely personal information, mobile devices are often protected by passwords, passcodes, or other security features, which generally enable only the primary user of the mobile device to use the mobile device and access the mobile device's functions and contents. I know from my training and experience, as well as from information found in publicly available online materials, that some models of Samsung devices offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. I am also aware that some models of smart phone devices are equipped with technology that can use a scan of the user's iris or facial features to unlock the device. In my training and experience, users of devices that offer such features often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device

---

measurements or to provide fingerprints, writing samples, or voice exemplars. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 7 (1973) (voice exemplars not protected by Fifth Amendment); *Gilbert*, 388 U.S. at 266-67 (handwriting exemplars not protected by Fifth Amendment); *California v. Byers*, 402 U.S. 424, 431-32 (1971) ("The act of stopping [a vehicle after an accident] is no more testimonial—indeed less so in some respects—than requiring a person in custody to stand or walk in a police lineup, to speak prescribed words, or to give samples of handwriting, fingerprints, or blood."); *Schmerber v. California*, 384 U.S. 757, 763-64 & n.8 (1966) ("[B]oth federal and state courts have usually held that . . . [the privilege against self- incrimination] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."); *see also In the Matter of the Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523, 532-533, 535 – 36 (D.D.C. 2018) (search warrant authorizing compelled use of biometric feature to unlock devices did not violate Fourth or Fifth Amendments); *In the Matter Of The Search Of: A White Google Pixel 3 XI Cellphone In A Black Incipio Case*, -- F. Supp. 3d --, 2019 WL 3401990, at *7 (D. Id. July 26, 2019) (determining that search warrant allowing agents to press subject's fingers on sensor to unlock cell phone did not violate the Fifth Amendment because "[where, as here, the Government agents will pick the fingers to be pressed on the Touch ID sensor, there is no need to engage the thought process of the subject at all in effectuating the seizure").

20

are engaged in child exploitation and thus have a heightened concern about securing the contents of the device.

48. The passcode(s) or password(s) that would unlock the **TARGET CELLPHONE** are not known to law enforcement officers. Thus, it will likely be necessary to hold the **TARGET CELLPHONE** up to **TORRES'** face or press **TORRES'** fingers to the **TARGET CELLPHONE's** fingerprint sensors in an attempt to unlock the device for the purpose of executing the searches authorized by this warrant. Attempting to unlock the **TARGET CELLPHONE** using this biometric data is necessary because the United States may not otherwise be able to access the data contained on any devices for the purpose of executing the search authorized by this warrant.

49. If **TORRES** refuses to comply, I request that the Court authorize the law enforcement officers attempting to execute this warrant to employ a reasonable degree of force to compel **TORRES'** compliance.

## CONCLUSION

50. Based on the above information, probable cause exists that the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as fully described in Attachments A-1 and A-3, contain evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 2252, possession, receipt, or distribution of child pornography. Accordingly, I respectfully request a warrant to search **TORRES** and the **TARGET RESIDENCE**

DISC-00286

for the **TARGET CELLPHONE** and seize the items listed in Attachments B-1 and B-3.

Michael R. Goodhue, Special Agent
Federal Bureau of Investigation

Sworn to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) via telephone this _13th_ day of ~~June~~, 2021.

SEAN P. FLYNN
United States Magistrate Judge

DISC-00287

**ATTACHMENT A-1**

**Item to Be Searched**

A cellular device belonging to Aby Raul Rivera Torres, with phone number 832-570-3410, which may include a Micro SD card or other electronic storage mediums ("**TARGET CELLPHONE**").

DISC-00288

**ATTACHMENT B-1**

**List of Items to be Seized and Searched**

A.    Particular thing to be searched:

The property to be searched is a cellular device ("**TARGET CELLPHONE**").

B.    Information to be seized:

1.    All visual depictions, including still images, videos, films, or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

2.    Any and all documents, photographs, videos, records, emails, text communications, Kik messages, voicemail messages, location services (GPS data), contacts, logs, and internet history pertaining to the production, possession, receipt, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, relating to an interest in child pornography, whether transmitted or received; pertaining to an interest in child exploitation, child erotica, pedophilia, or sexual abuse of children; relating to the persuading, inducing, enticing, or coercing of minors to engage in prostitution or any sexual activity; or pertaining to the transfer of obscene matter to minors.

3.    Any and all passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.

4.    Any and all computer data that would reveal the presence of malware, viruses, or malicious codes located on the computer storage media.

DISC-00289

5.    Any and all records, documents, invoices, and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs, and electronic messages, as well as other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

6.    Any documents, records, programs, or applications relating to the existence of counter-forensic programs (and associated data) that are designed to eliminate data from cellular phones.

7.    Evidence of user attribution showing who used or owned the **TARGET CELLPHONE** at the time the events described in this warrant occurred, such as logs, documents, internet searches, and browsing history.

8.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage such as on a SIM card and any photographic form.

9.    To conduct the search of the **TARGET CELLPHONE**, law enforcement personnel are authorized to present Aby Raul Rivera Torres' face and irises to the **TARGET CELLPHONE** or press Aby Raul Rivera Torres' fingers to any fingerprint sensors on the **TARGET CELLPHONE** in an attempt to unlock the device for the

purpose of executing the search authorized by this warrant. If Aby Raul Rivera Torres refuses to comply, law enforcement is granted the authority to employ a reasonable amount of force to compel Aby Raul Rivera Torres' to present his face and irises to the **TARGET CELLPHONE** sensor/camera designed to unlock the device and compel Aby Raul Rivera Torres' fingers to make contact with any fingerprint sensor on the **TARGET CELLPHONE.**

3

3

DISC-00290

DISC-00291

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A cellphone with phone number 832-570-3410 belonging to Aby Raul Rivera Torres

Case No. **8:21MJ2123 SPF**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____Florida_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1

**YOU ARE COMMANDED** to execute this warrant on or before _11/27/2021_ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ____SEAN P. FLYNN____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued: _11/13/2021 at 4:08 pm_

City and state:   Tampa, Florida

SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

DISC-00292

---

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_Executing officer's signature_

_Printed name and title_

DISC-00293

## ATTACHMENT A-1

### Item to Be Searched

A cellular device belonging to Aby Raul Rivera Torres, with phone number 832-570-3410, which may include a Micro SD card or other electronic storage mediums ("TARGET CELLPHONE").

## ATTACHMENT B-1

### List of Items to be Seized and Searched

A.   Particular thing to be searched:

The property to be searched is a cellular device ("**TARGET CELLPHONE**").

B.   Information to be seized:

1.   All visual depictions, including still images, videos, films, or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

2.   Any and all documents, photographs, videos, records, emails, text communications, Kik messages, voicemail messages, location services (GPS data), contacts, logs, and internet history pertaining to the production, possession, receipt, or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, relating to an interest in child pornography, whether transmitted or received; pertaining to an interest in child exploitation, child erotica, pedophilia, or sexual abuse of children; relating to the persuading, inducing, enticing, or coercing of minors to engage in prostitution or any sexual activity; or pertaining to the transfer of obscene matter to minors.

3.   Any and all passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.

4.   Any and all computer data that would reveal the presence of malware, viruses, or malicious codes located on the computer storage media.

3

3

5.       Any and all records, documents, invoices, and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs, and electronic messages, as well as other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

6.       Any documents, records, programs, or applications relating to the existence of counter-forensic programs (and associated data) that are designed to eliminate data from cellular phones.

7.       Evidence of user attribution showing who used or owned the **TARGET CELLPHONE** at the time the events described in this warrant occurred, such as logs, documents, internet searches, and browsing history.

8.       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage such as on a SIM card and any photographic form.

9.       To conduct the search of the **TARGET CELLPHONE**, law enforcement personnel are authorized to present Aby Raul Rivera Torres' face and irises to the **TARGET CELLPHONE** or press Aby Raul Rivera Torres' fingers to any fingerprint sensors on the **TARGET CELLPHONE** in an attempt to unlock the device for the

DISC-00296

purpose of executing the search authorized by this warrant. If Aby Raul Rivera Torres refuses to comply, law enforcement is granted the authority to employ a reasonable amount of force to compel Aby Raul Rivera Torres' to present his face and irises to the **TARGET CELLPHONE** sensor/camera designed to unlock the device and compel Aby Raul Rivera Torres' fingers to make contact with any fingerprint sensor on the **TARGET CELLPHONE.**

DISC-00297

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| IN THE MATTER OF THE SEARCH OF THE PERSON OF ABY RAUL RIVERA TORRES | Case No. **8:21MJ2124SPF** |
|---|---|
| | **Filed Under Seal** |

## MOTION TO SEAL

The United States of America respectfully moves to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) this motion to seal, and (4) any resulting orders, and in support thereof says as follows:

These documents relate to an ongoing investigation. Disclosure of the contents of these documents may cause the targets of the related investigation to take steps to thwart investigative techniques, destroy evidence, identify and retaliate against witnesses, and/or flee from prosecution.

WHEREFORE, the United States respectfully moves the Court to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) this motion to seal, and (4) any resulting orders, until an arrest of a target of the investigation, or

for a period of one year, whichever comes first.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By: Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 0100809
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lisa.Thelwell@usdoj.gov

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN THE MATTER OF THE SEARCH
OF THE PERSON OF ABY RAUL
RIVERA TORRES

Case No.   **8:21 MJ 2124 SPF**

**Filed Under Seal**

## ORDER

Upon the written motion of the United States of America to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders;

The Court finds that the interests of justice require that the documents be sealed; therefore

IT IS ORDERED that the Motion to Seal is Granted;

IT IS FURTHER ORDERED that (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders, be sealed until the arrest of a target of the investigation, or for a period of one year, whichever comes first;

DONE AND ORDERED at TAMPA, Florida this 13th day of November, 2021.

THE HONORABLE SEAN P. FLYNN
United States Magistrate Judge

Copy to:   AUSA Lisa M. Thelwell

DISC-00300

---

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
The person of Aby Raul Rivera Torres

Case No. **8:21 MJ 2124 SPF**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-2

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251a | Production of Child Pornography |
| 18 U.S.C. § 2252(a)(2) | Distribution of Child Pornography |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of Child Pornography |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Goodhue Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____   *(specify reliable electronic means)*.

Date:  11/13/2021

*Judge's signature*

City and state:   Tampa, Florida

SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

DISC-00301

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Michael R. Goodhue, being sworn to tell the truth, state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2008. I am presently assigned to the Tampa Division's Child Exploitation and Human Trafficking Task Force. In this capacity, I am responsible for conducting criminal investigations of statutes contained in Title 18 of the United States Code, including crimes related to child sex trafficking, child pornography and the sexual exploitation of children, among other violations of federal law.

2.  From March 2009 to the present, I have worked crimes against children violations in various capacities in the Philadelphia Division, FBI Headquarters Violent Crimes Against Children Unit, and the Miami Division. I have participated in investigations of persons suspected of violating federal child pornography and child sex trafficking laws, including 18 U.S.C. §§ 2251, 2252, 2422, and 1591. These investigations have included the use of surveillance techniques, the interviewing of subjects and witnesses, and the planning and execution of arrest, search, and seizure warrants. In the course of these investigations, I have reviewed images and videos containing child pornography and images depicting minor children engaged in sexually explicit conduct on various forms of electronic media including computers, digital cameras, and wireless telephones, and have discussed and reviewed these materials with other law enforcement officers. I have also received and provided training on crimes against children matters at various conferences and venues.

DISC-00302

3.  This affidavit is submitted in support of an application for the issuance of three search warrants: (1) a cellphone belonging to Aby Raul Rivera Torres ("**TARGET CELLPHONE**"); (2) the person of Aby Raul Rivera Torres ("**TORRES**"); and 2282 Opal Lane, Spring Hill, FL 34608 ("**TARGET RESIDENCE**"); all of which are more fully described in separate Attachments A-1, A-2, and A-3. As set forth in more detail below, there is probable cause to believe that **TORRES** has violated 18 U.S.C. §§ 2251(A), (production of child pornography), 2252(a)(2) (distribution of child pornography), and 2252(a)(4) (possession of child pornography).

4.  I am requesting authority to search the person of **TORRES** for the purpose of seizing the **TARGET CELLPHONE**. I am also requesting authority to search the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as well as any cellular telephone device, computer and computer media, and electronic storage devices located therein. I am also requesting authority to seize all items listed in Attachment B-1 and B-3 as instrumentalities, fruits, and/or evidence of criminal activity.

5.  The facts contained in this affidavit are drawn from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law-enforcement officers, information from agency reports, and the review of documents provided to me by witnesses and by law enforcement officers. Because this affidavit is being submitted for the limited purpose

DISC-00303

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 56 of 221

of seeking authorization to search **TORRES**, the **TARGET CELLPHONE**, and **TARGET RESIDENCE**, I have not set forth each and every fact learned during the course of this investigation.

## DEFINITIONS

6.    The following definitions apply to this Affidavit and Attachment B-1 and B-3:

a.    The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of 18.

b.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short to enable other participants to respond quickly in a format that resembles an oral conversation. This feature distinguishes "chatting" from other text-based online communications, such as, internet forums and email.

c.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

d.    "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) to include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or

computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.

e.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means that are capable of conversion into a visual image. *See* 18 U.S.C. § 2256(5).

f.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

g.    "Computer passwords and data security devices," as used herein, consists of information or items designed to restrict access to or to hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (*i.e.*, a string of alphanumeric and/or other characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress,

3

4

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 57 of 221

hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h.    "Fingerprint sensor-enabled device" refers to the automated method of verifying a match between two human fingerprints. Fingerprints are one of many forms of biometrics used to identify individuals and to verify their identity.

i.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, electronic mail ("email"), remote storage, and co-location of computers and other communications equipment.

j.    "Mobile applications," as used herein, are specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including, such as, engaging in online chat, reading a book, or playing a game.

k.    "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

### BACKGROUND ON COMPUTERS, CELLPHONES, AND CHILD PORNOGRAPHY

7.    Computer technology has revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography was once produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to

DISC-00306

develop and to reproduce the images. There were definable costs involved with the production of pornographic images. Consequently, distributing such media on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. Distribution, accordingly, was accomplished through a combination of personal contacts, mailings, and telephone calls. The development of computers has changed this. Now, computers serve multiple functions in connection with child pornography, including, principally: production, communication, distribution, and storage.

8.    Child pornographers can now transfer photographs onto a computer-readable format with a scanner. With the advent of digital cameras, they can now also transfer such images directly onto a computer. A device known as a modem allows any computer to connect to another computer by telephone, cable, or wireless connection. Such electronic contact can connect literally millions of computers around the world.

9.    The computer's and cellphone's ability to store images in digital form makes the computer, itself, an ideal repository for child pornography. Within the last decade, the size of the electronic storage media, commonly known as a hard drive, on home computers has grown tremendously. Consequently, hard drives can now easily store thousands of images at very high resolution.

10.    The Internet affords collectors of child pornography several different venues to obtain, view, and/or trade child pornography in a relatively secure and anonymous fashion.

DISC-00307

11.    Collectors and distributors of child pornography also use online resources to retrieve and to store child pornography, including services offered by Internet Portals such as Google, Yahoo, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Often, evidence of such online storage of child pornography is also found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can still be found on the user's computer in most cases.

12.    Digital files, such as, movies and pictures, can also be easily transferred between computers, smart phones, and other devices, or stored simultaneously on multiple devices. Collectors of child pornography often keep their child pornography in multiple places, including on multiple devices.

13.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (e.g., by saving an e-mail as a file on the computer or by saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be unintentionally retained (e.g., traces of a path of an electronic communication may be automatically stored in many places, such as, in temporary files or ISP client software). In addition to electronic communications, a computer user's activities on the Internet generally leave traces, "footprints," and/or history files of the browser used. A forensic examiner often can recover evidence

suggesting whether a computer contains wireless software, whether it was using Yahoo! Messenger, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

14.    Cellular phones and cellular phone technology have further revolutionized the way in which individuals interested in child pornography interact with each other. Today's cellular phones, many of which are called "smart phones," are typically capable of storing a wide variety of data. Such data includes not only telephone numbers, contact lists, addresses, voicemails, and/or text messages, but also images, videos, documents, and programs (often referred to as "applications" or "apps") in much the same way a desktop or laptop computer does.

15.    Data can also be stored on a cellular phone, particularly when it has a high-storage capacity, just like a computer. The storage capacity for a cellular phone includes both internal and removable digital memory. Today's cellular phones can offer up to 128 gigabytes of storage, or more. Removable memory storage can significantly increase, if not double, that storage capacity. As a result, cellular phones can store thousands of high-resolution images and videos. Further, the phones have the ability to be synced with, or connected to, a computer, which allows the user to transfer files between the devices.

16.    Cellular phones are also typically able to access the Internet through either a wireless data plan and/or through a wireless (also known as "wi-fi") Internet connection. This allows cellular phone users to perform many Internet functions on

DISC-00308

DISC-00309

their phones, such as, downloading and uploading data (*e.g.*, images, videos) from the Internet, sending and receiving emails, accessing web pages, browsing the Internet, using instant messaging services, and conducting live video chat. Consequently, cellular phones—given their ability to access the Internet and to download images and/or videos onto its internal and removable digital memory—are ideal repositories for child pornography, just like computers, and provide child pornographers with an additional method to share and to trade their child pornography collections.

17.    Cellular phones can also take pictures or "images," which are stored as image files, such as, "JPEGs" or "TIFFs." Image files often contain Exchangeable Image File Format ("EXIF") data. EXIF data can include a variety of information about the image, including, for example, the time and date that the image was taken, the place where an image was taken (also known as "geolocation data"), the settings that the device used to capture the image, the model of the camera phone that was used to take the image, the focal length of the lens, aperture settings, shutter speed, and ISO speed.

## BACKGROUND ON KIK

18.    Kik is a web-based instant messaging mobile application that allows users to transmit and receive messages, photos, and videos. Users can communicate privately with other users or in groups.

19.    Unlike many other smartphone messaging services that are based on a user's phone number, Kik uses usernames as the unique identifier. By using usernames instead of phone numbers, users' personal information is never shared by Kik.

DISC-00310

20.    Kik usernames have the following characteristics: are unique; can never be replicated; can never be changed; may include lower and uppercase letters, numbers and/or periods and underscores; and will never contain spaces, emoticons or special characters.

21.    Kik is available for download through the iOS App Store and the Google Play store on most iOS (iPhone/iPod/and iPad) and Android (including Kindle Fire) devices. Users may also be using Kik on their Windows, Symbian-based or BlackBerry OS.

## PROBABLE CAUSE

22.    On or about July 26, 2021, the FBI Oklahoma City Division, Tulsa Resident Agency (Tulsa RA) arrested and charged an individual ("Defendant 1") with child pornography related charges in the Northern District of Oklahoma. During a post-*Miranda* interview, Defendant 1 provided consent allowing agents to access his Kik account. An FBI Knoxville Online Covert Employee ("OCE") later accessed the Defendant 1's Kik account and observed membership to an administrator-only private Kik group with a title indicative of incestual child sexual abuse. There were several listed members of this group, to include the Kik account "Rainchexes".

23.    Based on my training and experience, administrators of Kik groups who are involved in the trading of produced child sexual abuse material ("CSAM"), will often create private or separate group chats within Kik to communicate with each other to verify prospective members through a vetting process and to ensure they have

DISC-00311

genuine access to a child for the purpose of producing and sharing CSAM with the other members.

24.    On or about October 27, 2021, FBI Tulsa RA obtained a search warrant in the Northern District of Oklahoma for multiple Kik accounts who were members of the aforementioned private Kik group, including the Kik account "Rainchexes".

25.    On or about November 1, 2021, FBI Tulsa RA and FBI Atlanta reviewed the search warrant return received from Kik, which included a voluminous amount of data and information, and began identifying suspected producers and traders of CSAM on the Kik platform.

26.    On or about November 12, 2021, I received information from the FBI Tulsa RA, they located CSAM images on the search warrant return of the account "Rainchexes", which were posted to a Kik group by the Kik account "puchot" and a display name of "Pucho Torres" and received by "Rainchexes". Several of the images described below were posted while using the Kik live "camera" function, which typically indicates the image was produced live, on that date, using the Kik application as the camera, instead of an image posted from a gallery of previously taken images. Based on my training and experience, offenders who utilize Kik for the purpose of producing CSAM images will use the Kik live "camera" function to gain credibility and bona fides when trying to obtain membership into private Kik groups associated with CSAM production and distribution. A detail of the images posted are listed below:

DISC-00312

a.   On or about July 20, 2021, Kik account "puchot" posted a series of five images of what appear to be a light skinned female child, approximately 8 to 12 years old from the waist down wearing floral print shorts. The child is lying in bed with pink colored sheets with a unicorn and rainbow print. There is also a heart shaped, green colored pillow in the background. The last image in the series is the same child with her buttocks exposed and an adult male's hand is present and manipulated the buttocks to expose her anus.

b.   On or about July 22, 2021, Kik account "puchot" posted a series of six images of what appear to be the same child and the same sheets described above. However, the child is now wearing a green colored shirt and green colored shorts with a heart and dolls printed on them. Two of the images in this series depict an adult male's hand pulling the green colored shorts to the side and exposing the anus and vaginal area of the child.

c.   On or about August 2, 2021, Kik account "puchot" posted a single image of what appears to be an adult male's penis exposed through tan colored shorts penetrating the vaginal area of the same child, with the buttocks exposed and facing the camera.

27.    On or about November 9, 2021, FBI Tulsa RA obtained an emergency disclosure request response from Kik for the subscriber information associated with the Kik account "puchot". The name on the account was registered as Pucho Torres, with an email address of pucho.torres@yahoo.com.

28.    Kik also provided records of several IP address logs between on or about October 10, 2021 and on or about November 9, 2021. An analysis of the IP logs indicated the user is accessing the internet through a mobile internet service, most commonly used through a cellular device, and residential based Wi-Fi connections.

29.    On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure to Charter Communications, who verbally provided subscriber information for the IP address 173.170.54.57, which was used to access the "puchot" Kik account

DISC-00313

as recently as November 7, 2021 at 20:21:13 UTC. The subscriber for the Charter Communications account is listed as C.E. and is registered at the **TARGET RESIDENCE**. It should be noted, during the 30-day period of IP logs provided by Kik, the Wifi at the **TARGET RESIDENCE** was utilized to access the Kik account "Puchot" on 15 separate days.

30.    I searched a law enforcement database and located a police report with the Hernando County Sheriff's Office, dated July 15, 2020. The report described that N.A. had been walking a dog when it separated from the leash and attacked another dog. N.A. provided her address as the **TARGET RESIDENCE** and indicated the actual dog owner was C.E., who was her ex-boyfriend who lives in Tampa, Florida. A search of the Florida Driver and Vehicle Identification Database (DAVID) revealed C.E. has a current address listed in Tampa, Florida, with a recent driver's license renewal at that address in May of 2021.

31.    During a search of social media for C.E., I identified a Facebook account of a C.E. from Tampa, Florida, who posted an image on or about March 24, 2020, of a young girl approximately 6 to 10 years old standing next to an older boy and C.E. commented "..yes those are two of my kids". Further analysis revealed an older Facebook account for C.E. that had an image posted on January 11, 2018 that appears to be the same two children, but younger and sitting in car seats. Also in the photo is a heart shaped, green pillow which appears to match the same pillow in paragraph 26 describing the CSAM images.

13

32.    During a search of social media accounts affiliated with **TORRES**, I found a YouTube posting dated May 8, 2021 for "Aby Raul Rivera Torres HCV" and depicts a skydiving jump at a Skydiving center located in Zephyrhills, Pasco County, Florida. (https://www.youtube.com/watch?v=2A3-DgvoxS8). In the beginning of the video, a female who appeared to be N.A. can be observed. During the video, the female believed to be N.A. says, "happy anniversary honey." Based on my investigation, it appears N.A., and **TORRES** are in a relationship and N.A. may be the mother and/or stepmother of the possible child victim. Additionally, a tattoo on **TORRES'** left forearm is partially visible and appears to have similar coloring and location to a tattoo visible in one of the CSAM images identified and noted in paragraph 26.

33.    On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for the IP address 174.211.169.250 used to access the "puchot" Kik on or about October 21, 2021 at 10:42:24 UTC, port number 1528 and 174.211.163.25 on or about October 20, 2021 at 4:02:24 UTC, port number 2954. The listed subscribers were Ady Rivera, 4016 Bismarck Palm Dr, Tampa, Florida, mobile telephone number 832-570-3410, and also listed on this account is Abyraul Rivera Torres (**TORRES**).

34.    On or about November 12, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for periodic location updates of **TORRES'**

14

mobile telephone number 832-570-3410. A response from Verizon Wireless revealed the cellular device is within the radius of certainty of the **TARGET RESIDENCE**.

35. On or about November 12, 2021, I conducted surveillance at the **TARGET RESIDENCE**. No vehicles were observed in the driveway.

36. A criminal history search of **TORRES** revealed an arrest on or about July 17, 2020 by Texas City Police Department for the Aggravated Sexual Assault of a Child, and additional charges by the Galveston Texas Police Department for Possession of Child Pornography related offenses on December 16, 2020. An open-source search of the criminal cases revealed a bond of approximately $150,000 was posted and it appears **TORRES** was released from custody on or about August 10, 2020. There are no pending wants or warrants in the NCIC system for **TORRES**.

37. DAVID record indicate **TORRES** has an expired Florida driver's license and has not updated his registration since June of 2014. FBI Tulsa RA obtained a Texas Driver's License, which indicated **TORRES** has an active driver's license which does not expire until May 2025.

38. Based on my training and experience, I know that mobile devices such as the **TARGET CELLPHONE** are small, compact, and usually carried on an individual's person, or within stored within arm's reach inside a pocket, bag, backpack, fanny pack, briefcase, or suitcase.

DISC-00316

## CELLPHONE AND COMPUTER DATA

39. As detailed above, there is probable cause to believe that **TORRES** used the **TARGET CELLPHONE** to produce and distribute child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(2), and that records and information will be stored on the **TARGET CELLPHONE**. There is also probable cause to believe **TORRES** utilized the **TARGET RESIDENCE** to produce child pornography images and evidence of this crime will be located at this residence. Thus, the warrant applied for would authorize the seizure of the **TARGET CELLPHONE** and **TARGET RESIDENCE** under Federal Rule of Criminal Procedure 41(e)(2)(B).

40. One place in which the records might be found is on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

41. Based on my knowledge, training, and experience, and consultation with other law-enforcement agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

DISC-00317

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten, also known as free space or slack space. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

42.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. It is technically possible, however, to delete this information.

43.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard-drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

44.     As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes

17

described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

45.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as, word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence, such as, the following:

a.     Forensic evidence of how computers were used, the purpose of their use, who used them, and when they were used, as described further in Attachment B-1, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user

18

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's knowledge or intent.

## UNLOCKING MOBILE DEVICES USING BIOMETRIC DATA

46.   Many cellphones have the capability to be can be unlocked using biometric data, in particular, fingerprint and facial recognition technology. Accordingly, if the **TARGET CELLPHONE** requires biometric data to unlock the device, I request that this Court authorize law enforcement officers to present **TORRES'** fingerprints, face and irises to the **TARGET CELLPHONE** cameras, screen, or fingerprint reader in an attempt to unlock the **TARGET CELLPHONE** for the purpose of executing the searches authorized by this warrant.[1]

---

[1]   Based on my training and experience, I know that a person's "identifying physical characteristic[s]" are not testimonial and thus fall "outside [the] protection" of the Fifth Amendment to the U.S. Constitution. *Gilbert v. California*, 388 U.S. 263, 267 (1967). The privilege against self-incrimination is not violated by an order compelling a person to submit to photographing and

19

DISC-00320

47.   Given their ability to store uniquely personal information, mobile devices are often protected by passwords, passcodes, or other security features, which generally enable only the primary user of the mobile device to use the mobile device and access the mobile device's functions and contents. I know from my training and experience, as well as from information found in publicly available online materials, that some models of Samsung devices offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. I am also aware that some models of smart phone devices are equipped with technology that can use a scan of the user's iris or facial features to unlock the device. In my training and experience, users of devices that offer such features often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device

---

measurements or to provide fingerprints, writing samples, or voice exemplars. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 7 (1973) (voice exemplars not protected by Fifth Amendment); *Gilbert*, 388 U.S. at 266-67 (handwriting exemplars not protected by Fifth Amendment); *California v. Byers*, 402 U.S. 424, 431-32 (1971) ("The act of stopping [a vehicle after an accident] is no more testimonial—indeed less so in some respects—than requiring a person in custody to stand or walk in a police lineup, to speak prescribed words, or to give samples of handwriting, fingerprints, or blood."); *Schmerber v. California*, 384 U.S. 757, 763-64 & n.8 (1966) ("[B]oth federal and state courts have usually held that . . . [the privilege against self- incrimination] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."); *see also In the Matter of the Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523, 532-533, 535 - 36 (D.D.C. 2018) (search warrant authorizing compelled use of biometric feature to unlock devices did not violate Fourth or Fifth Amendments); *In the Matter Of The Search Of: A White Google Pixel 3 XL Cellphone In A Black Incipio Case*, -- F. Supp. 3d --, 2019 WL 3401990, at *7 (D. Id. July 26, 2019) (determining that search warrant allowing agents to press subject's fingers on sensor to unlock cell phone did not violate the Fifth Amendment because "[w]here, as here, the Government agents will pick the fingers to be pressed on the Touch ID sensor, there is no need to engage the thought process of the subject at all in effectuating the seizure.").

20

DISC-00321

are engaged in child exploitation and thus have a heightened concern about securing the contents of the device.

48.     The passcode(s) or password(s) that would unlock the **TARGET CELLPHONE** are not known to law enforcement officers. Thus, it will likely be necessary to hold the **TARGET CELLPHONE** up to **TORRES'** face or press **TORRES'** fingers to the **TARGET CELLPHONE's** fingerprint sensors in an attempt to unlock the device for the purpose of executing the searches authorized by this warrant. Attempting to unlock the **TARGET CELLPHONE** using this biometric data is necessary because the United States may not otherwise be able to access the data contained on any devices for the purpose of executing the search authorized by this warrant.

49.     If **TORRES** refuses to comply, I request that the Court authorize the law enforcement officers attempting to execute this warrant to employ a reasonable degree of force to compel **TORRES'** compliance.

## CONCLUSION

50.     Based on the above information, probable cause exists that the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as fully described in Attachments A-1 and A-3, contain evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 2252, possession, receipt, or distribution of child pornography. Accordingly, I respectfully request a warrant to search **TORRES** and the **TARGET RESIDENCE**

DISC-00322

for the **TARGET CELLPHONE** and seize the items listed in Attachments B-1 and B-3.

Michael R. Goodhue, Special Agent
Federal Bureau of Investigation

Sworn to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) via telephone this *13th* day of ~~June~~, *November* 2021.

SEAN P. FLYNN
United States Magistrate Judge

DISC-00323

## ATTACHMENT A-2

### Person to Be Searched

The person of Aby Raul Rivera Torres ("**TORRES**"), date of birth May 2, 1989 with social security number ending in 8795. Law enforcement databases list **TORRES's** as standing 5'7" and weighing approximately 190 pounds with black hair and green eyes. **TORRES** is depicted below.



The search of **TORRES** shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within **TORRES's** immediate vicinity and control at the location where the search warrant is executed. The search shall not include a strip search or a body cavity search.

DISC-00324

## ATTACHMENT B-2

### List of Items to be Seized

The property to be seized from the locations described in Attachment A-2 and searched is a cellular device belonging to Aby Raul Rivera Torres, with phone number 832-570-3410, which may include a Micro SD card or other electronic storage mediums ("**TARGET CELLPHONE**").

DISC-00325

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The person of Aby Raul Rivera Torres

Case No. **8:21MJ2124 SPF**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachment B-2

**YOU ARE COMMANDED** to execute this warrant on or before  11/27/2021  *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   SEAN P. FLYNN
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  11/13/2021 at 4:18 pm

_____
*Judge's signature*

City and state:   Tampa, Florida

SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

DISC-00326

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

DISC-00327

### ATTACHMENT A-2

#### Person to Be Searched

The person of Aby Raul Rivera Torres ("**TORRES**"), date of birth May 2, 1989 with social security number ending in 8795. Law enforcement databases list **TORRES's** as standing 5'7" and weighing approximately 190 pounds with black hair and green eyes. **TORRES** is depicted below.



The search of **TORRES** shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within **TORRES's** immediate vicinity and control at the location where the search warrant is executed. The search shall not include a strip search or a body cavity search.

DISC-00328

### ATTACHMENT B-2

#### List of Items to be Seized

The property to be seized from the locations described in Attachment A-2 and searched is a cellular device belonging to Aby Raul Rivera Torres, with phone number 832-570-3410, which may include a Micro SD card or other electronic storage mediums ("**TARGET CELLPHONE**").

DISC-00329

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RESIDENCE LOCATED AT 2282 OPAL LANE, SPRING HILL, FL 34608 | Case No. **8:21MJ2125SPF** **Filed Under Seal** |

## MOTION TO SEAL

The United States of America respectfully moves to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) this motion to seal, and (4) any resulting orders, and in support thereof says as follows:

These documents relate to an ongoing investigation. Disclosure of the contents of these documents may cause the targets of the related investigation to take steps to thwart investigative techniques, destroy evidence, identify and retaliate against witnesses, and/or flee from prosecution.

WHEREFORE, the United States respectfully moves the Court to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) this motion to seal, and (4) any resulting orders, until an arrest of a target of the investigation, or

for a period of one year, whichever comes first.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:

Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 0100809
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lisa.Thelwell@usdoj.gov

2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RESIDENCE LOCATED AT 2282 OPAL LANE, SPRING HILL, FL 34608 | Case No. **Filed Under Seal** |

## ORDER

Upon the written motion of the United States of America to seal (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders;

The Court finds that the interests of justice require that the documents be sealed; therefore

IT IS ORDERED that the Motion to Seal is Granted;

IT IS FURTHER ORDERED that (1) the application for search warrant and attached affidavit, (2) the warrant, (3) the motion to seal, and (4) any resulting orders, be sealed until the arrest of a target of the investigation, or for a period of one year, whichever comes first;

DONE AND ORDERED at TAMPA, Florida this 13ᵗʰ day of November, 2021.

THE HONORABLE SEAN P. FLYNN
United States Magistrate Judge

Copy to:   AUSA Lisa M. Thelwell

DISC-00332

---

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | | |
|---|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* A residence located at 2282 Opal Lane Spring Hill, FL 34608 | ) ) ) ) ) | Case No. **8:21MJ2125 SPF** |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-3.

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-3.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251a | Production of Child Pornography |
| 18 U.S.C. § 2252(a)(2) | Distribution of Child Pornography |
| 18 U.S.C. § 2252(a)(4)(B) | Possession of Child Pornography |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Goodhue Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date:   11/13/2021

*Judge's signature*

City and state:   Tampa, Florida

SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

DISC-00333

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Michael R. Goodhue, being sworn to tell the truth, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September 2008.  I am presently assigned to the Tampa Division's Child Exploitation and Human Trafficking Task Force. In this capacity, I am responsible for conducting criminal investigations of statutes contained in Title 18 of the United States Code, including crimes related to child sex trafficking, child pornography and the sexual exploitation of children, among other violations of federal law.

2.     From March 2009 to the present, I have worked crimes against children violations in various capacities in the Philadelphia Division, FBI Headquarters Violent Crimes Against Children Unit, and the Miami Division. I have participated in investigations of persons suspected of violating federal child pornography and child sex trafficking laws, including 18 U.S.C. §§ 2251, 2252, 2422, and 1591. These investigations have included the use of surveillance techniques, the interviewing of subjects and witnesses, and the planning and execution of arrest, search, and seizure warrants. In the course of these investigations, I have reviewed images and videos containing child pornography and images depicting minor children engaged in sexually explicit conduct on various forms of electronic media including computers, digital cameras, and wireless telephones, and have discussed and reviewed these materials with other law enforcement officers.  I have also received and provided training on crimes against children matters at various conferences and venues.

1

3.     This affidavit is submitted in support of an application for the issuance of three search warrants: (1) a cellphone belonging to Aby Raul Rivera Torres ("**TARGET CELLPHONE**"); (2) the person of Aby Raul Rivera Torres ("**TORRES**"); and 2282 Opal Lane, Spring Hill, FL 34608 ("**TARGET RESIDENCE**"); all of which are more fully described in separate Attachments A-1, A-2, and A-3. As set forth in more detail below, there is probable cause to believe that **TORRES** has violated 18 U.S.C. §§ 2251(A), (production of child pornography), 2252(a)(2) (distribution of child pornography), and 2252(a)(4) (possession of child pornography).

4.     I am requesting authority to search the person of **TORRES** for the purpose of seizing the **TARGET CELLPHONE**. I am also requesting authority to search the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as well as any cellular telephone device, computer and computer media, and electronic storage devices located therein. I am also requesting authority to seize all items listed in Attachment B-1 and B-3 as instrumentalities, fruits, and/or evidence of criminal activity.

5.     The facts contained in this affidavit are drawn from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law-enforcement officers, information from agency reports, and the review of documents provided to me by witnesses and by law enforcement officers.  Because this affidavit is being submitted for the limited purpose

2

of seeking authorization to search **TORRES**, the **TARGET CELLPHONE**, and **TARGET RESIDENCE**, I have not set forth each and every fact learned during the course of this investigation.

### DEFINITIONS

6.    The following definitions apply to this Affidavit and Attachment B-1 and B-3:

a.    The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of 18.

b.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short to enable other participants to respond quickly in a format that resembles an oral conversation.  This feature distinguishes "chatting" from other text-based online communications, such as, internet forums and email.

c.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

d.    "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) to include any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or

3

computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.

e.    "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means that are capable of conversion into a visual image.  *See* 18 U.S.C. § 2256(5).

f.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  *See* 18 U.S.C. § 2256(2).

g.    "Computer passwords and data security devices," as used herein, consists of information or items designed to restrict access to or to hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (*i.e.*, a string of alphanumeric and/or other characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress,

4

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 72 of 221

hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

h.    "Fingerprint sensor-enabled device" refers to the automated method of verifying a match between two human fingerprints. Fingerprints are one of many forms of biometrics used to identify individuals and to verify their identity.

i.    "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, electronic mail ("email"), remote storage, and co-location of computers and other communications equipment.

j.    "Mobile applications," as used herein, are specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including, such as, engaging in online chat, reading a book, or playing a game.

k.    "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

## BACKGROUND ON COMPUTERS, CELLPHONES, AND CHILD PORNOGRAPHY

7.    Computer technology has revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography was once produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to

DISC-00338

develop and to reproduce the images. There were definable costs involved with the production of pornographic images. Consequently, distributing such media on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. Distribution, accordingly, was accomplished through a combination of personal contacts, mailings, and telephone calls. The development of computers has changed this. Now, computers serve multiple functions in connection with child pornography, including, principally: production, communication, distribution, and storage.

8.    Child pornographers can now transfer photographs onto a computer-readable format with a scanner. With the advent of digital cameras, they can now also transfer such images directly onto a computer. A device known as a modem allows any computer to connect to another computer by telephone, cable, or wireless connection. Such electronic contact can connect literally millions of computers around the world.

9.    The computer's and cellphone's ability to store images in digital form makes the computer, itself, an ideal repository for child pornography. Within the last decade, the size of the electronic storage media, commonly known as a hard drive, on home computers has grown tremendously. Consequently, hard drives can now easily store thousands of images at very high resolution.

10.    The Internet affords collectors of child pornography several different venues to obtain, view, and/or trade child pornography in a relatively secure and anonymous fashion.

DISC-00339

11.   Collectors and distributors of child pornography also use online resources to retrieve and to store child pornography, including services offered by Internet Portals such as Google, Yahoo!, and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Often, evidence of such online storage of child pornography is also found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can still be found on the user's computer in most cases.

12.   Digital files, such as, movies and pictures, can also be easily transferred between computers, smart phones, and other devices, or stored simultaneously on multiple devices. Collectors of child pornography often keep their child pornography in multiple places, including on multiple devices.

13.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*e.g.*, by saving an e-mail as a file on the computer or by saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be unintentionally retained (*e.g.*, traces of a path of an electronic communication may be automatically stored in many places, such as, in temporary files or ISP client software). In addition to electronic communications, a computer user's activities on the Internet generally leave traces, "footprints," and/or history files of the browser used. A forensic examiner often can recover evidence

DISC-00340

suggesting whether a computer contains wireless software, whether it was using Yahoo! Messenger, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

14.   Cellular phones and cellular phone technology have further revolutionized the way in which individuals interested in child pornography interact with each other. Today's cellular phones, many of which are called "smart phones," are typically capable of storing a wide variety of data. Such data includes not only telephone numbers, contact lists, addresses, voicemails, and/or text messages, but also images, videos, documents, and programs (often referred to as "applications" or "apps") in much the same way a desktop or laptop computer does.

15.   Data can also be stored on a cellular phone, particularly when it has a high-storage capacity, just like a computer. The storage capacity for a cellular phone includes both internal and removable digital memory. Today's cellular phones can offer up to 128 gigabytes of storage, or more. Removable memory storage can significantly increase, if not double, that storage capacity. As a result, cellular phones can store thousands of high-resolution images and videos. Further, the phones have the ability to be synced with, or connected to, a computer, which allows the user to transfer files between the devices.

16.   Cellular phones are also typically able to access the Internet through either a wireless data plan and/or through a wireless (also known as "wi-fi") Internet connection. This allows cellular phone users to perform many Internet functions on

DISC-00341

their phones, such as, downloading and uploading data (*e.g.*, images, videos) from the Internet, sending and receiving emails, accessing web pages, browsing the Internet, using instant messaging services, and conducting live video chat. Consequently, cellular phones—given their ability to access the Internet and to download images and/or videos onto its internal and removable digital memory—are ideal repositories for child pornography, just like computers, and provide child pornographers with an additional method to share and to trade their child pornography collections.

17.   Cellular phones can also take pictures or "images," which are stored as image files, such as, "JPEGs" or "TIFFs." Image files often contain Exchangeable Image File Format ("EXIF") data.  EXIF data can include a variety of information about the image, including, for example, the time and date that the image was taken, the place where an image was taken (also known as "geolocation data"), the settings that the device used to capture the image, the model of the camera phone that was used to take the image, the focal length of the lens, aperture settings, shutter speed, and ISO speed.

## BACKGROUND ON KIK

18.   Kik is a web-based instant messaging mobile application that allows users to transmit and receive messages, photos, and videos. Users can communicate privately with other users or in groups.

19.   Unlike many other smartphone messaging services that are based on a user's phone number, Kik uses usernames as the unique identifier. By using usernames instead of phone numbers, users' personal information is never shared by Kik.

DISC-00342

20.   Kik usernames have the following characteristics: are unique; can never be replicated; can never be changed; may include lower and uppercase letters, numbers and/or periods and underscores; and will never contain spaces, emoticons or special characters.

21.   Kik is available for download through the iOS App Store and the Google Play store on most iOS (iPhone/iPod/and iPad) and Android (including Kindle Fire) devices. Users may also be using Kik on their Windows, Symbian-based or BlackBerry OS.

## PROBABLE CAUSE

22.   On or about July 26, 2021, the FBI Oklahoma City Division, Tulsa Resident Agency (Tulsa RA) arrested and charged an individual ("Defendant 1") with child pornography related charges in the Northern District of Oklahoma. During a post-*Miranda* interview, Defendant 1 provided consent allowing agents to access his Kik account. An FBI Knoxville Online Covert Employee ("OCE") later accessed the Defendant 1's Kik account and observed membership to an administrator-only private Kik group with a title indicative of incestual child sexual abuse. There were several listed members of this group, to include the Kik account "Rainchexes".

23.   Based on my training and experience, administrators of Kik groups who are involved in the trading of produced child sexual abuse material ("CSAM"), will often create private or separate group chats within Kik to communicate with each other to verify prospective members through a vetting process and to ensure they have

DISC-00343

genuine access to a child for the purpose of producing and sharing CSAM with the other members.

24.    On or about October 27, 2021, FBI Tulsa RA obtained a search warrant in the Northern District of Oklahoma for multiple Kik accounts who were members of the aforementioned private Kik group, including the Kik account "Rainchexes".

25.    On or about November 1, 2021, FBI Tulsa RA and FBI Atlanta reviewed the search warrant return received from Kik, which included a voluminous amount of data and information, and began identifying suspected producers and traders of CSAM on the Kik platform.

26.    On or about November 12, 2021, I received information from the FBI Tulsa RA, they located CSAM images on the search warrant return of the account "Rainchexes", which were posted to a Kik group by the Kik account "puchot" and a display name of "Pucho Torres" and received by "Rainchexes". Several of the images described below were posted while using the Kik live "camera" function, which typically indicates the image was produced live, on that date, using the Kik application as the camera, instead of an image posted from a gallery of previously taken images. Based on my training and experience, offenders who utilize Kik for the purpose of producing CSAM images will use the Kik live "camera" function to gain credibility and bona fides when trying to obtain membership into private Kik groups associated with CSAM production and distribution. A detail of the images posted are listed below:

a.    On or about July 20, 2021, Kik account "puchot" posted a series of five images of what appear to be a light skinned female child, approximately 8 to 12 years old from the waist down wearing floral print shorts. The child is lying in bed with pink colored sheets with a unicorn and rainbow print. There is also a heart shaped, green colored pillow in the background. The last image in the series is the same child with her buttocks exposed and an adult male's hand is present and manipulated the buttocks to expose her anus.

b.    On or about July 22, 2021, Kik account "puchot" posted a series of six images of what appear to be the same child and the same sheets described above. However, the child is now wearing a green colored shirt and green colored shorts with a heart and dolls printed on them. Two of the images in this series depict an adult male's hand pulling the green colored shorts to the side and exposing the anus and vaginal area of the child.

c.    On or about August 2, 2021, Kik account "puchot" posted a single image of what appears to be an adult male's penis exposed through tan colored shorts penetrating the vaginal area of the same child, with the buttocks exposed and facing the camera.

27.    On or about November 9, 2021, FBI Tulsa RA obtained an emergency disclosure request response from Kik for the subscriber information associated with the Kik account "puchot". The name on the account was registered as Pucho Torres, with an email address of pucho.torres@yahoo.com.

28.    Kik also provided records of several IP address logs between on or about October 10, 2021 and on or about November 9, 2021. An analysis of the IP logs indicated the user is accessing the internet through a mobile internet service, most commonly used through a cellular device, and residential based Wi-Fi connections.

29.    On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure to Charter Communications, who verbally provided subscriber information for the IP address 173.170.54.57, which was used to access the "puchot" Kik account

11

12

as recently as November 7, 2021 at 20:21:13 UTC. The subscriber for the Charter Communications account is listed as C.E. and is registered at the **TARGET RESIDENCE**. It should be noted, during the 30-day period of IP logs provided by Kik, the Wifi at the **TARGET RESIDENCE** was utilized to access the Kik account "Puchot" on 15 separate days.

30.   I searched a law enforcement database and located a police report with the Hernando County Sheriff's Office, dated July 15, 2020. The report described that N.A. had been walking a dog when it separated from the leash and attacked another dog. N.A. provided her address as the **TARGET RESIDENCE** and indicated the actual dog owner was C.E., who was her ex-boyfriend who lives in Tampa, Florida. A search of the Florida Driver and Vehicle Identification Database (DAVID) revealed C.E. has a current address listed in Tampa, Florida, with a recent driver's license renewal at that address in May of 2021.

31.   During a search of social media for C.E., I identified a Facebook account of a C.E. from Tampa, Florida, who posted an image on or about March 24, 2020, of a young girl approximately 6 to 10 years old standing next to an older boy and C.E. commented "..yes those are two of my kids". Further analysis revealed an older Facebook account for C.E. that had an image posted on January 11, 2018 that appears to be the same two children, but younger and sitting in car seats. Also in the photo is a heart shaped, green pillow which appears to match the same pillow in paragraph 26 describing the CSAM images.

13

32.   During a search of social media accounts affiliated with **TORRES**, I found a YouTube posting dated May 8, 2021 for "Aby Raul Rivera Torres HCV" and depicts a skydiving jump at a Skydiving center located in Zephyrhills, Pasco County, Florida. (https://www.youtube.com/watch?v=2A3-DgvoxS8). In the beginning of the video, a female who appeared to be N.A. can be observed. During the video, the female believed to be N.A. says, "happy anniversary honey." Based on my investigation, it appears N.A., and **TORRES** are in a relationship and N.A. may be the mother and/or stepmother of the possible child victim. Additionally, a tattoo on **TORRES'** left forearm is partially visible and appears to have similar coloring and location to a tattoo visible in one of the CSAM images identified and noted in paragraph 26.

33.   On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for the IP address 174.211.169.250 used to access the "puchot" Kik on or about October 21, 2021 at 10:42:24 UTC, port number 1528 and 174.211.163.25 on or about October 20, 2021 at 4:02:24 UTC, port number 2954. The listed subscribers were Ady Rivera, 4016 Bismarck Palm Dr, Tampa, Florida, mobile telephone number 832-570-3410, and also listed on this account is Abyraul Rivera Torres (**TORRES**).

34.   On or about November 12, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for periodic location updates of **TORRES'**

14

mobile telephone number 832-570-3410. A response from Verizon Wireless revealed the cellular device is within the radius of certainty of the **TARGET RESIDENCE**.

35. On or about November 12, 2021, I conducted surveillance at the **TARGET RESIDENCE**. No vehicles were observed in the driveway.

36. A criminal history search of **TORRES** revealed an arrest on or about July 17, 2020 by Texas City Police Department for the Aggravated Sexual Assault of a Child, and additional charges by the Galveston Texas Police Department for Possession of Child Pornography related offenses on December 16, 2020. An open-source search of the criminal cases revealed a bond of approximately $150,000 was posted and it appears **TORRES** was released from custody on or about August 10, 2020. There are no pending wants or warrants in the NCIC system for **TORRES**.

37. DAVID record indicate **TORRES** has an expired Florida driver's license and has not updated his registration since June of 2014. FBI Tulsa RA obtained a Texas Driver's License, which indicated **TORRES** has an active driver's license which does not expire until May 2025.

38. Based on my training and experience, I know that mobile devices such as the **TARGET CELLPHONE** are small, compact, and usually carried on an individual's person, or within stored within arm's reach inside a pocket, bag, backpack, fanny pack, briefcase, or suitcase.

15

## CELLPHONE AND COMPUTER DATA

39. As detailed above, there is probable cause to believe that **TORRES** used the **TARGET CELLPHONE** to produce and distribute child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252(a)(2), and that records and information will be stored on the **TARGET CELLPHONE**. There is also probable cause to believe **TORRES** utilized the **TARGET RESIDENCE** to produce child pornography images and evidence of this crime will be located at this residence. Thus, the warrant applied for would authorize the seizure of the **TARGET CELLPHONE** and **TARGET RESIDENCE** under Federal Rule of Criminal Procedure 41(e)(2)(B).

40. One place in which the records might be found is on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

41. Based on my knowledge, training, and experience, and consultation with other law-enforcement agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not

16

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the storage medium that is not currently being used by an active file for long periods of time before they are overwritten, also known as free space or slack space. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

42.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. It is technically possible, however, to delete this information.

43.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard-drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

44.    As further described in Attachment B-1, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

45.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as, word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence, such as, the following:

a.    Forensic evidence of how computers were used, the purpose of their use, who used them, and when they were used, as described further in Attachment B-1, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's knowledge or intent.

### UNLOCKING MOBILE DEVICES USING BIOMETRIC DATA

     46.     Many cellphones have the capability to be can be unlocked using biometric data, in particular, fingerprint and facial recognition technology. Accordingly, if the **TARGET CELLPHONE** requires biometric data to unlock the device, I request that this Court authorize law enforcement officers to present **TORRES'** fingerprints, face and irises to the **TARGET CELLPHONE** cameras, screen, or fingerprint reader in an attempt to unlock the **TARGET CELLPHONE** for the purpose of executing the searches authorized by this warrant.[1]

---

[1]    Based on my training and experience, I know that a person's "identifying physical characteristic[s]" are not testimonial and thus fall "outside [the] protection" of the Fifth Amendment to the U.S. Constitution. *Gilbert v. California,* 388 U.S. 263, 267 (1967). The privilege against self-incrimination is not violated by an order compelling a person to submit to photographing and

     47.     Given their ability to store uniquely personal information, mobile devices are often protected by passwords, passcodes, or other security features, which generally enable only the primary user of the mobile device to use the mobile device and access the mobile device's functions and contents. I know from my training and experience, as well as from information found in publicly available online materials, that some models of Samsung devices offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. I am also aware that some models of smart phone devices are equipped with technology that can use a scan of the user's iris or facial features to unlock the device. In my training and experience, users of devices that offer such features often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device

---

measurements or to provide fingerprints, writing samples, or voice exemplars. *See, e.g., United States v. Dionisio,* 410 U.S. 1, 7 (1973) (voice exemplars not protected by Fifth Amendment); *Gilbert,* 388 U.S. at 266-67 (handwriting exemplars not protected by Fifth Amendment); *California v. Byers,* 402 U.S. 424, 431-32 (1971) ("The act of stopping [a vehicle after an accident] is no more testimonial—indeed less so in some respects—than stopping a person in custody to stand or walk in a police lineup, to speak prescribed words, or to give samples of handwriting, fingerprints, or blood."); *Schmerber v. California,* 384 U.S. 757, 763-64 & n.8 (1966) ("[B]oth federal and state courts have usually held that . . . [the privilege against self- incrimination] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture."); *see also In the Matter of the Search of [Redacted] Washington, District of Columbia,* 317 F. Supp. 3d 523, 532-533, 535 - 36 (D.D.C. 2018) (search warrant authorizing compelled use of biometric feature to unlock devices did not violate Fourth or Fifth Amendments); *In the Matter of The Search Of A White Google Pixel 3 Xl Cellphone In A Black Incipio Case,* – F. Supp. 3d –, 2019 WL 3401990, at *7 (D. Id. July 26, 2019) (determining that search warrant allowing agents to press subject's fingers on sensor to unlock cell phone did not violate the Fifth Amendment because "[w]here, as here, the Government agents will pick the fingers to be pressed on the Touch ID sensor, there is no need to engage the thought process of the subject at all in effectuating the seizure.").

are engaged in child exploitation and thus have a heightened concern about securing the contents of the device.

48.   The passcode(s) or password(s) that would unlock the **TARGET CELLPHONE** are not known to law enforcement officers. Thus, it will likely be necessary to hold the **TARGET CELLPHONE** up to **TORRES'** face or press **TORRES'** fingers to the **TARGET CELLPHONE's** fingerprint sensors in an attempt to unlock the device for the purpose of executing the searches authorized by this warrant. Attempting to unlock the **TARGET CELLPHONE** using this biometric data is necessary because the United States may not otherwise be able to access the data contained on any devices for the purpose of executing the search authorized by this warrant.

49.   If **TORRES** refuses to comply, I request that the Court authorize the law enforcement officers attempting to execute this warrant to employ a reasonable degree of force to compel **TORRES'** compliance.

### CONCLUSION

50.   Based on the above information, probable cause exists that the **TARGET CELLPHONE** and **TARGET RESIDENCE**, as fully described in Attachments A-1 and A-3, contain evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 2252, possession, receipt, or distribution of child pornography. Accordingly, I respectfully request a warrant to search **TORRES** and the **TARGET RESIDENCE**

21

for the **TARGET CELLPHONE** and seize the items listed in Attachments B-1 and B-3.

Michael R. Goodhue, Special Agent
Federal Bureau of Investigation

Sworn to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) via telephone this 13th day of June, 2021.

SEAN P. FLYNN
United States Magistrate Judge

22

### ATTACHMENT A-3

#### Description of Location to be Searched

The location is known as 2282 Opal Lane, Spring Hill, FL 34608 ("TARGET RESIDENCE"), and is identified as follows: The TARGET RESIDENCE is brown in color with a white iron entrance gate and two-car driveway. The numbers "2282" are displayed in the top center of the two-car garage. The TARGET RESIDENCE is located in Spring Hill, Hernando County, Florida, which is in the Middle District of Florida. The residence is depicted below:



### ATTACHMENT B-3

#### Description of Items to be Searched for and Seized

The following materials concerning Aby Raul Rivera Torres' violations of 18 U.S.C. §§ 2251 and 2252, which constitute evidence of the commission of such a criminal offense, contraband, the fruits of such crime, or property designed or intended for use or which is or has been used as the means of committing such a criminal offense:

1.      All visual depictions possessed by Aby Raul Rivera Torres, including still images, videos, films, or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the receipt or storage of the same, but not limited to:

Any computer, computer system, cellular devices, Personal Data Assistants (PDAs), and any related peripherals owned, possessed, used or accessed by Aby Raul Rivera Torres, including any data processing devices and software (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, routers, computer compact disks, CD-ROMS, DVD, and other memory storage devices) as well as any devices, mechanisms, or parts owned, possessed, used or accessed by Aby Raul Rivera Torres that can be used to restrict access to computer hardware (including but not limited to physical keys and locks); keyboards; monitors; mice; modems; and routers.

2.      Computer monitors, keyboards, and computer mice owned, possessed, used or accessed by Aby Raul Rivera Torres.

3.      Any and all computer passwords used or accessed by Aby Raul Rivera Torres and other data security devices used or accessed by Aby Raul Rivera Torres, which are designed to restrict access to or hide computer software, documentation, or

2

USCA11 Case: 22-12996   Document: 18   Date Filed: 01/17/2023   Page: 82 of 221

data. Data security devices may consist of hardware, software, or other programming code.

4.    Any and all computer data owned, possessed, used or accessed by Aby Raul Rivera Torres that would reveal the presence of malware, viruses, or malicious codes located on the computer storage media owned, possessed, used or accessed by Aby Raul Rivera Torres.

5.    Any and all documents, photographs, videos, records, emails, logs, and internet history (in documentary or electronic form), owned, possessed, used or accessed by Aby Raul Rivera Torres that pertain to the production, possession, receipt, or distribution of child pornography, or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, concerning an interest by Aby Raul Rivera Torres in child pornography, whether transmitted or received; pertaining to an interest in child exploitation, child erotica, pedophilia, or sexual abuse of children; relating to the persuading, inducing, enticing, or coercing of minors by Aby Raul Rivera Torres to engage in prostitution or any sexual activity; or pertaining to the transfer of obscene matter by Aby Raul Rivera Torres to minors.

6.    Any and all materials or items owned, possessed, used or accessed by Aby Raul Rivera Torres that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child

3

prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings. "Child erotica" may also include, in this context, sex aids and/or toys.

7.    Any and all records, documents, invoices, and materials, in any format or medium owned, possessed, used or accessed by Aby Raul Rivera Torres (including, but not limited to, e-mail messages, chat logs, and electronic messages, as well as other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.    Records, documents, invoices, and materials owned, possessed, used or accessed by Aby Raul Rivera Torres that demonstrate use or control of an Internet Service Provider account, including paid bills as well as all records relating to the ownership or use of computer equipment and cellular phone found in the residence.

10.    Documents and records regarding Aby Raul Rivera Torres' ownership and/or possession of the searched premises limited to paid utility bills, paid telephone bills, and rental agreements.

11.    Any documents, records, programs, or applications owned, possessed, used or accessed by Aby Raul Rivera Torres relating to the existence of counter-forensic programs (and associated data) that are designed to eliminate data from the computers.

4

12. Any clothing worn by the minor victim during the production of CSAM images in the **TARGET RESIDENCE**.

13. Any heart shaped pillow or bedding from the background of the CSAM images produced in the **TARGET RESIDENCE**.

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means    ☐ Original    ☐ Duplicate Original

## UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. **8:21MJ2125SPF** |
| A residence located at 2282 Opal Lane Spring Hill, FL 34608 | ) | |

### WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ___ Middle ___ District of ___ Florida ___
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-3

**YOU ARE COMMANDED** to execute this warrant on or before **11/27/2021** *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___ SEAN P. FLYNN ___
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ___ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of ___

Date and time issued: 11/13/2021 at 4:14 pm

City and state: Tampa, Florida

SEAN P. FLYNN, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

---

### ATTACHMENT A-3

#### Description of Location to be Searched

The location is known as 2282 Opal Lane, Spring Hill, FL 34608 ("**TARGET RESIDENCE**"), and is identified as follows:  The **TARGET RESIDENCE** is brown in color with a white iron entrance gate and two-car driveway. The numbers "2282" are displayed in the top center of the two-car garage. The **TARGET RESIDENCE** is located in Spring Hill, Hernando County, Florida, which is in the Middle District of Florida. The residence is depicted below:



## ATTACHMENT B-3

### Description of Items to be Searched for and Seized

The following materials concerning Aby Raul Rivera Torres' violations of 18 U.S.C. §§ 2251 and 2252, which constitute evidence of the commission of such a criminal offense, contraband, the fruits of such crime, or property designed or intended for use or which is or has been used as the means of committing such a criminal offense:

1. All visual depictions possessed by Aby Raul Rivera Torres, including still images, videos, films, or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the receipt or storage of the same, but not limited to:

Any computer, computer system, cellular devices, Personal Data Assistants (PDAs), and any related peripherals owned, possessed, used or accessed by Aby Raul Rivera Torres, including any data processing devices and software (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, routers, computer compact disks, CD-ROMS, DVD, and other memory storage devices) as well as any devices, mechanisms, or parts owned, possessed, used or accessed by Aby Raul Rivera Torres that can be used to restrict access to computer hardware (including but not limited to physical keys and locks); keyboards; monitors; mice; modems; and routers.

2. Computer monitors, keyboards, and computer mice owned, possessed, used or accessed by Aby Raul Rivera Torres.

3. Any and all computer passwords used or accessed by Aby Raul Rivera Torres and other data security devices used or accessed by Aby Raul Rivera Torres, which are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.

4. Any and all computer data owned, possessed, used or accessed by Aby Raul Rivera Torres that would reveal the presence of malware, viruses, or malicious codes located on the computer storage media owned, possessed, used or accessed by Aby Raul Rivera Torres.

5. Any and all documents, photographs, videos, records, emails, logs, and internet history (in documentary or electronic form), owned, possessed, used or accessed by Aby Raul Rivera Torres that pertain to the production, possession, receipt, or distribution of child pornography, or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, concerning an interest by Aby Raul Rivera Torres in child pornography, whether transmitted or received; pertaining to an interest in child exploitation, child erotica, pedophilia, or sexual abuse of children; relating to the persuading, inducing, enticing, or coercing of minors by Aby Raul Rivera Torres to engage in prostitution or any sexual activity; or pertaining to the transfer of obscene matter by Aby Raul Rivera Torres to minors.

6. Any and all materials or items owned, possessed, used or accessed by Aby Raul Rivera Torres that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child

2

3

prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings. "Child erotica" may also include, in this context, sex aids and/or toys.

7.    Any and all records, documents, invoices, and materials, in any format or medium owned, possessed, used or accessed by Aby Raul Rivera Torres (including, but not limited to, e-mail messages, chat logs, and electronic messages, as well as other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.    Records, documents, invoices, and materials owned, possessed, used or accessed by Aby Raul Rivera Torres that demonstrate use or control of an Internet Service Provider account, including paid bills as well as all records relating to the ownership or use of computer equipment and cellular phone found in the residence.

10.    Documents and records regarding Aby Raul Rivera Torres' ownership and/or possession of the searched premises limited to paid utility bills, paid telephone bills, and rental agreements.

11.    Any documents, records, programs, or applications owned, possessed, used or accessed by Aby Raul Rivera Torres relating to the existence of counter-forensic programs (and associated data) that are designed to eliminate data from the computers.

12.    Any clothing worn by the minor victim during the production of CSAM images in the **TARGET RESIDENCE**.

13.    Any heart shaped pillow or bedding from the background of the CSAM images produced in the **TARGET RESIDENCE**.

# DOC. 28

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                         **Case No: 8:21-cr-397-MSS-JSS**

**ABY RAUL RIVERA TORRES**

_____ /

## MOTION FOR EVIDENTIARY HEARING AND ORAL ARGUMENT
## ON THE DEFENDANT'S MOTION TO SUPPRESS
## UNLAWFUL SEIZURE AND SEARCH OF CELLPHONE

The Defendant, Mr. Aby Raul Rivera Torres ("Mr. Rivera Torres"), by and through his undersigned counsel, Mr. Adam J. Nate, pursuant to Middle District of Florida Local Rule 3.01(h), moves this Honorable Court to set an Evidentiary Hearing and Oral Argument on the Defendant's "Motion to Suppress Unlawful Seizure and Search of Cellphone" (Doc. 27).

As grounds in support of this motion, Mr. Rivera Torres states the following:

1.      On February 4, 2022, Mr. Rivera Torres filed a "Motion to Suppress Unlawful Seizure and Search of Cellphone" (Doc. 27).

2.      Mr. Rivera Torres requests the Court set an evidentiary hearing on the motion, at which time factual disputes can be resolved and the Court can hear oral arguments from the parties.

3.      Mr. Rivera Torres anticipates that an evidentiary hearing and oral argument will require approximately four hours.

**WHEREFORE**, the Defendant, Mr. Rivera Torres, respectfully moves this Honorable Court to set an evidentiary hearing and oral argument on his "Motion to Suppress Unlawful Seizure and Search of Cellphone" (Doc. 27).

Respectfully submitted this 4th day of February, 2022.

**A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER**

**_/s/ Adam J. Nate_**

Adam J. Nate
Florida Bar No.0077004
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida  33602
Telephone:   (813) 228-2715
E-mail:      Adam_Nate@fd.org

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of February, 2022, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Ms. Lisa M. Thelwell, Assistant United States Attorney

**/s/ *Adam J. Nate***

Adam J. Nate
Assistant Federal Defender

# DOC. 33

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States hereby opposes Defendant Aby Raul Rivera Torres's *Motion to Suppress Unlawful Seizure and Search of Cellphone* ("Motion to Suppress"). Doc. 27. In his motion, the defendant asserts that the government unlawfully searched his boat, exceeding the scope of the residential search warrant, with the aid of a private individual. Contrary to the defendant's claim, however, the United States did not search the defendant's boat and subsequently unlawfully seize his cellular phone. The Fourth Amendment does not apply to searches conducted by private individuals unless they are acting as an instrument or agent of the government. The government did not employ the use of private individual to conduct an unlawful search of the defendant's boat. For the reasons set forth below, the United States respectfully requests that the Court deny the defendant's motion.

## I.    PROCEDURAL HISTORY

1.    On November 13, 2021, the Federal Bureau of Investigation arrested the defendant on a federal criminal complaint, charging him with production of child pornography. Doc. 1.

2.    The defendant appeared for his initial appearance on November 15, 2021. Doc. 10. The court ordered him detained. Doc. 11.

3.    On December 15, 2021, a federal grand jury charged the defendant in a four-count indictment. Doc. 15. Count One charges the defendant with production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e). Counts Two, Three, and Four charge the defendant with distributing child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). *Id*.

4.    The court granted the defendant's motion to continue and scheduled trial to commence during the April 2022 trial term. Docs. 24, 25. The defendant waived speedy trial through and including April 30, 2022. Docs. 25, 29.

5.    The defendant filed the instant motion on February 4, 2022, thereby tolling the speedy trial clock. *See* 18 U.S.C. § 3161(h)(1)(D).

## II.    FACTUAL BACKGROUND

*Initial Investigation and Surveillance of the Residence*

6.    On or about July 26, 2021, the FBI Oklahoma City Division, Tulsa Resident Agency (Tulsa RA) arrested and charged an individual ("Defendant 1")

with child pornography related charges in the Northern District of Oklahoma. During a post-*Miranda* interview, Defendant 1 provided consent allowing agents to access his Kik account. An FBI Knoxville Online Covert Employee ("OCE") later accessed the Defendant 1's Kik account and observed membership to an administrator-only private Kik group with a title indicative of incestual child sexual abuse. There were several listed members of this group, to include the Kik account "Rainchexes".

7.     On or about October 27, 2021, FBI Tulsa RA obtained a search warrant in the Northern District of Oklahoma for multiple Kik accounts who were members of the private Kik group, including the Kik account "Rainchexes".

8.     On or about November 1, 2021, FBI Tulsa RA and FBI Atlanta reviewed the search warrant return received from Kik, which included a voluminous amount of data and information, and began identifying suspected producers and traders of child sex abuse material ("CSAM") on the Kik platform.

9.     On or about November 12, 2021, FBI Tampa received information from the FBI Tulsa RA, they located CSAM images in the search warrant return of the account "Rainchexes" that had been posted to a Kik group by the Kik account "puchot" and a display name of "Pucho Torres" and received by "Rainchexes". Several of the child sex abuse images were posted while using the Kik live "camera" function, which typically indicates the image was produced live,

on that date, using the Kik application as the camera, instead of an image posted from a gallery of previously taken images. The Kik account "puchot" posted a series of images depicting a minor female child, approximately 8 to 12 years old, being sexually abused. In some of the images, the forearm of an adult male is visible. The arm has distinctive tattoos that are visible in the images.

10.   On or about November 9, 2021, FBI Tulsa RA obtained an emergency disclosure request response from Kik for the subscriber information associated with the Kik account "puchot". The name on the account was registered as Pucho Torres, with an email address of pucho.torres@yahoo.com. Kik also provided records of several IP address logs between on or about October 10, 2021, and on or about November 9, 2021. An analysis of the IP logs indicated the user is accessing the internet through a mobile internet service, most commonly used through a cellular device, and residential based Wi-Fi connections.

11.   On or about November 11, 2021, FBI Tulsa RA submitted an emergency disclosure to Charter Communications, who verbally provided subscriber information for the IP address 173.170.54.57, which was used to access the "puchot" Kik account on 15 separate occasions and as recently as November 7, 2021, at 20:21:13 UTC. The subscriber for the Charter Communications account is listed as C.E. and is registered at a residence in Spring Hill, Florida ("the residence").

12.     FBI agents discovered that the defendant was residing at the residence with his apparent girlfriend (N.A.) and her minor children. Investigators learned that the defendant had a cellular phone assigned to Verizon Wireless.

13.     On or about November 12, 2021, FBI Tulsa RA submitted an emergency disclosure request to Verizon Wireless for periodic location updates of the defendant's cellular phone number. A response from Verizon Wireless revealed the cellular device is within the radius of certainty of the residence.

14.     On that same date, FBI agents conducted surveillance at the residence. The did not observe any vehicles but did see a boat parked in the driveway.

15.     On November 13, 2021, FBI agents conducted surveillance of the residence while they awaited authorization of a search warrant. At approximately 1:00 p.m., agents observed the defendant inside the parked boat, which was secured to a trailer in the driveway, at the residence. Agents also observed three minor children standing outside the residence in the front yard near the boat.

16.     FBI Special Agents John Sermons and Andrew Stiles approached the defendant at approximately 1:03 p.m. and ordered him out of the boat and detained him for further investigation. Agents observed that the defendant had tattoos that appeared to be similar to the tattoos on the adult male forearm depicted in the CSAM.

5

***Search of the Residence & Seizure of the Defendant's Cellphone***

17.     On November 13, 2021, the FBI obtained three federal search warrants – for the residence, the defendant's person, and the defendant's cellphone. FBI Special Agent Michael Goodhue obtained approval of the search warrants at approximately 1:30 p.m. via telephone.

18.     At the time law enforcement officers executed the search warrant, the defendant was at the residence alone with three minor children, including the minor victim in this case.

19.     Sometime after 1:30 p.m., Agent Sermons and Agent Stiles asked the minor children if they had seen the defendant with a cellphone. The children said "yes" and went inside the house to show the agents where they had seen the defendant using his phone. The children told the agents to search the living room couches and recliners.

20.     When the phone was not located, the minor victim shouted she knew where to look. The minor victim then ran outside to the boat parked in the driveway, climbed into the boat, and found the defendant's cellular phone in the same area agents had observed the defendant standing when they ordered him out of the boat. The minor victim then exited the boat and gave the phone to Agent Stiles. Agent Stiles then took the phone and gave it to Agent Sermons, who was in a vehicle interviewing the defendant.

6

21.    FBI agents did not encourage or instruct the minor victim to retrieve the defendant's cellular phone from the boat.

### III.    **MEMORANDUM OF LAW**

### A. The Fourth Amendment Does Not Apply to Searches by Private Individuals

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" A search by a private citizen generally does not implicate the Fourth Amendment. *See U.S. v. Jacobsen*, 466 U.S. 109, 104 (1984); *U.S. v. Simpson*, 904 F.2d 607, 609 (11th Cir. 1990); *U.S. Steiger*, 318. F.3d 1039, 1045 (11th Cir. 2003). The Fourth Amendment is only implicated if the private person is acting as an instrument or agent of the government. *Steiger*, 318 F.3d at 1045. To determine whether a private person is acting as an agent of the government, the court conducts a two-prong analysis: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement rather than to further his own ends." *Id*. As part of the inquiry into the first prong, the court also considers whether the government "openly encouraged or cooperated in the search." *U.S. v. Emile*, 618 Fed. Appx. 953, 955 (11th Cir. 2015) (quoting *U.S. v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985).

In this case, no government agent instructed the minor children to locate or provide the defendant's cellular phone. The agents asked the children if they had seen the defendant with his cellphone. The children told agents to search the living room couch and recliner. When the device was not located, the minor victim had a "eureka moment", shouted she knew where the phone was, and took off running to the boat, which was parked in the driveway. Without encouragement, instruction, or guidance, the minor victim climbed into the boat, found the phone, and gave it to law enforcement officers. Moreover, the agents did not cooperate or participate in the search. They did not enter the boat or instruct the minor victim on what to do or where to search to locate the device.

## IV.   <u>CONCLUSION</u>

The law is clear that Fourth Amendment protections are not triggered in a search conducted by a private individual who is not acting as an agent for the government. The United States did not engage in an unlawful search of the defendant's boat. Without encouragement or cooperation, the minor victim independently searched the defendant's boat for his cellphone. Acting as a private individual, the minor victim subsequently exited the boat and provided it to law enforcement.

WHEREFORE the United States respectfully requests this Court enter an

order denying the defendant's Motion to Suppress. Doc. 27.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: *s/ Lisa M. Thelwell*
    Lisa M. Thelwell
    Assistant United States Attorney
    Florida Bar No. 100809
    400 N. Tampa Street, Suite 3200
    Tampa, Florida 33602-4798
    Telephone:   (813) 274-6000
    Facsimile:    (813) 274-6103
    E-mail: lisa.thelwell@usdoj.gov

**U.S. v. Rivera Torres**                    **Case No. 8:21-cr-397-MSS-JSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2022, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Adam Nate, Esq.


By: *s/ Lisa M. Thelwell*
    Lisa M. Thelwell
    Assistant United States Attorney
    Florida Bar No. 100809
    400 N. Tampa Street, Suite 3200
    Tampa, Florida 33602-4798
    Telephone:   (813) 274-6000
    Facsimile:   (813) 274-6103
    E-mail: lisa.thelwell@usdoj.gov

DOC. 38

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA,**

      **v.**                              **CASE NO. 8:21-cr-397-MSS-JSS**

**ABY RAUL RIVERA TORRES**

_____

## ORDER

      **THIS CAUSE** comes before the Court for consideration of Defendant's Motion to Suppress Unlawful Seizure and Search of Cellphone, (Dkt. 27) and the Government's response in opposition. (Dkt. 33) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** Defendant's Motion to Suppress.

### I. BACKGROUND

      Defendant was charged in an Indictment on December 15, 2021. (Dkt. 15) In Count One, Defendant is charged with the production of child pornography in violation of 18 U.S.C. § 2251(a) and (e). (Dkt. 15) In Counts Two, Three, and Four, Defendant is charged with distributing child pornography in violation of 18 U.S.C. § 2251(a)(2) and (b)(1). (Id.)

      On February 4, 2022, Defendant filed a Motion to Suppress all evidence obtained from the seizure and search of his cellphone. (Dkt. 27) Defendant contends

the Government, through the assistance of a minor child, unlawfully searched his boat to seize his cellphone, which exceeded the scope of the lawful warrant for search of his residence. (Id.) Defendant asserts that the minor child who searched the boat and recovered the phone acted as an agent of the Government. (Id.) The Government contends the minor child acted on her own volition as a private individual during the search of the boat and did not act on behalf of the Government. (Dkt. 33)

For the reasons that follow, the Court **DENIES** Defendant's Motion to Suppress.

## II. LEGAL STANDARD

The Fourth Amendment establishes that "right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protections extended from the Fourth Amendment do not apply to a private individual not acting as an agent of the government or with the participation or knowledge of any government official. U.S. v. Jacobsen, 466 U.S. 109, 113 (1984). The Eleventh Circuit looks to two critical factors to determine whether a private party acts as an agent of the government: (1) whether the government knew of and acquiesced in the intrusive conduct and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends. U.S. v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003). As part of the inquiry under the first prong, courts have considered whether the government had knowledge and

encouraged the search. <u>U.S. v. Emile</u>, 618 Fed. Appx. 953, 955 (11th Cir. 2015)

(quoting <u>U.S. v. Ford</u>, 765 F.2d 1088, 1090 (11th Cir. 1985)). [1]

### III. DISCUSSION

The Parties agree as to the following material facts. On November 13, 2021, law enforcement was conducting surveillance of the residence where Defendant resided with his girlfriend and her minor children. (Dkt. 27 at ¶¶ 1, 2; Dkt. 33 at ¶ 12, 15) Law enforcement observed Defendant and minor children outside the residence. (Dkt. 27 at ¶¶ 11,12; Dkt. 33 at ¶¶ 15) Defendant was in a parked boat, which was secured to a trailer in the driveway at the residence. (Dkt. 27 at ¶ 11; Dkt. 33 at ¶ 15) Law enforcement approached and detained Defendant. (Dkt. 27 at ¶ 13; Dkt. 33 at ¶ 16) After Defendant was detained, law enforcement obtained valid search warrants for Defendant's person, cellphone, and residence. (Dkt. 27 at ¶¶ 10, 15; Dkt. 33 at ¶ 17)

Law enforcement began to execute the search of the residence. (Dkt. 27 at ¶ 16; Dkt. 33 at ¶ 19) An officer standing outside of the residence asked the minor children if they had seen Defendant with his cellphone. (Dkt. 27 at ¶¶ 17; Dkt. 33 at ¶ 19) The minor children answered in the affirmative. (Dkt. 27 at ¶ 18; Dkt. 33 at ¶ 19) With the permission of law enforcement, the children went inside the residence and told law enforcement to search the couch and recliner. (Dkt. 27 at ¶¶ 18, 19; Dkt. 33 at ¶ 19) Law enforcement proceeded to look in those areas but did not locate the phone. (Dkt. 27 at ¶ 20; Dkt. 33 at ¶ 20) One of the minor children stated she knew where to look

---

[1] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.  <u>See</u> 11th Cir. R. 36-2."  <u>United States v. Futrell</u>, 209 F.3d 1286, 1289 (11th Cir. 2000).

for the cellphone next. (Dkt. 27 at ¶ 21; Dkt. 33 at ¶ 20) Without prompting, the minor child left the house, entered the boat in the driveway and retrieved the cellphone from the boat. (Dkt. 27 at ¶ 21; Dkt. 33 at ¶ 20) The minor child gave the cellphone to law enforcement. (Dkt. 27 at ¶ 22; Dkt. 33 at ¶ 20)

### A. Whether the Government Knew of and Acquiesced in the Intrusive Conduct

Defendant argues that the minor child acted as a government agent because the Government knew that the minor child would search the boat and further agreed to and encouraged her behavior. (Dkt. 27 at ¶ 44) The facts do not support Defendant's assertion that the Government knew of and acquiesced in the minor child's intrusive conduct.

Coolidge v. New Hampshire, 403 U.S. 443 (1971) is informative. In Coolidge, the Supreme Court held, in part, that a search and seizure under the Fourth Amendment is not implicated where a private individual's action is not tainted by coercion or suggestions made by officers. Id. at 489-90. There, officers went to the defendant's home and asked his wife if there were any guns in the house. Id. at 486. The wife retreated into the home retrieved the guns and gave them to the officers. Id. The officers then asked the wife what the defendant was wearing on the night of the incident for which the husband had been arrested. Id. The wife provided the officers with the clothing. Id. The defendant sought to suppress the guns and clothes claiming they were the product of an unlawful search and seizure under the Fourth Amendment because that the wife acted as an instrument of the officers. Id. at 487. The Supreme

4

Court held, in part, that the wife was not acting as a government agent when providing the officers with the guns and clothes, noting that she provided the items "wholly on her own initiative." Id. at 487-90. Additionally, the Supreme Court held that the officers made no attempt to coerce the wife or direct her actions with suggestions. Id. at 489.

By contrast, in State v. Moninger, 957 So.2d 2, 5 (Fla. Dist. Ct. App. 2007), the court held, in part, that a search and seizure under the Fourth Amendment was implicated where an officer's suggestion and encouragement precipitated a private individual's action. In Moninger, detectives responded to the defendant's residence, where a minor also lived, to investigate an allegation of child molestation. Id. at 3. A detective conducted an interview with the minor and asked if she had anything to corroborate her claims of abuse. Id. The minor informed the detective that the defendant had condoms in his bedroom. Id. The detectives told the minor to retrieve her belongings and the condom from the home if she wanted to take them with her. Id. After this conversation, the minor went into the defendant's bedroom, retrieved the condoms, and gave them to the detectives. Id. The defendant sought to suppress the condoms claiming they were the obtained through an unlawful search and seizure because the minor acted as an instrument of the detectives. Id. The court held, in part, that the minor was acting as a government agent because she was complying with detective's instruction to retrieve the condoms, which led to her intrusive conduct inside the defendant's bedroom. Id. at 5.

In this present case, the salient facts are more akin to the facts in <u>Coolidge</u> than those at play in <u>Moninger</u>. Like the officers in <u>Coolidge</u>, law enforcement asked the children, without coercion or suggestion, if they knew where Defendant's phone was located. Unlike the detectives in <u>Moninger</u>, law enforcement did not direct or encourage the minor child to search the boat to retrieve the cellphone. Similar to the wife in <u>Coolidge</u>, the minor child searched the boat and retrieved the cellphone of her own volition. Further, unlike the detective in <u>Moninger</u>, law enforcement here did not know the minor child would board the boat and retrieve Defendant's cellphone. Thus, the Court finds that Defendant fails to satisfy the first factor under the Eleventh Circuit test: law enforcement's encouragement of, knowledge of, or acquiescence in the intrusive conduct that led to the discovery of the challenged evidence. <u>Steiger</u>, 318 F.3d 1045.

The Court need not address the second factor, whether the minor child's purpose was to assist law enforcement efforts rather than to further her own ends, because the facts fail to satisfy the first factor under the Eleventh Circuit test.

## IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Defendant's Motion to Suppress Unlawful Seizure and Search of Cellphone, (Dkt. 27) is **DENIED.**

2. Defendant's Motion for Evidentiary Hearing and Oral Argument on the Defendant's Motion to Suppress Unlawful Seizure and Search of Cellphone, (Dkt. 28) is **DENIED**. The Court finds no disputed issues of

material fact pertinent to the resolution of the motion are presented on the moving papers or the response.

**DONE** and **ORDERED** in Tampa, Florida, on this 13th day of April 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
All Counsel of Record
Any *Pro Se* parties

# Doc. 40

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                       CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

**JOINT STATUS REPORT**

The United States of America, by Roger B. Handberg, United States Attorney

for the Middle District of Florida, files with this Court, pursuant to Fed. R. Crim. P.

17.1, the following status report. In response to the inquiries in the Court's order

(doc. 22), the United States herein states as follows:

**1.    Brief summary of the case's status:**

Aby Raul Rivera Torres, the defendant, was arrested on a criminal complaint

on November 13, 2021. Docs. 1, 2. The defendant appeared for his initial appearance

on November 15, 2021. Doc. 10. The court held a detention hearing and ordered the

defendant detained. Docs.10, 11.

On December 15, 2021, a federal grand jury returned a four-count indictment

charging the defendant with one count of production of child pornography, in

violation of 18 U.S.C. § 2251(a) and (e); and three counts of distribution of child

pornography, in violation of 18 U.S.C. § 2252(a)(2). Doc. 15. The defendant waived

his appearance at arraignment. Doc. 19. The United States provided initial discovery

on or about January 11, 2022. Additional discovery was provided on January 13,

2022.

**2.**     **Possibility of a plea agreement as to each defendant:**

A resolution by plea agreement is not likely.

**3.**     **Number of days required for trial, for government's case-in-chief:**

The parties have agreed to a stipulated facts bench trial, which should not last more than one day.

**4.**     **Pending motions, dates on which they were filed, and whether they are ripe for determination:**

There are no pending motions. Defense counsel has indicated he is unavailable for trial May 9 – 13, 2022.

**5.**     **Potential speedy trial problems:**

There are no speedy trial concerns. On April 6, 2022, the defendant filed a written waiver of speedy trial through May 31, 2022, and an unopposed motion to continue trial to the May 2022 term. Docs. 36, 37. The Court granted the defendant's motion to continue to the May trial term, which commences on May 2, 2022. Doc. 39. Since the defendant has waived speedy trial through the end of May 2022, there is no speedy trial issue.

The United States has consulted with counsel for the defendant herein and both parties agree to the above information.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney


By:    */s/ Lisa M. Thelwell*
       Lisa M. Thelwell
       Assistant United States Attorney
       Florida Bar No. 100809
       400 N. Tampa Street, Suite 3200
       Tampa, Florida 33602-4798
       Telephone:   (813) 274-6000
       Facsimile:    (813) 274-6358
       E-mail: lisa.thelwell@usdoj.gov

**U.S. v. Rivera Torres**                    **Case No. 8:21-cr-397-MSS-JSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Adam Nate, AFD

*/s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: lisa.thelwell@usdoj.gov

# DOC. 42

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **CASE NO: 8:21-cr-00397-MSS-JSS**

**ABY RAUL RIVERA TORRES**

_____

## ORDER SETTING STIPULATED
## FACTS BENCH TRIAL

**THIS CAUSE** comes before the Court upon review of the Parties' recent

Status Report. (Dkt 40) The parties advised the Court that they have "agreed to a

stipulated facts bench trial, which should not last more than one day."

Accordingly, it is **ORDERED** as follows:

1. This matter is hereby set for a stipulated facts bench trial on **Monday, May 23,
   2022 at 9:30 AM** in Tampa Courtroom 7A before the Undersigned; One (1) day
   has been reserved for this trial.

2. The Government is directed to file a Notice of Essential Elements of the Offense
   on or before **May 16, 2022.**

3. **Exhibit lists and witness lists** shall be electronically filed no later than the **9:00
   AM on the morning of trial**. All exhibits are to be appropriately pre- marked,
   in accordance with Local Rule 3.07, Middle District of Florida. A three-ring
   binder containing copies of all exhibits, properly pre-marked, shall be provided
   to the Courtroom Deputy Clerk the morning of trial for the Court's use.
   **Additionally, the Parties shall provide to the Courtroom Deputy Clerk, at
   the conclusion of trial, a disk with electronic copies, in  pdf  format, of all**

**exhibits <u>admitted</u> into evidence**.

4. Every visitor is required to present to court security personnel, a valid official photo ID when entering the courthouse. Absent leave of Court, only members of the Florida Bar or *Pro Hac Vice* counsel are permitted to bring electronic equipment into the courthouse and into courtroom 7A.

   **DONE AND ORDERED** this 29th day of April, 2022.

   _____
   MARY S. SCRIVEN
   UNITED STATES DISTRICT JUDGE

# DOC. 44

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

ABY RAUL RIVERA TORRES

CASE NO. 8:21-cr- 397-MSS-JSS
18 U.S.C. § 2251(a)
18 U.S.C. § 2252(a)(2)
18 U.S.C. § 2252(a)(4)(B)

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT ONE

On or about August 2, 2021, in the Middle District of Florida, and elsewhere,
the defendant,

ABY RAUL RIVERA TORRES,

did employ, use, persuade, induce, entice, and coerce a minor to engage in any
sexually explicit conduct for the purpose of producing a visual depiction of such
conduct, knowing and having reason to know that such visual depiction would be
transported and transmitted using any means and facility of interstate and foreign
commerce and the visual depiction was actually transported and transmitted using
any means and facility of interstate and foreign commerce.

In violation of 18 U.S.C. § 2251(a) and (e).

## COUNT TWO

On or about July 20, 2021, in the Middle District of Florida, and elsewhere,
the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## COUNT THREE

On or about July 22, 2021, in the Middle District of Florida, and elsewhere, the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## COUNT FOUR

On or about August 2, 2021, in the Middle District of Florida, and elsewhere, the defendant,

ABY RAUL RIVERA TORRES,

did knowingly distribute a visual depiction using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use

of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct.

In violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

## COUNT FIVE

On or about November 13, 2021, in the Middle District of Florida, and elsewhere, the defendant,

### ABY RAUL RIVERA TORRES,

did knowingly possess matters which contained a visual depiction that had been shipped and transported using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct and the visual depiction was of such conduct, and the depiction involved a prepubescent minor and a minor who had not attained 12 years of age.

In violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).

## FORFEITURE

1.      The allegations contained in Counts One through Five are incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 2253.

2.      Upon conviction of a violation of 18 U.S.C. §§ 2251(a), 2252(a)(2), and 2252(a)(4(b), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 2253:

        a.  Any visual depiction described in 18 U.S.C. §§ 2251, 2251A, or 2252,

3

2252A, 2252B, or 2260 of chapter 110 of Title 18, or any book, magazine, periodical, film, videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received in violation of chapter 110;

      b.  Any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

      c.  Any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

    3.    The property to be forfeited includes, but is not limited to, the following: a black Samsung cellphone seized from the defendant's residence in or about November 2021.

    4.    If any of the property described above, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant

to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2253(b).

A TRUE BILL,

_____
Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
Lisa M. Thelwell
Assistant United States Attorney

By: _____
Stacie B. Harris
Assistant United States Attorney
Chief, Special Victims Section

5

FORM OBD-34
May 22

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
## Tampa Division

## THE UNITED STATES OF AMERICA

vs.

## ABY RAUL RIVERA TORRES

## SUPERSEDING INDICTMENT

Violations:   18 U.S.C. § 2251(a)
              18 U.S.C. § 2252(a)(2)

A true bill,

███████████████████
                Foreperson

Filed in open court this 4th day
of May, 2022.

_____
                Clerk

Bail $_____

GPO 863 525

# DOC. 46

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES


**NOTICE OF ESSENTIAL ELEMENTS OF OFFENSE**

The United States of America, by Roger B. Handberg, United States Attorney

for the Middle District of Florida, hereby files this Notice of Elements of Offense

stating as follows:

ESSENTIAL ELEMENTS

The essential elements of a violation of 18 U.S.C. § 2251(a), production of child

pornography, are as follows:

First:      an actual minor, that is, a real person who was less than 18 years
            old, was depicted;

Second:     the defendant employed, used, persuaded, induce, enticed, or
            coerced the minor to engage in sexually explicit conduct for the
            purpose of producing a visual depiction, e.g., video tape of the
            conduct; and

Third:      the defendant knew or had reason to know that the visual
            depiction would be transported in interstate or foreign commerce;
            or the visual depiction was actually transported in interstate or
            foreign commerce.

The essential elements of a violation of 18 U.S.C. § 2252(a)(2), distribution of child pornography, are as follows:

| | |
|---|---|
| First: | the defendant knowingly distributed a visual depiction of sexually explicit conduct; |
| Second: | the depiction was shipped or transported in interstate or foreign commerce by any means, including computer |
| Third: | producing the visual depiction involved using a minor engaged in sexually explicit conduct; |
| Fourth: | the depiction is of a minor engaged in sexually explicit conduct; and |
| Fifth: | the defendant knew that at least one of the performers in the visual depiction was a minor and knew that the visual depiction was of such minor engaged in sexually explicit conduct. |

The essential elements of a violation of 18 U.S.C. § 2252(a)(4)(B), possession of child pornography, are as follows:

| | |
|---|---|
| First: | the defendant knowingly possessed a visual depiction; |
| Second: | the depiction had been shipped or transported using any means or facility of interstate or foreign commerce; |
| Third: | producing the visual depiction involved using a minor engaged in sexually explicit conduct; |
| Fourth: | the depiction is of a minor engaged in sexually explicit conduct; |
| Fifth: | the defendant knew that at least one performer in the visual depiction was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct; and |

2

Sixth:     the visual depiction involved the use of a prepubescent minor or a minor who had not attained 12 years of age.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    */s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: lisa.thelwell@usdoj.gov

**U.S. v. Rivera Torres**                    **Case No. 8:21-cr-397-MSS-JSS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Adam Nate, AFD

> <u> /s/ Lisa M. Thelwell</u>
> Lisa M. Thelwell
> Assistant United States Attorney
> Florida Bar No. 100809
> 400 N. Tampa Street, Suite 3200
> Tampa, Florida 33602-4798
> Telephone:   (813) 274-6000
> Facsimile:    (813) 274-6358
> E-mail: lisa.thelwell@usdoj.gov

# Doc. 53

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                        Case No. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

**UNITED STATES' MEMORANDUM
OF LAW REGARDING FORFEITURE**

The United States of America submits the following memorandum regarding

the forfeiture sought in this case, outlining the statutory basis for the forfeiture, as

well as the required standard of proof.[1]

**MEMORANDUM OF LAW**

The United States seeks to forfeit a black Samsung Galaxy S20+ cell phone,

seized from the defendant's residence in or about November 2021, which was used

or intended to be used to commit or to promote the commission of the (1) production

of child pornography, as charged in Count One, and/or (2) distribution of child

pornography, as charged in Counts Two through Four, and/or (3) possession of

child pornography as charged in Count Five, and/or is property traceable to such

property.

I.   **Background**

1.     Count One of the Superseding Indictment charges the defendant with

_____

[1]  This memorandum is being filed in conjunction with the United States' proposed
forfeiture finding.

production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e).

Counts Two through Four charge the defendant with distribution of child

pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).   Count Five charges

the defendant with possession of child pornography, in violation of 18 U.S.C. §

2252(a)(4)(B) and (b)(2). Doc. 44.

2.      The forfeiture allegations of the Superseding Indictment notified the

defendant that, under the provisions of 18 U.S.C. § 2253, the United States intended

to forfeit the black Samsung cellphone.   *Id.* at 3-5.

## II.    <u>Applicable Statutes</u>

In sentencing a person convicted of production of child pornography, in

violation of 18 U.S.C. § 18 U.S.C. § 2251(a), and/or distribution of child

pornography, in violation of 18 U.S.C. § 2252(a)(2), and/ or possession of child

pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), the Court's authority to

forfeit specific assets is found in 18 U.S.C. § 2253.   The United States may

criminally forfeit, pursuant to 18 U.S.C. § 2253, any property, real or personal, used

or intended to be used to commit or to promote the commission of such offenses, or

any property traceable to such property.

## III.    <u>Standard of Proof</u>

Because forfeiture is an aspect of sentencing, the United States need only

prove the elements of forfeiture by a preponderance of the evidence.   *See United*

*States v. Dicter,* 198 F.3d 1284, 1289-90 (11th Cir. 1999) (elements of forfeiture under

2

21 U.S.C. § 853(a)(1) and (a)(2) must be proven under the preponderance standard);

*United States v. Hasson*, 333. F.3d 1264, 1278 (11th Cir. 2003) (extending

preponderance standard to forfeiture cases under 18 U.S.C. § 982(a)(1)).

Moreover, the post-*Libretti* changes to federal sentencing law do not impact

forfeiture.   *See United States v. Booker,* 543 U.S. 220, 258 (2005) (18 U.S.C. § 3554,

the provision in the Sentencing Reform Act which requires the district court to enter

an order of criminal forfeiture at sentencing, is "perfectly valid").   This is so because,

as the United States Court of Appeals for the Second Circuit observed, *Booker*

"prohibit[s] a judicial increase in punishment beyond a previously specified range; in

criminal forfeiture, there is no previously specified range."   *United States v. Fruchter*,

411 F.3d 377, 383 (2d Cir. 2005) (holding that the Supreme Court's decisions in

*Blakely* and *Booker* did not change the preponderance standard established in *Libretti*).

The United States Court of Appeals for the Eleventh Circuit has held that the

preponderance standard applies to forfeiture proceedings and that forfeiture

proceedings are outside the *Apprendi* analysis.   *United States v. Cabeza*, 258 F.3d 1256,

1257 (11th Cir. 2001) (per curiam) ("Because forfeiture is a punishment and not an

element of the offense, it does not fall within the reach of *Apprendi*.").

## IV.   <u>Conclusion</u>

Should the Court find the defendant guilty of any or all of Counts One

through Five of the Superseding Indictment, the United States respectfully requests

that the Court enter a finding as to whether the United States has established, by a

3

preponderance of the evidence, that the black Samsung Galaxy S20+ cell phone

identified on page one, above, was used or intended to be used to commit or to

promote the commission of the (1) production of child pornography, as charged in

Count One, and/or (2) distribution of child pornography, as charged in Counts Two

through Four, and/or (3) possession of child pornography, as charged in Count Five,

and/or is property traceable to such property.

Respectfully Submitted,

ROGER B. HANDBERG
United States Attorney


By:     *s/Suzanne C. Nebesky*
        SUZANNE C. NEBESKY
        Assistant United States Attorney
        Fla. Bar No. 59377
        400 N. Tampa Street, Suite 3200
        Tampa, Florida 33602
        Tel:    (813) 274-6000
        E-mail: suzanne.nebesky@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

<u>*s/ Suzanne C. Nebesky*</u>
SUZANNE C. NEBESKY
Assistant United States Attorney

5

# Doc. 55

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                            CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

## STIPULATION OF THE PARTIES

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, and the defendant, Aby Raul Rivera Torres, by his undersigned counsel, hereby enter the following stipulation of fact.

1.    On or about July 20, 2021, the defendant used his Kik account to distribute a series of five images of what appear to be a light skinned female child, approximately 8 to 12 years old ("Minor Victim 1") from the waist down wearing floral print shorts. In the images, Minor Victim 1 is lying in bed with pink colored sheets with a unicorn and rainbow print. There is also a heart shaped, green colored pillow in the background. The last image in the series is of Minor Victim 1 with her buttocks exposed and an adult male's hand is present and manipulated the buttocks to expose her anus.

2.    On or about July 22, 2021, the defendant used his Kik account to distribute a series of six images of Minor Victim 1 and the same bed sheets as described in paragraph one. In these images, however, Minor Victim 1 is wearing a green colored shirt and green colored shorts with a heart and dolls printed on them. Two of the

images in this series depict an adult male's hand pulling the green colored shorts to the side and exposing Minor Victim 1's anus and vaginal area.

3.     On or about August 2, 2021, the defendant used his Kik account to distribute a single image of what appears to be an adult male's penis exposed through tan colored shorts penetrating the vaginal area of Minor Victim 1, with Minor Victim 1's buttocks exposed and facing the camera. This image was created using the "camera" or "live" function on the defendant's Kik account on or about August 2, 2021.

4.     On or about August 2, 2021, the defendant used his Kik account to distribute a single image of what appears to be an adult male's penis penetrating or attempting to penetrate the anus of Minor Victim 1, with Minor Victim 1's anus exposed and facing the camera.

5.     Minor Victim 1's mother reviewed several sanitized versions of the child sex abuse images described in paragraphs one through and four. The mother of the child positively identified Minor Victim 1, Minor Victim 1's bedsheets and pajamas. The mother also positively identified the defendant's penis, shorts, sandal, hand, and tattoo in several of the child sex abuse images described in paragraphs one through and four.

6.     On November 13, 2021, law enforcement officers conducted a search warrant at the defendant's residence located in Spring Hill, Florida, which is within the Middle District of Florida. Agents located and seized the same bed and bedsheets

that were utilized to produce child sex abuse material of Minor Victim 1 described in paragraphs one, two, three, and four.

7.     On November 13, 2021, law enforcement officers interviewed the defendant. Post-*Miranda*, the defendant admitted to law enforcement officers that he had produced the child sex abuse images of Minor Victim 1 described in paragraphs one, two, three, and four.

8.     At the time of the search warrant, Minor Victim 1 found the defendant's cellphone, a black Samsung cellphone with IMEI 355464111428867, in the defendant's boat that had been parked in the driveway of the defendant's residence. Minor Victim 1 provided the defendant's cellphone to law enforcement officers, who subsequently searched it pursuant to a search warrant.

9.     A forensic analysis of the defendant's cellphone revealed that the defendant was in possession of approximately 667 total images of child sexual abuse material ("CSAM"). Approximately 60 of these CSAM images were considered visually unique and not duplicates. Approximately 43 of these images depicted the Minor Victim 1. The remaining 17 CSAM images depicted several minor females ranging in approximate ages from 4 to 14 years old.

So stipulated this _____ day of May, 2022.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

Adam Nate, AFD
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: 813-228-2715
E-mail: adam_nate@fd.org

Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: lisa.thelwell@usdoj.gov

Aby Raul Rivera Torres
Defendant

4

# DOC. 60

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO: 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

_____

## WAIVER OF RIGHT TO TRIAL BY JURY

**WRITTEN WAIVER OF THE DEFENDANT:**

I, ABY RAUL RIVERA TORRES, the defendant in this case, know about my
Sixth Amendment, personal right to a jury trial in which a jury of 12 people would
determine whether I am guilty beyond a reasonable doubt of the charges brought
against me. I have had sufficient time to consider this right and to consult with my
attorney about my right to a trial by jury.

I knowingly, intelligently, and unequivocally elect to waive my right to a jury
trial and elect to have the District Judge assigned to my case hear the evidence and
testimony to determine whether I am guilty beyond a reasonable doubt of the charges
brought against me.  I am making this election freely, voluntarily, knowingly, and
intelligently, and not because of any promises, inducements, threats, or coercion.

DATE: 5/25/22

_____
Aby Raul Rivera Torres
Defendant

**COUNSEL APPROVAL:**

DATE: 5/23/22

Adam Joseph Nate
Counsel for Defendant

**CONSENT OF GOVERNMENT:**
The United States of America consents to the Defendant's waiver of a jury trial and waives its right to request special findings.

DATE: 5/23/22

Lisa Marie Thelwell
Assistant United States Attorney

**COURT'S APPROVAL:**
I find that the Defendant has knowingly and voluntarily waived the right to a jury trial and I approve the waiver.

Signed and approved in open court this 23rd day of May 2022.

MARY S. SCRIVEN
U.S. DISTRICT JUDGE

# Doc. 68

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                         CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

## VERDICT

1. **Count One of the Superseding Indictment**

   As to the offense of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e),

       The Court finds the defendant, Aby Raul Rivera Torres:

       Guilty ____✓____           Not Guilty _____

2. **Count Two of the Superseding Indictment**

   As to the offense of distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1),

       The Court finds the defendant, Aby Raul Rivera Torres:

       Guilty ____✓____           Not Guilty _____

3. **Count Three of the Superseding Indictment**

   As to the offense of distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1),

       The Court finds the defendant, Aby Raul Rivera Torres:

       Guilty ____✓____            Not Guilty _____

4. **Count Four of the Superseding Indictment**

As to the offense of distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1),

The Court finds the defendant, Aby Raul Rivera Torres:

Guilty _____✓_____          Not Guilty _____

5. **Count Five of the Superseding Indictment**

As to the offense of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(b) and (b)(2),

The Court finds the defendant, Aby Raul Rivera Torres:

Guilty _____✓_____          Not Guilty _____

The Court further finds that the visual depiction involved a prepubescent or a minor who had not attained 12 years of age.

Yes _____✓_____          No _____

On this 23rd day of May, 2022.

MARY S. SCRIVEN
U.S. District Court Judge

2

DOC. 91

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION

 3   UNITED STATES OF AMERICA,

 4              Plaintiff,

 5        vs.              CASE NO. 8:21-cr-397-MSS-JSS
                           May 23, 2022
 6                         Tampa, Florida
                           9:31 - 10:05 a.m.
 7
     ABY RAUL RIVERA TORRES,
 8
                Defendant.
 9   _____/

10

11            TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE MARY S. SCRIVEN
12         UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14
     For the Government:    LISA MARIE THELWELL, ESQ.
15                          Assistant U.S. Attorney
                            400 N. Tampa Street, Suite 3200
16                          Tampa, Florida 33602
                            813/274-6000
17
     For the Defendant:     ADAM JOSEPH NATE, ESQ.
18                          Federal Public Defender
                            400 N. Tampa St., Suite 2700
19                          Tampa, Florida 33602
                            813/228-2715
20
     Court Reporter:        Howard W. Jones, RDR, RMR, FCRR
21                          801 N. Florida Avenue, Suite 15A
                            Tampa, Florida 33602
22                          813/301-5024

23

24   Proceedings reported and transcribed by
25   computer-aided transcription.
```

---

2

```
 1                    I N D E X

 2                                          PAGE

 3
     TRIAL PROCEEDINGS:                      11
 4
     MOTION FOR JUDGMENT OF ACQUITTAL
 5     ON BEHALF OF THE DEFENDANT:           23

 6   CERTIFICATE OF COURT REPORTER:          26

 7

 8           * * * * * * * * * *

 9
               E X H I B I T S
10
```

| COURT EXHIBIT NO. | IDENTIFIED | PAGE RECEIVED |
|---|---|---|
| 1 | 19 | 22 |
| 2 | 19 | 22 |
| 3 | 19 | 22 |
| 4 | 19 | 22 |
| 5 | 19 | 22 |
| 6 | 19 | 22 |
| 7 | 19 | 22 |

```
17
               * * * * * * * * * * *
```

3

```
1              P R O C E E D I N G S
2         (Court called to order.)
3         THE COURT:  Good morning.
4         Call the case.
5         THE DEPUTY CLERK:  The Court calls Case
6  No. 8:21-cr-397-MSS-JSS, United States of America vs. Aby
7  Raul Rivera Torres.
8         Counsel, please state your appearances for the
9  record beginning with counsel for the United States.
10        MS. THELWELL:  Good morning, Your Honor.  Lisa
11 Thelwell on behalf of the United States.
12        THE COURT:  Good morning.
13        MR. NATE:  Good morning, Your Honor.  Adam Nate on
14 behalf of Mr. Torres.
15        THE COURT:  Good morning.
16        Please swear the defendant.
17        THE DEPUTY CLERK:  Please raise your right hand.
18        (Defendant sworn by the Deputy Clerk.)
19        THE DEFENDANT:  I do.
20        THE DEPUTY CLERK:  Please state your name and
21 spell your first and last name for the record.
22        THE DEFENDANT:  Aby Raul Rivera Torres, A-b-y
23 T-o-r-r-e-s.
24        THE DEPUTY CLERK:  Thank you.  You may be seated.
25        THE COURT:  Mr. Torres, you're under oath, sir.
```

4

```
1  You have to give truthful answers.  If you give false
2  answers, you face penalties of perjury, false statement, and
3  obstruction.
4         Do you understand that?
5         THE DEFENDANT:  Yes, Your Honor.
6         THE COURT:  Now, I understand that the purpose of
7  this hearing today is for the Court to conduct what is
8  called a bench trial concerning your guilt or innocence with
9  respect to the charges that have been brought against you in
10 this case.
11        Is that your understanding?
12        THE DEFENDANT:  Yes, Your Honor.
13        THE COURT:  Has anyone threatened you to get you
14 to appear here today?
15        THE DEFENDANT:  No, Your Honor.
16        THE COURT:  Has anyone promised you anything in
17 the way of any sort of outcome of your case and sentencing
18 to get you to appear here today?
19        THE DEFENDANT:  No, Your Honor.
20        THE COURT:  Are you appearing voluntarily?
21        THE DEFENDANT:  Yes, Your Honor.
22        THE COURT:  Are you under the influence of drugs
23 or alcohol?
24        THE DEFENDANT:  No, Your Honor.
25        THE COURT:  Do you understand where you are?
```

5

```
 1              THE DEFENDANT:  Yes, ma'am.
 2         THE COURT:  Where are you?
 3         THE DEFENDANT:  Courthouse.
 4         THE COURT:  In what city?
 5         THE DEFENDANT:  Criminal courthouse.
 6         THE COURT:  What city?
 7         THE DEFENDANT:  Tampa, Florida.
 8         THE COURT:  Do you know what today is?
 9         THE DEFENDANT:  23 -- May 23rd.
10         THE COURT:  All right.  Sir, have you had an
11 opportunity to discuss your decision about proceeding with a
12 bench trial with your lawyer?
13         THE DEFENDANT:  Yes.
14         THE COURT:  Has he answered all of your questions
15 to your satisfaction?
16         THE DEFENDANT:  Yes.
17         THE COURT:  Do you have any questions for the
18 Court.
19         THE DEFENDANT:  No, ma'am.
20         THE COURT:  Have you ever been in a trial before?
21         THE DEFENDANT:  No, ma'am.
22         THE COURT:  So, if we were to hold a trial here in
23 federal Court, what would happen is that we would call
24 people from the community to sit in judgment considering the
25 evidence offered by the government and any evidence that you
```

6

```
 1 chose to offer.  There would be at least 12 people who would
 2 sit to hear this case.  And they would sit over there in
 3 that jury box and they would listen to the evidence brought
 4 by the government and brought by you, if you brought any,
 5 and they would decide whether the government could prove
 6 your guilt beyond a reasonable doubt.  If they could not
 7 convince every member of the jury that you were guilty, you
 8 could not be convicted.
 9         Do you understand that?
10         THE DEFENDANT:  Yes, ma'am.
11         THE COURT:  You would have the right to challenge
12 the government's evidence by cross-examining its witnesses,
13 you would have the right to bring your own evidence, if you
14 chose to do so, you would have the right to testify on your
15 own behalf if you wanted to, no one could force you to
16 testify.  And if you chose not to testify, the Court would
17 direct the jury that it could not consider your decision not
18 to testify in assessing your guilt or innocence.  You are
19 presumed innocent unless proven guilty beyond a reasonable
20 doubt by the government.
21         Do you understand that?
22         THE DEFENDANT:  Yes, ma'am.
23         THE COURT:  Do you understand that by proceeding
24 in this bench trial you would give up all of those rights
25 with respect to a jury trial.  And by stipulating to facts,
```

7

1   you would give up your right to challenge those facts.

2           Do you understand both of those things?

3           THE DEFENDANT:  Yes, ma'am.

4           THE COURT:  Are you prepared, sir, to give up your

5   right to a jury trial as I have described it?

6           THE DEFENDANT:  Yes, ma'am.

7           THE COURT:  And are you prepared to stipulate to

8   certain facts with respect to your guilt in this case?

9           THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  With respect to the details of a jury

11  trial, does the government wish for the Court to tell the

12  defendant anything else?

13          MS. THELWELL:  No, Your Honor.  Thank you.

14          THE COURT:  Does the defense?

15          MR. NATE:  No, Your Honor.  Thank you.

16          THE COURT:  Did the government file notice of

17  maximum penalties in this case?  I see a notice of essential

18  elements.

19          MS. THELWELL:  No, Your Honor, I filed a notice of

20  essential elements as the Court had requested.  I may have

21  misinterpreted, I thought the order was just for the

22  essential elements.

23          THE COURT:  Does the government know the maximum

24  penalties?

25          MS. THELWELL:  Yes, Your Honor.

8

1           THE COURT:  Can you please recite the maximum

2   penalties for the defendant?

3           MS. THELWELL:  Yes, Your Honor.

4           As to Count One, in violation of 18 U.S.C.

5   2251(a), there is a mandatory minimum of 15 years up

6   to 30 years imprisonment, as well as a minimum of five years

7   supervised release up to life; there is a 5,000-dollar

8   special assessment if the defendant is not indigent; there

9   is a $100 special assessment and up to $250,000 fine.

10          For Counts Two through Four, in violation of

11  18 U.S.C. 2252(a)(2), there is a mandatory minimum of five

12  years up to 20 years imprisonment; there is a mandatory

13  minimum of five years up to life for supervised release; a

14  5,000-dollar fine as to each count -- excuse me, special

15  assessment as to each count if the defendant is not

16  indigent; a 100-dollar special assessment as to each count

17  and up to a $250,000 fine as to each count.

18          On Count Five, in violation of 18 U.S.C.

19  2252(a)(4)(B), and (a)(2), there is a mandatory -- excuse

20  me, the maximum exposure is up to 20 years imprisonment, a

21  mandatory minimum of five years supervised release up to

22  life, a 5,000-dollar special assessment if the defendant is

23  not indigent, a 100-dollar special assessment and up to

24  250,000-dollar fine.

25          THE COURT:  Thank you.

9

```
1              Mr. Torres, have you heard those penalties that
2    you face for each of these offenses?
3              THE DEFENDANT:  Yes, ma'am.
4              THE COURT:  Have you discussed those penalties
5    with your lawyer?
6              THE DEFENDANT:  Yes, ma'am.
7              THE COURT:  Mr. Nate, do you agree that those are
8    the penalties the defendant faces on each of these offenses?
9              MR. NATE:  Yes, Your Honor.
10             THE COURT:  Have you discussed these penalties
11   with your client?
12             MR. NATE:  Yes, I did, Your Honor.
13             THE COURT:  Have any promises been made to this
14   defendant with respect to any reduction of sentence below
15   the statutory mandatory minimum?
16             MR. NATE:  No promises, Your Honor.
17             THE COURT:  Do you have any questions of the Court
18   with respect to these penalties, Mr. Torres?
19             THE DEFENDANT:  No, Your Honor.
20             THE COURT:  Now, the Court understands that the
21   government recently filed a notice of intent to call a
22   witness at a stipulated bench trial.
23             MS. THELWELL:  Your Honor, I just did that in an
24   abundance of caution, because the Court order had indicated
25   any witness list or exhibit list to be filed by today.  I
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

10

```
1    don't anticipate that we'll need to call a witness.
2              THE COURT:  All right.  So with all of those
3    explanations, Mr. Torres, do you voluntarily agree to waive
4    your right to jury trial?
5              THE DEFENDANT:  Yes, Your Honor.
6              THE COURT:  And do you agree to proceed to a bench
7    trial at which the Court will make the determination of
8    guilt or innocence based upon the stipulated facts?
9              THE DEFENDANT:  Yes, Your Honor.
10             THE COURT:  Has anyone threatened you to get you
11   to make that decision?
12             THE DEFENDANT:  No, Your Honor.
13             THE COURT:  Is anyone promising you anything in
14   exchange for that?
15             THE DEFENDANT:  No, Your Honor.
16             THE COURT:  So tell me in your own words what
17   you've agreed to do.
18             THE DEFENDANT:  Leave it up to the Court to decide
19   whether I'm innocent or guilty.
20             THE COURT:  By Court, what do you mean, the judge
21   or the jury?
22             THE DEFENDANT:  You, Judge.
23             THE COURT:  All right.  And you're doing that
24   based upon stipulated facts, the facts that you agree to, do
25   you understand that?
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

11

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  All right.  I have the waiver of jury

3    trial.

4          Would you please present it to the parties,

5    Ms. O'Brien, and have everyone execute it?

6          (Waiver signed by Ms. Thelwell, Defendant Torres,

7    and Mr. Nate, after which the following proceedings were had

8    in open court.)

9          THE COURT:  Thank you.

10          THE DEPUTY CLERK:  You are welcome.

11          THE COURT:  All right.  This matter will now

12    proceed to trial.

13          Preceding the opening statement, if any, the

14    government wishes to assert or the defense wishes to assert,

15    let me tell the defendant what the essential elements of

16    these offenses are.

17          As to Count One, the essential elements of

18    18 U.S.C. 2251(a), production of child pornography, are as

19    follows:

20          First, an actual minor that is a real person who

21    was less than 18 years of age was depicted;

22          Two, the defendant employed, used, persuaded,

23    induced, enticed, or coerced the minor to engage in sexually

24    explicit conduct for the purpose of producing a visual

25    depiction, e.g., a videotape of the conduct; and,

12

1          Three, the defendant knew or had reason to know

2    that the visual depiction would be transported in interstate

3    or foreign commerce or the visual depiction was actually

4    transported in interstate or foreign commerce.

5          As to Counts Two through Four, violations of

6    18 U.S.C. 2252(a)(2), distribution of child pornography, the

7    elements are as follows:

8          The defendant knowingly distributed a visual

9    depiction of sexually explicit conduct;

10          Two, the depiction was shipped or transported in

11    interstate or foreign commerce by any means, including a

12    computer;

13          Three, producing a visual depiction involved using

14    a minor engaged in sexually explicit conduct;

15          Four, the depiction is of a minor engaged in

16    sexually explicit conduct; and,

17          Five, the defendant knew that at least one of the

18    performers in the visual depiction was a minor and knew that

19    the visual depiction was of such a minor engaged in sexually

20    explicit conduct.

21          The elements of Count Five are as follows:

22          This is a violation of 18 U.S.C. 2252(a)(4)(B),

23    possession of child pornography, the defendant knowingly:

24          Possessed the visual depiction;

25          The depiction had been shipped or transported

13

1    using any means or facility of interstate or foreign

2    commerce;

3           Producing the visual depiction involved using a

4    minor engaged in sexually explicit conduct;

5           Four, the depiction is of a minor engaged in

6    sexually explicit conduct;

7           Five, the defendant knew that at least one of the

8    more performers in the visual depiction was a minor and knew

9    that the depiction showed the minor engaged in sexually

10   explicit conduct; and,

11          Six, the visual depiction involved the use of a

12   prepubescent minor or a minor who had not attained the age

13   of 12 years of age.

14          Do you understand all of those elements?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Have you previously discussed them

17   with your lawyer?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Ms. Thelwell, how does the government

20   wish to proceed at this time?

21          MS. THELWELL:  Your Honor, the government would

22   waive any opening statement.

23          THE COURT:  And the defense.

24          MR. NATE:  Your Honor, we'd waive an opening

25   statement as well.

14

1           THE COURT:  All right.  Would the government like

2    to introduce the stipulation of facts?

3           MS. THELWELL:  Yes, Your Honor, filed at

4    Document 55.

5           THE COURT:  Mr. Torres, you have a Spanish

6    surname.  I just want to be sure you can read English.  Is

7    that right?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  And have you read the stipulation of

10   facts?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  There is a signature on the last page

13   of this document, page four.  Is that your signature?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Did you sign this document after

16   having read it?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Did you have a full opportunity to

19   discuss it with your lawyer?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you stipulate, sir, that each of

22   the facts alleged in this stipulation is true?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Well, you're looking at your lawyer

25   and he's shaking his head.  I'm asking you whether you agree

15

1  that each of these facts is true.

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Do you have any question or dispute

4  about any of these facts?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  And do you agree, Mr. Torres, that

7  these facts would be sufficient to satisfy the elements that

8  I just read to you for Counts One through Five?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Does the government intend to

11 introduce any exhibits?

12         MS. THELWELL:  No, Your Honor.

13         THE COURT:  Yes, sir?

14         MR. NATE:  Yes, Your Honor.  There was an exhibit

15 list filed.  I just want to be clear for the record for my

16 client's sake, I know that's why he was looking at me.

17 There was an exhibit list filed, Exhibits 1 through 7 and it

18 deals with evidence related to the stipulation of facts.

19 All those exhibits flow from the cellphone at issue in the

20 defense's motion to suppress at Document 27.  The reason

21 we're going through this bench trial is to preserve that

22 matter for appellate purposes, Your Honor.

23         I just want to make sure that on the record that

24 we do object to those exhibits and any facts flowing from

25 them for the purposes of preserving that matter for

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

16

1  appellate purposes, Your Honor.

2          THE COURT:  You object to the images on the basis

3  that you contend that the Court should have suppressed this

4  evidence; is that right?

5          MR. NATE:  That's correct, Your Honor.  And I

6  recognize the Court did deny that motion at Document 38, but

7  we intend to preserve that matter for appellate purposes,

8  Your Honor.

9          THE COURT:  And, Mr. Torres, even though you wish

10 to preserve this right for appeal, this is this question of

11 whether the evidence should be suppressed, you do agree that

12 if these images are available to the Court, and they are on

13 this record, that these images would support the elements

14 that were just stipulated to?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Your only contention is that the Court

17 should not have allowed the cellphone evidence to be

18 introduced at the trial; is that right?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Well, Ms. Thelwell, in the abundance

21 of caution, it seems to me the government needs to introduce

22 its evidence at trial over the objection of the defendant

23 preserved for appeal, because I don't -- he stipulated to

24 these facts, but he's simultaneously challenging the

25 evidentiary basis of the facts.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

17

1        MS. THELWELL:  Okay.  Yes, Your Honor.

2        THE COURT:  Mr. Nate, how would you plan for us to

3   deal with this?

4        MR. NATE:  The images themselves are obviously

5   child pornography and graphic ones.  I don't need the Court

6   to see them or anything like that.  The government did file

7   an exhibit list.  That exhibit list flows from the

8   stipulation of the parties.  As long as I have on the record

9   that I have an objection to this exhibit list that the

10  government does put that forward right now, just a list

11  itself, I understand what evidence they're referring to on

12  that, just as long as I can maintain that objection that all

13  this evidence flows from the cellphone evidence at issue in

14  the motion to suppress and the Court overrules my objection

15  for the record, I'm fine to move forward, Your Honor.

16       THE COURT:  All right.  Now, you know that the

17  Court will likely see the exhibits before the case is

18  sentenced.

19       MR. NATE:  Oh, yes, I understand that, Your Honor.

20  I just didn't need to have it shown to us as part of a

21  stipulated jury trial.  If the Court -- I don't need the

22  Court to see it right now unless the Court wants to, I'm

23  trying to balance those issues, Your Honor.

24       THE COURT:  All right.  Would you move your

25  evidence, Ms. Thelwell.

18

1        MS. THELWELL:  Because there is an objection from

2   defense counsel, do I need to call Special Agent Goodhue at

3   this time?

4        THE COURT:  Well, there's no objection that these

5   images came off the cellphone.  The only objection I

6   understand there is -- I'm sorry.  There's no objection that

7   the evidence came off of the cellphone and there's no

8   objection that the evidence would support the stipulated

9   facts.  The only dispute is that the government should not

10  have obtained the cellphone in the manner that it did.

11       And so I don't -- I don't know, Mr. Nate, does she

12  need to call a witness to testify to that or do you

13  stipulate that the --

14       MR. NATE:  No, Your Honor.

15       THE COURT:  -- the evidence came off of the

16  cellphone?

17       MR. NATE:  That's correct, I do not believe she

18  needs to call -- Ms. Thelwell needs to call a witness.  I

19  think if she just states that she's moving into evidence

20  Exhibits 1 through 7, I will object, and the Court will

21  overrule my objection based on a previous order and that's

22  sufficient.

23       THE COURT:  All right.  Mr. Torres, sir, do you

24  agree and stipulate that the evidence in the government's

25  exhibit list came from the cellphone?

19

```
1          THE DEFENDANT:  Yes, Your Honor.
2          THE COURT:  And you maintain your objection over
3    the manner in which the government secured the cellphone; is
4    that right?
5          THE DEFENDANT:  Yes, Your Honor.
6          THE COURT:  Ms. Thelwell, the defense is not
7    requiring you to call a witness.
8          MS. THELWELL:  I understand, Your Honor.  Just for
9    the sake of clarity, the production images, which are
10   Government's Exhibits 1, 2, and 3, those images were not
11   found on the defendant's cellphone, but were found in the
12   course of the undercover investigation from the KIK account.
13   If that makes any sense.
14         But the remaining images in Government's
15   Exhibits 4, 5, and 6, those did come from the defendant's
16   cellphone and it relates to paragraph nine of the
17   stipulation.
18         THE COURT:  And the photographs of his tattoos
19   came from where?
20         MS. THELWELL:  Those were taken by the case agent
21   at the time of the arrest.
22         THE COURT:  All right.  Move your evidence.
23         MS. THELWELL:  At this time, the United States
24   moves Exhibits 1 through 7 into evidence.
25         THE COURT:  Mr. Nate?
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

20

```
1          MR. NATE:  Yes, Your Honor.  We object to the
2    Court's admission of those exhibits based on our previous
3    motion to suppress, which the Court denied.
4          THE COURT:  Now, that's as to one, two, three and
5    seven as well?
6          MR. NATE:  Yes, Your Honor.  There was -- in an
7    abundance of caution, yes, the cellphone contained enormous
8    amounts of data and some of them -- some of that data was
9    used to confirm and connect dots related to Exhibits 1, 2,
10   3, and 7 as well.
11         So I object to all those exhibits, Your Honor,
12   based on the Court's denial of the motion to suppress.
13         THE COURT:  Ms. Thelwell, do you agree that the
14   evidence, one, two, and three and seven, was obtained by or
15   triggered by the evidence that was found in Exhibits 4, 5,
16   and 6 from the cellphone?
17         MS. THELWELL:  Exhibits 1, 2, 3 and 7 were all
18   relating to a KIK search warrant that we had obtained prior
19   to even locating the defendant's cellphone.  But like I
20   stated earlier, Exhibit 7 are photographs that were taken by
21   the case agent at the arrest.
22         THE COURT:  So you already had the search warrant
23   for the KIK account that yielded one, two, and three?
24         MS. THELWELL:  Correct, Your Honor, prior to the
25   execution of the search warrant and arrest in this case.
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

21

1        THE COURT:  Mr. Nate, do you agree or disagree

2   with that?

3        MR. NATE:  I partly agree, Your Honor.  But one

4   issue is that, for example, when it comes to the matter of

5   tattoos, he has photographs on the cellphone partially

6   showing with tattoos, I believe.  So if there came up any

7   issue, they can compare those two things for the purpose of

8   evidence.  Similarly, with some of the data on the cellphone

9   as it relates to the KIK account.  And I just don't want

10  there to be any issues down the road on appeal.  I object to

11  anything directly or incorrectly, however it was used, from

12  the cellphone, Your Honor.

13       But Ms. Thelwell also says, yes, the Exhibits 1

14  through 3, for example, there's a private -- there's a

15  different search warrant, a different KIK account, but the

16  evidence could be used from the cellphone to confirm that

17  information as well or identity information from the

18  cellphone.  That's my concern.

19       So in an abundance of caution, I wanted to object

20  to the government moving in all seven based on the motion to

21  suppress, Your Honor.

22       THE COURT:  The court would grant the government's

23  motion to admit the evidence as a Court exhibit for

24  completeness of the record.

25       The defendant maintains his objection to the

22

1   manner by which the cellphone evidence was obtained and

2   maintains any objection as to whether the cellphone evidence

3   and data was used to tie the KIK account information to the

4   defendant.

5        The Court's determination in this case will be

6   based on the stipulation of the parties as to the

7   defendant's conduct in this case as set forth in Document 55

8   and signed by the defendant.

9        And so that the record is clear, the Court, for

10  purposes of a guilt determination, has not seen these

11  exhibits and does not intend to rely on those exhibits in

12  determining the defendant's guilt or innocence in this case.

13       Is there anything else with respect to the

14  stipulated facts or the Court exhibit either party wishes to

15  raise from the government?

16       MS. THELWELL:  No, Your Honor.

17       MR. NATE:  No, Your Honor.  Thank you.

18       (Court Exhibit Nos. 1, 2, 3, 4, 5, 6, and 7

19  admitted into evidence.)

20       THE COURT:  And does the government rest its case?

21       MS. THELWELL:  Yes, Your Honor.

22       THE COURT:  Does the defense file a motion against

23  the government's case?

24       MR. NATE:  Yes, Your Honor.  We would move, Your

25  Honor, for a motion for judgment of acquittal at this time,

23

1  Your Honor, based on the evidence.

2        THE COURT:  And what's that motion based on, the

3  stipulated facts?

4        MR. NATE:  Yes, Your Honor, we're just preserving

5  the record related to the motion to suppress, Your Honor,

6  one more time.

7        THE COURT:  All right.  The Court denies the

8  motion for judgment of acquittal.  The evidence is more than

9  sufficient to support the offense as charged in this

10  superseding indictment.

11        Thank you.

12        MR. NATE:  The defense rests as well, Your Honor.

13        THE COURT:  All right.  The court has considered

14  the parties' evidence in this case as set forth in the

15  stipulation of facts.  I am familiar with the case.  The

16  Court determines, therefore, that the government has met its

17  burden of proving the defendant's guilt to all of the

18  charges set forth in the superseding indictment, including

19  production of child pornography in violation of 18 U.S.C.

20  2251(a).

21        The Court finds the defendant guilty as to the

22  elements of Counts 2 through 4, distribution of child

23  pornography, in violation of 18 U.S.C. 2252(a)(2), the Court

24  finds the defendant guilty as to each such Count 2, 3, and

25  4.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

24

1        And as to the charge of possession of child

2  pornography, in violation of 18 U.S.C. 2252(a)(4)(B), the

3  Court finds the defendant guilty.

4        So say this Court this 23rd day of September,

5  2022 -- I'm sorry, 23rd day of May, 2022.

6        Is there anything further from the government?

7        MS. THELWELL:  No, Your Honor.

8        THE COURT:  From the defense?

9        MR. NATE:  No, Your Honor.  Thank you.

10        THE COURT:  All right.  The matter will be set

11  over for sentencing at a date to be notified in the docket.

12        Is there any reason to delay sentencing in this

13  case beyond the standard time?

14        MS. THELWELL:  No, Your Honor.

15        MR. NATE:  No, Your Honor.

16        THE COURT:  Do we have a sentencing date as of yet

17  or are we going to just set it out by separate notice?

18        THE DEPUTY CLERK:  I thought you would send it out

19  by separate notice.

20        THE COURT:  All right.  We'll send it out by

21  separate notice.

22        The defendant will be required to assist the

23  Office of Probation in the preparation of a final sentencing

24  report.

25        And the defendant remains in the custody of the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

25

```
1    United States Marshal to await sentencing.

2              We are dismissed.

3                   (Proceedings adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

26

```
1    UNITED STATES DISTRICT COURT )
                                  )
2    MIDDLE DISTRICT OF FLORIDA   )

3

4            REPORTER TRANSCRIPT CERTIFICATE

5        I, Bill Jones, Official Court Reporter for the United
     States District Court, Middle District of Florida, certify,
     pursuant to Section 753, Title 28, United States Code, that
6    the foregoing is a true and correct transcription of the
     stenographic notes taken by the undersigned in the
7    above-entitled matter (Pages 1 through 25 inclusive) and
     that the transcript page format is in conformance with the
8    regulations of the Judicial Conference of the United States
     of America.

9

10        /s    Bill Jones
                _____
11              Bill Jones, RDR, RMR, FCRR
                Official Court Reporter
12              United States District Court
                Middle District of Florida
13              Tampa Division
                Date:  10/18/22

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

# DOC. 74

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                            **Case No. 8:21-cr-397-MSS-JSS**

**ABY RAUL RIVERA TORRES**

**━━━━━━━━━━━━━━━━━━━━━━━/**

## SENTENCING MEMORANDUM

The Defendant, Mr. Aby Raul Rivera Torres ("Mr. Rivera Torres"), by and through his undersigned attorney, Mr. Adam J. Nate, pursuant to 18 U.S.C. §§ 3553 and 3551, files this memorandum to request the following sentence: 240-months imprisonment, followed by a 10-year term of supervised release, with the special conditions that Mr. Rivera Torres (a) complete a 1-year term of home detention overseen with electronic location monitoring following his release from incarceration, and (b) complete a mental health evaluation and cooperate with any recommended treatment. Mr. Rivera Torres also requests the Court recommend the Bureau of Prisons place him in the Residential Sex Offender Treatment Program at either the Federal Medical Center-Devins (an administrative-security federal prison in Ayer, MA), or the United States Penitentiary-Marion (a medium-security federal

prison located in Marion, IL).[1]  This total sentence of combining both pertinent

mandatory-minimum sentences as well as implementing a stricter form of supervised

release – along with the lifetime notification requirements related to federal, state,

and local sex offender registration laws – is a sentence that is sufficient but not

greater than necessary to punish Mr. Rivera Torres and maintain the safety of

society.

Respectfully submitted this 12th day of August, 2022.

**A. FITZGERALD HALL, ESQ.**
**FEDERAL DEFENDER**

**/s/ *Adam J. Nate***

Adam J. Nate
Florida Bar No.0077004
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida  33602
Telephone:  (813) 228-2715
E-mail:       Adam_Nate@fd.org

---

[1] "[BOP] offers sex offender treatment to offenders with a history of sexual offending and who volunteer for treatment.  The Bureau provides two levels of treatment intensity: residential and non-residential . . . Residential treatment involves high intensity programming for a period of 12 to 18 months.  The Bureau provides this program at USP Marion in Illinois and at FMC Devens in Massachusetts.  Participants benefit from a therapeutic community on a residential housing unit where they work to reduce their risk of future offending.  Offenders receive treatment five days per week."  Federal Bureau of Prisons, *Sex Offenders*, available at:
https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of August, 2022, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to the following:

Ms. Lisa M. Thelwell, Assistant United States Attorney

<u>/s/ *Adam J. Nate*</u>

Adam J. Nate
Assistant Federal Defender

# DOC. 75

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

**SENTENCING MEMORANDUM**

    The United States files this sentencing memorandum requesting a life sentence for defendant Aby Raul Rivera Torres and order restitution for the victims of the offenses.

**I.**       **Background**

    **A.**    **Offense Conduct**

    On November 13, 2021, the FBI arrested Torres on a criminal complaint for production of child pornography, in violation of 18 U.S.C. § 2251(a).  Doc. 1.  The complaint alleged that Torres was a member of an online social media group dedicated to discussing incestual child sexual abuse and sharing child sex abuse material ("CSAM") with group members. Between July 20, 2021, and August 2, 2021, Torres distributed to the group 12 CSAM images that he had produced of 8-year-old Minor Victim 1.

    On November 13, 2021, the FBI conducted a search warrant at Torres' residence and seized his cellular phone. At the time law enforcement officers arrived at the residence, Torres was home alone with three minor children, including Minor Victim 1. The FBI also obtained a search warrant for Torres' cellphone. A forensic

1

analysis of the phone revealed Torres was in possession of approximately 667 CSAM images, including images depicting prepubescent females as young as 4 years old being sexually abused.

### B.    Procedural History

On November 15, 2021, Torres appeared for his initial appearance. Doc. 10. The court ordered him detained. Doc. 11. On December 15, 2021, a federal grand jury returned a four-count Indictment charging Torres with one count of production, in violation of 18 U.S.C. §§ 2251(a) and (e); and three counts of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2). Doc. 15.

On May 4, 2022, a federal grand jury returned a five-count Superseding Indictment charging Torres with one count of production, in violation of 18 U.S.C. §§ 2251(a) and (e); three counts of distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

 On May 23, 2022, the court adjudicated Torres guilty as charged in the superseding indictment after conducting a bench trial. Doc. 59. Torres' sentencing hearing is scheduled for August 24, 2022. Doc. 65.

### II.    Presentence Investigation Report

On August 10, 2022, probation issued its Final Presentence Investigation Report (PSR) as to the defendant. Doc. 72. Pursuant to the PSR, the defendant's applicable Guidelines range for the underlying offense is life; he has a criminal history

2

category of II; and the applicable period of supervised release is five years to life. PSR ¶ 123. The parties have set forth legal objections to the information stated in the PSR.

### III.      <u>Argument for Life Imprisonment</u>

The facts of this case and the defendant's predatory nature are egregious and demand a life sentence. A life sentence is necessary due to the nature and circumstances of the offense, to promote respect for the law, provide just punishment for the offense, afford adequate deterrence of these crimes, and for the protection of the public against further crimes of the defendant. *See* 18 U.S.C. § 3553(a). The United States recognizes that a sentencing court may not presume that a sentence within the advisory guideline range is reasonable; however, the Guidelines remain a significant and pivotal component of the sentencing process. The Court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). A

consideration of these factors warrants a life sentence.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of the offense are appalling. Torres relocated to the Middle District of Florida during the COVID-19 pandemic in the fall of 2020 while out on state bond for a child exploitation charge. Once he arrived, he began a dating relationship with Minor Victim 1's mother and quickly moved into her residence, where he had unrestricted access to 8-year-old Minor Victim 1. During the child forensic interview, Minor Victim 1 explained that Torres would sexually abuse her when no one was around. She described Torres as being "sneaky". He frequently came into Minor Victim 1's room and sexually assaulted her by penetrating Minor Victim 1's anus and vagina with his penis. On at least one occasion, Minor Victim 1 said Torres offered her money if she let him put his penis in her butt. Minor Victim 1 asked Torres to stop sexually assaulting her but he did not. In addition, Torres forced Minor Victim 1 to touch his erect penis on multiple occasions. Minor Victim 1 reported the abuse to her mother, but her mother didn't do anything to keep her safe. It wasn't until the FBI showed up to Minor Victim 1's house with a search warrant and arrested Torres that the sexual abuse stopped. Minor Victim 1 told law enforcement officers that Torres had sexually assaulted her the same morning of the search warrant.

Post-*Miranda*, Torres admitted to taking the sexually explicit photos of him abusing Minor Victim 1 described in paragraphs 12-14 of the PSR. He stated that he took the pictures of Minor Victim 1 when she was left in his care and custody. Torres

admitted he sold a few of the pictures to others via CashApp for approximately $100 per photo. He told agents he sold photos to approximately three or four people.

In this case, the nature and circumstances of the offense weigh heavily against the defendant. The pervasiveness of Torres' sexual abuse of Minor Victim 1, which occurred over an extended period of time, demonstrates that Torres did not have a solitary lapse in judgment. Torres was calculated and repeatedly sexually abused Minor Victim 1 when she was left in his care and custody. The nature and circumstances of the offense dictate the need for a lifetime of incarceration.

### B.    History and Characteristics of the Defendant

Torres is a child predator. *See* PSR ¶¶ 74-77. Minor Victim 1 is not Torres' first victim.  In 2018, Torres was in a dating relationship with S.S. in Galveston, Texas. On or about March 21, 2018, S.S. reported to the Texas City Police Department that she suspected Torres sexually abused her 11-year-old daughter. According to S.S., she went to the gym and left her daughter ("Minor Victim 2") with Torres at her home. While at the gym, S.S. received a call from Minor Victim 2. Minor Victim 2 stated that she went to give Torres a hug and touched Torres' erect penis while he was lying in bed. When questioned by police, Minor Victim 2 explained that she was in her bedroom getting ready for school when Torres came into her room and asked her what she was doing. Minor Victim 2 explained that she was getting ready for school and Torres told her to come and give him a hug when she was finished. Minor Victim 2 told police she went into Torres' room to give him a hug and *accidentally* brushed up against his penis. Based on the minor victim's statement and Torres' corroborating

statement, the Texas City Police Department closed the investigation because the incident appeared to be unintentional. Two years later, however, Minor Victim 2 disclosed that Torres did in fact force her to touch his penis in 2018 and he had been sexually abusing her ever since.

On or about April 11, 2020, Minor Victim 2 told her mother that Torres had been sexually assaulting Minor Victim 2 on multiple occasions over the course of two years. Minor Victim 2 reported to the Texas City Police Department that Torres would push his erect penis up against Minor Victim 2 when he hugged her, and he would force her to touch his penis while he was clothed and unclothed. Minor Victim 2 recalled that on at least one occasion, while at the pool, Torres would make Minor Victim 2 touch his penis while he was underwater. On another occasion, Torres vaginally penetrated Minor Victim 2 while they were in the pool. Additionally, in an apparent attempt to groom Minor Victim 2, Torres forced Minor Victim 2 to watch child pornography with him. Minor Victim 2 explained that she did not report the abuse because she was fearful it would ruin her mother's relationship with Torres and was afraid something bad would happen to her mother. Minor Victim 2 finally felt comfortable reporting the abuse when her mother ended her relationship with Torres. On July 17, 2020, law enforcement officers in Galveston, Texas, arrested Torres for aggravated sexual assault of a child based on his abuse of Minor Victim 2. PSR ¶ 74. Torres posted bond on August 10, 2020. *Id.*

According to Minor Victim 1's mother, Torres relocated to Florida shortly after posting bond in the fall of 2020. It was at this time that Torres began a dating

relationship with Minor Victim 1's mother and began to sexually abuse Minor Victim 1. The abuse continued up until the time of his arrest on November 13, 2021.

In addition to actively sexually abusing minors in his care, custody, and control, Torres exploits children by viewing and collecting CSAM for his own sexual gratification. Prior to his federal arrest in this case, Torres was charged in three separate cases of possessing child pornography based on conduct from February 2020 in Galveston, Texas. *See* PSR ¶¶ 75-77.

Torres is precisely the kind of individual for which Congress "directed the Commission to ensure lengthy incarceration"—offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors.  USSG § 4B1.5 app. notes. He has a pattern of sexually exploiting young girls entrusted in his care and custody. His proven track record dictates the need for a lifetime of incarceration.

### C.    Seriousness of the Crime, Promote Respect for the Law, and Need for Just Punishment

Torres' criminal history as described in the PSR and outlined above, demonstrate the need for the sentence imposed in this case to reflect the seriousness of the crime, promote respect for the law, and provide just punishment is significant. As the Eleventh Circuit explained in a child exploitation case, "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010), *cert. denied*, 131 S. Ct. 1813 (2011).  "Child sex crimes are among the most egregious and despicable of societal and criminal offenses ...." *United States v. Sarras*, 575 F.3d 1191,

1220 (11th Cir. 2009) (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable). Congress has explained that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense." S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59. Because "[t]he seriousness of the crime varies directly with the harm it causes or threatens ..." this Court should impose the maximum sentence possible. *Irey*, 612 F.3d at 1206. The sexual abuse committed by Torres is egregious and undoubtedly inflicted irreparable harm on Minor Victim 1. She (and all of Torres' victims) will forever need the benefit of therapeutic treatment as she matures throughout life and learns to develop appropriate and healthy relationships. The significant harms inflicted and threatened by Torres' conduct designate the seriousness of the offense and the need for a lifetime of imprisonment.

### D.    Adequate Deterrence to Criminal Conduct and Need to Protect the Public from Further Crimes of the Defendant

The Seventh Circuit has explained why deterrence is so important for crimes involving the sexual abuse of children, including child pornography. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." If sentences are more severe, like-minded individuals will be deterred, and the incarceration of those convicted of such crimes will help to protect the public. Furthermore, the Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a

class...." *Smith v. Doe*, 538 U.S. 84, 103 (2003). Torres' pattern of sexually exploiting minors is evidence of his recidivism. Accordingly, there is a strong need to protect the public from further crimes of the defendant.

     To abate similar conduct in the future, this Court should impose a severe sentence that will serve as a warning to individuals considering similar conduct. A lengthy sentence will deter comparable activities and convey that such behavior is unacceptable and will be adjudicated harshly within the Eleventh Circuit. Moreover, there is a strong need to protect the public from further crimes of defendant. He has a history of sexually abusing children. Torres has not demonstrated any signs of changing his predatory ways, and he continues to pose a serious danger to society. By repeatedly sexually exploiting minors, Torres has volunteered to illustrate the repercussions for behavior civilized society deems unacceptable.

**IV.**      <u>**Conclusion**</u>

The defendant's sentence should fairly account for the history of his predatory nature and the scope of his criminal endeavors, acknowledge the harm that he has caused to the child victim, and acknowledge the severe ramifications of his actions. For the aforementioned reasons, the United States respectfully requests that this Court issue the only reasonable sentence for the defendant—life imprisonment.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Lisa M. Thelwell*
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: lisa.thelwell@usdoj.gov

**U.S. v. Torres**                         **Case No. 8:21-cr-397-MSS-JSS**

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Adam Nate, AFD

/s/ Lisa M. Thelwell
Lisa M. Thelwell
Assistant United States Attorney
Florida Bar No. 100809
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: lisa.thelwell@usdoj.gov

DOC. 96

```
 1              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,    )
                                  )
 5              Plaintiff,        )
                                  )
 6                                ) Case No.
           vs.                    ) 8:21-CR-397-MSS-JSS
 7                                )
                                  )
 8   ABY RAUL RIVERA TORRES,      )
                                  )
 9              Defendant.        )

10

11
     _____
12
                   SENTENCING HEARING
13       BEFORE THE HONORABLE MARY S. SCRIVEN
              UNITED STATES DISTRICT JUDGE
14
                   AUGUST 24, 2022
15                     9:33 A.M.
                    TAMPA, FLORIDA
16   _____

17

18

19

20

21        Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23          DAVID J. COLLIER, RMR, CRR
              FEDERAL OFFICIAL COURT REPORTER
24          801 NORTH FLORIDA AVENUE, 7TH FLOOR
                  TAMPA, FLORIDA  33602
25
```

```
 1   APPEARANCES:

 2

 3   FOR THE GOVERNMENT:

 4

 5        Lisa Marie Thelwell

 6        United States Attorney's Office

 7        400 North Tampa Street, Suite 3200

 8        Tampa, Florida  33602

 9        (813) 274-6000

10

11

12   FOR THE DEFENDANT:

13

14        Adam J. Nate

15        Federal Public Defender's Office

16        400 North Tampa Street, Suite 2700

17        Tampa, Florida  33602-4726

18        (813) 228-2715

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2                 - - - o0o - - -

 3         THE COURT:  Good morning.  Call the case, please.

 4         COURTROOM DEPUTY:  Yes, Your Honor.

 5         Court calls Case Number 8:21-CR-397-MSS-JSS,

 6   United States of America versus Aby Raul Rivera Torres.

 7         Counsel, please state your appearances for the

 8   record, beginning with the Government.

 9         MS. THELWELL:  Good morning, Your Honor.

10   Lisa Thelwell on behalf of the United States.  Seated at

11   counsel's table is FBI Special Agent Michael Goodhue.

12         THE COURT:  Good morning.

13         MR. NATE:  Good morning, Your Honor.  Adam Nate on

14   behalf of Mr. Rivera Torres.

15         THE COURT:  Good morning.  Please swear the

16   defendant.

17         COURTROOM DEPUTY:  Yes, Your Honor.

18         Please stand and raise your right hand.

19         Do you solemnly swear or affirm, under penalty of

20   perjury, that the statements you give in these proceedings will

21   be the truth, the whole truth and nothing but the truth?

22         THE DEFENDANT:  Yes.

23         COURTROOM DEPUTY:  Thank you.  Please state and spell

24   your name for the record.

25         THE DEFENDANT:  Aby Raul Rivera Torres, A-B-Y,
```

```
 1   R-A-U-L, R-I-V-E-R-A, T-O-R-R-E-S.

 2         COURTROOM DEPUTY:  Thank you.

 3         THE COURT:  You may be seated.

 4         Mr. Torres, you're under oath.  You have to give

 5   truthful answers.  If you give false answers, you face

 6   penalties of perjury, false statement and obstruction.  Do you

 7   understand that?

 8         THE DEFENDANT:  Yes, ma'am.

 9         THE COURT:  Pull the microphone down toward you.

10         At the same time, it's not my purpose to induce you

11   to give false answers or mislead you, so if you don't

12   understand something that I'm saying to you or if you need to

13   confer with your lawyer, ask for clarification or ask for a

14   chance to speak with counsel.  Do you understand that?

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  Sir, on May 23rd, 2022 the Court found

17   you guilty of Counts One, Two, Three, Four and Five of the

18   Superseding Indictment.  Count One charged you with production

19   of child pornography; Counts Two, Three and Four charged you

20   with distribution of child pornography; and Count Five charged

21   you with possession of child pornography of a minor who had not

22   attained the age of 12 years, all in violation of U.S. law.

23         The Court hereby adjudges you formally publicly

24   guilty of those charges and we are now at the stage in the

25   proceedings where it is my job to address the matter of your
```

1  sentencing.  I do that by conferring with you, your lawyer and
2  counsel for the Government and reviewing the materials
3  submitted in advance of this hearing.
4       Has the defense had an opportunity to review the
5  presentence report?
6       MR. NATE:  Yes, Your Honor.
7       THE COURT:  Any objection to its factual accuracy?
8       MR. NATE:  No, Your Honor.
9       THE COURT:  Any objection to the guideline
10  calculations?
11       MR. NATE:  Yes, Your Honor.  We object to paragraphs
12  43 and 54, both of which deal with the pattern enhancement,
13  Your Honor.
14       THE COURT:  Let me hear from you.  I just don't see
15  it addressed in your sentencing memo.
16       MR. NATE:  Your Honor, it's addressed in the
17  presentence report, in the addendum, the information provided
18  both before and after a position of parties meeting, and
19  I believed that was sufficient to qualify my objection,
20  Your Honor.
21       THE COURT:  Yes, sir.  Let me hear from you.
22       MR. NATE:  Sorry, Your Honor.
23       THE COURT:  Do you wish to make any further argument?
24       MR. NATE:  No, Your Honor.  I believe that the
25  Government has the burden, based on my objection, to

1  demonstrate -- address my objections, Your Honor.
2       THE COURT:  Ms. Thelwell, has the Government had an
3  opportunity to review the presentence report?
4       MS. THELWELL:  Yes, Your Honor.
5       THE COURT:  Any objection to its factual accuracy?
6       MS. THELWELL:  No, Your Honor.
7       THE COURT:  Any objection to the guideline
8  calculations?
9       MS. THELWELL:  No, Your Honor.
10       Sorry.  I apologize.  I did have one objection to
11  paragraph 45 as it relates to the offense -- the number of
12  images involved in the offense.
13       THE COURT:  Yes, ma'am.
14       MS. THELWELL:  The Application Note to the
15  United States Sentencing Guideline 2G2.2 instructs how to
16  determine the number of images.  Specifically, in note 6(b)(i)
17  it states that each photograph, picture, computer or
18  computer-generated image or any similar visual depiction shall
19  be considered to be one image.  It's the Government's position
20  that the plain reading of the guidelines requires that
21  duplicate images also count.  There is no option carved out in
22  the guidelines that duplicate images do not count.  The
23  Eleventh Circuit is silent on this particular issue, so there
24  is no binding case for this Court.  I will acknowledge that
25  there is a circuit split in how the various circuits are

1   handling this issue, I've outlined that as well in my objection
2   that was attached to the PSR, but I can provide further
3   information if the Court would like.
4           THE COURT:  The duplicate images that you're seeking
5   to have counted, is it clear that these images were duplicated
6   or is it unclear whether they were duplicated and that they
7   just, as often happens, store and then essentially duplicate
8   themselves?
9           MS. THELWELL:  My understanding is that the number
10  that the probation office relied on -- give me one moment -- in
11  paragraph 19 of the PSR, only sixty -- so there are a total of
12  667 images of child sex abuse material, which is why I'm
13  seeking the additional enhancement.  Probation has only relied
14  on 60 of those images because those 60 had unique hash values
15  and so therefore were not duplicates.
16          My argument is that all 667 should count because the
17  guidelines do not require the exclusion of duplicates,
18  regardless of the hash value.
19          THE COURT:  But my question is do you know if the
20  hash value duplicates were duplicated by the defendant or
21  whether this is something that's a function of what the
22  computer does to the photographs?
23          MS. THELWELL:  One moment, Your Honor.
24          At this time, Your Honor, I'd like to ask
25  Agent Goodhue to testify to that fact or that question.

1           THE COURT:  Does he know the answer to the question?
2           MS. THELWELL:  Yes, Your Honor.
3           THE COURT:  Call your witness.
4           MS. THELWELL:  At this time the United States calls
5   FBI Special Agent Michael Goodhue.
6           THE COURT:  Did the parties notify the Court that
7   this hearing was going to take more than 30 minutes?
8           MS. THELWELL:  No, Your Honor.
9           THE COURT:  Is it anticipated that it will?
10          MR. NATE:  Not from defense, Your Honor.
11          THE COURT:  Beg your pardon?
12          MR. NATE:  Not from the defense, Your Honor.
13          MS. THELWELL:  I -- maybe 45 minutes.
14          THE COURT:  All right.  Please swear the witness.
15          COURTROOM DEPUTY:  Do you solemnly swear or affirm,
16  under penalty of perjury, that the testimony you're about to
17  give in this cause will be the truth, the whole truth and
18  nothing but the truth?
19          THE WITNESS:  I do.
20          COURTROOM DEPUTY:  Thank you.
21          Please state and spell your name for the record.
22          THE WITNESS:  Michael Goodhue, G-O-O-D-H-U-E.
23          COURTROOM DEPUTY:  Thank you.
24          You may take the stand.
25          THE COURT:  Mr. Goodhue, you're under oath.  You have

1  to give truthful answers.  If you give false answers, you face
2  penalties of perjury, false statement and obstruction.  Do you
3  understand that?
4         THE DEFENDANT:  Yes, Your Honor.
5         THE COURT:  Counsel.
6         **DIRECT EXAMINATION OF MICHAEL GOODHUE**
7  **BY MS. THELWELL:**
8  Q    Agent Goodhue, did you review the child sex abuse material
9  that was discovered in this case?
10 A    I did.
11 Q    And what, if anything, can you tell us as it relates to
12 the 667 images that were found on Mr. Torres' cell phone?
13 A    So when a person uses their cell phone on social media
14 applications such as KIK, every time that image is sent and
15 received it could make a copy and store a copy in the temporary
16 folders within that phone, so the 667 images in total is as a
17 result of those images being constantly traded back and forth,
18 edited by the user who sends it out, but it's my understanding
19 based on my training that the images will not duplicate
20 themselves.
21 Q    What do you mean by that?
22        THE WITNESS:  I think, Your Honor --
23        THE COURT:  Well, what do you mean by your training
24 and understanding?  Are you an IT specialist?
25        THE WITNESS:  No, Your Honor.  I have received

1  cell phone training, forensic examination training before.
2         THE COURT:  Consisting of what?
3         THE WITNESS:  A SANS class on cell phone forensics.
4         THE COURT:  And how long was that class?
5         THE WITNESS:  It was just a one week class.  It was a
6  very general overview.  But I'm pretty familiar with the KIK
7  application.
8         THE COURT:  And how much of that coursework focused
9  on duplication of images on cell phones?
10        THE WITNESS:  Not specifically about duplication of
11 images.
12        THE COURT:  And how much on hash values?
13        THE WITNESS:  Hash values?  It actually did not cover
14 hash values, that training.
15        THE COURT:  And the trainer who told you that the
16 images don't duplicate themselves and don't create multiple
17 images within the device, who was that?
18        THE WITNESS:  The training was put on by SANS and one
19 of the cell phone experts, Ms. Heather Mahalik.
20        THE COURT:  And when was that training?
21        THE WITNESS:  I think I took it about a year ago.  It
22 was an on-demand class.
23        THE COURT:  What does that mean?
24        THE WITNESS:  You could take it at your leisure as
25 long as you do the 40 hours.

```
 1          THE COURT:  It was internet-based?
 2          THE WITNESS:  Yes, ma'am.
 3          THE COURT:  Not in-person?
 4          THE WITNESS:  Correct, Your Honor.
 5          THE COURT:  And what's your educational background?
 6          THE WITNESS:  I actually have an accounting degree.
 7          THE COURT:  All right.  Anything else you want to ask
 8  this witness?
 9  BY MS. THELWELL:
10  Q    Do you have any other additional training as it relates to
11  computer or cell phone forensics?
12  A    No, I do not.
13          MS. THELWELL:  No other questions, Your Honor.
14          THE COURT:  All right.  Any Cross by the defense?
15          MR. NATE:  No, Your Honor.
16          THE COURT:  Thank you.  You may step down.
17          MS. THELWELL:  I have no further argument,
18  Your Honor.
19          THE COURT:  All right.  The Court overrules the
20  Government's objection with respect to the number of images and
21  maintains the position stated by Probation is accurate both as
22  a factual matter and as a legal matter, factually meaning I
23  can't tell how the images were duplicated on the phone, whether
24  this is a function of something the defendant did or whether
25  it's a function of how the phone operates, and so I would
```

```
 1  accept the probation officer's statement as to the number of
 2  images calculable under the guidelines.
 3          Any other objections from the Government with respect
 4  to the presentence report?
 5          MS. THELWELL:  No, Your Honor.
 6          THE COURT:  And would you like to respond to the
 7  defense challenge to the pattern as set forth in, what is it,
 8  45?
 9          MR. NATE:  The first one, Your Honor, is in paragraph
10  43, that's the pattern enhancement related to
11  Section 2G2.2(b)(5), and the second one is paragraph 54, which
12  is a Chapter 4 enhancement.
13          MS. THELWELL:  Your Honor, the Government agrees with
14  the Probation Office's assessment and asks that both of these
15  objections be overruled.  First, as it begins with paragraph
16  43, the offense conduct related to the other child victim out
17  of Galveston, Texas does in fact show that the defendant has a
18  pattern.  The Application Note when describing pattern of
19  activity at 2G2.2, Application Note --
20          THE COURT:  Was he convicted of the offense in Texas?
21          MS. THELWELL:  No, Your Honor, but the Application
22  Note says that this means any combination of two or more
23  separate instances of sexual abuse or sexual exploitation of a
24  minor by the defendant, whether or not the abuse or
25  exploitation, A, occurred during the course of the offense; B,
```

1   involved the same minor victim; or, C, resulted in the offense
2   for such conduct.  So the fact that he has not yet been
3   convicted of that offense is irrelevant as it relates to
4   determining whether it's a pattern of activity under the
5   guideline.
6          THE COURT:  So of those three, which one are you
7   relying on?  Because it didn't occur during the course of the
8   offense, it was before the offense, and it didn't involve the
9   same minor victim, because --
10         MS. THELWELL:  It's a different victim.
11         THE COURT:  -- it's a different victim, so you're
12  relying on C, resulted in the offense for --
13         MS. THELWELL:  Right.  So it says whether or not the
14  abuse or exploitation resulted in a conviction for such
15  conduct.
16         THE COURT:  And are you prepared to prove that the
17  conduct occurred?
18         MS. THELWELL:  Your Honor, I can.  I would rely on
19  the information that's already contained in the PSR as it
20  relates to his criminal history in paragraph 74, it outlines
21  the conduct that occurred.
22         THE COURT:  And, Mr. Nate, your client did not object
23  to the facts in the presentence report; is that right?
24         MR. NATE:  Well, we object -- we don't object that
25  that's the statements that were made, that there was a forensic

1   interview.  We object to the reliance upon that, that it
2   happened, we deny that it happened, and any reliance on --
3          THE COURT:  Well, that's fact.  So are you denying
4   the allegations in paragraph 74?  This is the time to challenge
5   any facts in the presentence report, or else they're accepted
6   as true.
7          MR. NATE:  Yes, Your Honor, and I made clear in my
8   objection that we do deny this allegation.  It never happened.
9   But to address Your Honor's question, we objected to paragraph
10  74.  We don't object that the police report says this, we don't
11  object that there's a supplemental police report.  We object to
12  the substance of it, absolutely.  We deny that anything
13  happened in Texas.
14         THE COURT:  Ms. Thelwell.
15         MS. THELWELL:  Yes, Your Honor.  It's the
16  Government's position that the Government can rely on the
17  information provided by the police report.  I do have the
18  mother of that victim here if the Court wanted to hear from her
19  to testify to the facts, but I think Mr. Nate's objection
20  should be overruled.
21         MR. NATE:  Your Honor, this would not only be
22  hearsay, there would be double hearsay involved and triple
23  hearsay.  Now, hearsay is allowed in a sentencing hearing,
24  I understand that, so long as all the hearsay, whether it's
25  single, double or triple, has sufficient indicia of

1  reliability, and the Court would need to make explicit findings
2  on factors of credibility.
3      In *U.S. v. Reme*, 738 F.2d 1156, the Eleventh Circuit
4  explained four ways to show that hearsay evidence could be
5  admitted as reliable.  So the guidelines don't set any of this
6  out, the guidelines just say, well, it's okay as long as it's
7  reliable, but the Eleventh Circuit goes more in-depth than
8  this.  It gives one of four ways that the Government can
9  outline reliability.  First, the evidence falls within a firmly
10 rooted hearsay exception; two, the declarant's statement was
11 originally made in a situation that encompassed trial-type
12 protections, such as oath, defendant's opportunity to
13 cross-examine, or fact finder's chance to observe the
14 declarant's demeanor, that would be the Court in this case;
15 three, the declarant's statements were spontaneous or against
16 their own penal interest; or, four, the hearsay evidence is
17 corroborated with other evidence in the record.  The Government
18 can't meet any one of those four in this case, or hasn't yet,
19 Your Honor.
20     THE COURT:  What's the status of the investigation in
21 Texas?
22     MS. THELWELL:  Your Honor, that case is pending.  The
23 defendant has obviously been in Florida custody this entire
24 time.
25     THE COURT:  And you intend to call the victim's

1  mother to testify as to what the victim told the mother?
2      MS. THELWELL:  Your Honor, I would prefer not to.
3  I had intended to rely on the information that's contained
4  within the PSR in paragraph 74.  It is sufficiently reliable.
5  It came from a police report.  There is an indictment outlining
6  the alleged offense.  I don't think -- I don't think it's
7  necessary to call the victim -- excuse me, the victim's mother.
8      THE COURT:  I don't see a reference to the
9  indictment.  Am I missing it?
10     MS. THELWELL:  I'm sorry?
11     THE COURT:  I don't see a reference to the
12 indictment.
13     MS. THELWELL:  On paragraph 74 it says:  According to
14 the indictment, on or about April 11th, 2020, the defendant did
15 intentionally or knowingly cause the penetration of the sexual
16 organ of Jane Doe, a child who was then younger than 14 years
17 of age, by the defendant's sexual organ.  And then it further
18 outlines the police report --
19     THE COURT:  But the police report is all the hearsay
20 of the victim and the victim's mother, and so the fact that
21 it's in a police report doesn't create any more reliability.
22     MS. THELWELL:  Right.  But the Court is allowed to
23 rely on hearsay.  I don't see that there's any -- the
24 United States calls Samantha Saenz.
25     THE COURT:  My question is when you call the witness,

1  do you intend to have her tell us what the victim told her or

2  do you intend to have her tell us something else?

3       Does she have any personal knowledge of the events

4  beyond what the minor victim told her?

5       MS. THELWELL:  No, because she was not there at the

6  time of the sexual abuse.

7       THE COURT:  All right.  Give me one second.

8       What's your next objection, Mr. Nate?

9       MR. NATE:  Paragraph 54, it's a similar objection.

10  This is a Chapter 4 enhancement related to alleged pattern.  It

11  lists the same conduct related to the events we're talking

12  about in Texas.  We obviously object to that.  It also outlines

13  facts from the offense conduct, specifically in paragraphs 12,

14  13 and 14, where there's distribution on different dates.  We

15  don't deny that; however, it appears that Probation and the

16  Government is stating that there was three separate occurrences

17  of sexual contact, and we don't believe that the evidence

18  supports that, Your Honor, therefore we object to the pattern

19  enhancement.

20       THE COURT:  Ms. Thelwell.

21       MS. THELWELL:  Yes, Your Honor.  As it relates to

22  paragraphs 12, 13 and 14, the images that are described there,

23  it's the Government's position that these were produced on

24  separate occasions.  As you can see from the description, the

25  victim is wearing different clothing in each of those

1  instances.  Additionally, in her forensic interview she had

2  reported that the victim -- excuse me, that the sexual abuse

3  had been ongoing.  In paragraph 20 she outlined the nature of

4  the abuse and described specific instances.

5       So it's the Government's position that the pattern

6  enhancement for the repeat and dangerous sex offender

7  enhancement does in fact apply to this case, not only because

8  of the repeated conduct against the victim in this case but

9  also including the victim from Texas and the conduct described

10  in paragraph 74.

11       THE COURT:  In the photograph -- in the forensic

12  analysis of the phone there is no date referenced in the

13  photographs?

14       MS. THELWELL:  There is no metadata associated with

15  those images, so we are unable to confirm the creation date.

16  We do know that at least, for example, in paragraph 14, that

17  image was created using the KIK application's live feature,

18  which would have meant he was in the app taking the photo at

19  that time on or about August 2nd, so at the very least we know

20  that in paragraph 14 that image was created on or about

21  August 2nd, and then, again, paragraphs 12 and 13, the victim

22  is wearing separate -- different clothing, which would suggest

23  that these occurred on separate dates.  They were distributed

24  on separate dates as well, which would also kind of corroborate

25  that they were likely produced on separate occasions.

1          THE COURT:  Mr. Nate, with respect to the indicia of
2    different dates described by Ms. Thelwell.
3          MR. NATE:  Yes.  The only issue, Your Honor, that
4    I think the Court can rely on is the different clothing is not
5    enough, that's just simply not enough, because the defendant
6    very well could have -- or the victim in this case very well
7    could have changed clothes, obviously.  The --
8          THE COURT:  What is the length of time between events
9    that's necessary to establish the different events?
10         MR. NATE:  That's something the Court would have to
11   determine, Your Honor.  It's a factual finding.  In
12   *United States versus Fox*, which is cited in the addendum to the
13   presentence report, it discusses -- one second, Your Honor --
14   single victims and a pattern of activity, it distinguishes
15   between multiple unrelated occasions of prohibited sexual
16   contact, which is necessary to meet the 4B1.5 enhancement.
17   So our argument is there wasn't multiple unrelated occasions.
18         As far as the different occasions argument, again,
19   that's something that's a factual determination by the Court.
20   That's something that's been litigated in other circumstances,
21   such as armed career criminal as well.  So our argument simply
22   is because we don't have that metadata, we don't know that
23   these images weren't created on the same day.  Obviously the
24   Court found that the different -- there could be different
25   occasions based on the change of clothes, we would object to

1    that, but that would be the only way, I think, the Court could
2    make that determination.  We agree there's different clothing
3    in the pictures.  We don't dispute that, Your Honor.  We just
4    can't say that just because you distribute them on different
5    dates, that there was -- that there was -- that was an
6    independent act, Your Honor, sufficient to meet the 4B
7    enhancement.
8          THE COURT:  Do you have any witness, Ms. Thelwell,
9    who can provide any -- shed any additional light on the images,
10   suggesting different dates?
11         MS. THELWELL:  No, Your Honor, but if I may just
12   briefly respond to Mr. Nate.
13         THE COURT:  Yes.
14         MS. THELWELL:  It's the Government's position that we
15   have shown by a preponderance of the evidence that this
16   enhancement applies and that these images were -- or these
17   instances are separate occasions as defined by the guidelines.
18   Specifically, it says that the plain meaning of "separate
19   occasions" does not require two events that are unrelated, it
20   only requires that the events are independent and
21   distinguishable from each other.  I'm just referring back to
22   the Probation Office's addendum.  This is at document 72,
23   page 113.
24         Here we have the victim in a forensic interview in
25   paragraph 20 explaining that Mr. Torres frequently sexually

1  abused her and frequently took photos.  Then we have in
2  paragraphs 12, 13 and 14 three -- at least three different sets
3  of photos that are easily distinguishable because of the
4  clothing, they were distributed on separate dates, and at least
5  in paragraph 14 we know for a fact, based on the metadata that
6  was recovered there, that that image was created on or about
7  August 2nd, 2021 and distributed through the -- well, it's
8  taken on KIK using the live feature, which is how we know the
9  date, and then distributed.  So at least we have that one
10 separate instance.  And obviously if an image was distributed
11 on or about July 22nd, as outlined in paragraph, I believe, 12,
12 that occurred prior to August 2nd, so that's at least two
13 occasions that we have right there.  So it's the Government's
14 position that the defendant's objection should be overruled.
15 The United States has proven this particular enhancement by a
16 preponderance of the evidence.
17        THE COURT:  Call your witness on the question of the
18 offense in Galveston.
19        MS. THELWELL:  One moment, Your Honor.
20        The United States calls Samantha Saenz.
21        THE COURT:  Please come forward to be sworn, ma'am.
22        COURTROOM DEPUTY:  Please raise your right hand.
23        Do you solemnly swear or affirm, under penalty of
24 perjury, that the testimony you're about to give in this cause
25 will be the truth, the whole truth and nothing but the truth?

1        THE WITNESS:  Yes.
2        COURTROOM DEPUTY:  Thank you.
3        Please state and spell your name for the record.
4        THE WITNESS:  Samantha Saenz, S-A-M-A-N-T-H-A,
5  S-A-E-N-Z.
6        COURTROOM DEPUTY:  Thank you.  You may take the
7  stand.
8        THE COURT:  Pronounce your last name for me again,
9  ma'am.  Pronounce your last name.
10       THE WITNESS:  Saenz.
11       THE COURT:  Ms. Saenz, you're under oath.  You have
12 to give truthful answers.  If you give false answers, you face
13 penalties of perjury, false statement and obstruction.  Do you
14 understand that?
15       THE DEFENDANT:  Yes.
16       THE COURT:  Counsel.
17       MS. THELWELL:  Good morning, Ms. Saenz.
18       **DIRECT EXAMINATION OF SAMANTHA SAENZ**
19 **BY MS. THELWELL:**
20 Q    How do you know Mr. Rivera Torres?
21 A    He was my boyfriend at the time.
22 Q    When was that?
23 A    It started out when my daughter was nine.  She's 14 right
24 now.  So before 2020.
25 Q    And you said prior to 2020?

SAMANTHA SAENZ - AUGUST 24, 2022          23
Direct Examination by Ms. Thelwell

1   A    Yes.  We reported it in 2020.
2   Q    When did the relationship end?
3   A    Around that time.
4   Q    In 2020?
5   A    Yes.
6   Q    Do you remember what part of 2020?
7   A    No, it's -- well, it was the same day that he picked up a
8   terroristic threat case in the State of Texas with the mother
9   of his child.
10  Q    When you were all were dating, did he live with you?
11  A    Yes.
12  Q    Who else lived in the house?
13  A    Me, Aby and my daughter.
14  Q    And by "Aby" do you mean Mr. Rivera Torres?
15  A    Yes.
16  Q    Do you see him here in the courtroom?
17  A    Yes, I do.
18  Q    Can you identify him by an article of clothing.
19  A    Yes, in orange.
20        MS. THELWELL:  Okay.  Let the record reflect that
21  Ms. Saenz has identified the defendant in this case.
22  BY MS. THELWELL:
23  Q    At some point in the beginning of your relationship do you
24  recall receiving a phone call from your daughter while you were
25  at the gym?

SAMANTHA SAENZ - AUGUST 24, 2022          24
Direct Examination by Ms. Thelwell

1   A    Yes.
2   Q    And what was that call about?
3   A    She told me that he had went to her room and tried to wake
4   her up for school and told her whenever you're done getting
5   ready, go ahead and come to my room so that I could tell you
6   good morning or let you know when it's time to go for school.
7   So she said that she went over there and he took off the
8   blanket from himself and exposed himself to her and made her
9   grab him, grab his private area and hold onto it.
10  Q    Okay.  And by "private area" do you mean his penis?
11  A    Yes.
12  Q    And what did you do when you received that call?
13  A    I rushed home and then I called the cops.  Whenever the
14  cops got there, they took him outside, they questioned him.
15  I was in the room waiting with my daughter, and she wouldn't
16  speak, she wouldn't say anything, I was trying to question her
17  myself, and then the police officer came and got both of us
18  from the room and she retracted on what she said, and in the
19  present day --
20  Q    Before you move on, what do you mean when you say she
21  retracted from what she said when she was talking to the
22  police?
23  A    They were just asking her questions about the phone call
24  or if he had -- you know, like what he did, and at first she
25  said yes and then she said no.

SAMANTHA SAENZ - AUGUST 24, 2022          25
Direct Examination by Ms. Thelwell

1  Q    Okay.  And so when she said no, what do you mean?  She was
2  saying nothing actually happened?
3  A    They just asked her the question did he make you hold his
4  penis, and at first she said yes and then she said no.
5  Q    So what happened at that point?
6  A    He left the home --
7  Q    Was there any police investigation?
8  A    Yeah.  He left the home.  He wasn't allowed back.  He was
9  like doing driving at the time.  And then we went through
10 investigation, they interviewed him, they interviewed me, and
11 then they declared because of her saying no and then just
12 shutting down and not speaking on it anymore, that it didn't
13 happen, because when they interviewed him he claimed that he
14 wakes up like that and she accidentally hugged him, so --
15 Q    And is that what you believed at that time?
16 A    No.
17       MR. NATE:  Objection on relevance.
18       THE COURT:  Sustained.
19 BY MS. THELWELL:
20 Q    All right.  Well, what did you do after the police closed
21 that investigation?
22 A    With what?
23 Q    Did you continue in a relationship with Mr. Rivera Torres?
24 A    After a while, yes.
25 Q    And why was that?

SAMANTHA SAENZ - AUGUST 24, 2022          26
Direct Examination by Ms. Thelwell

1  A    Because my daughter was just telling me that nothing
2  happened.
3  Q    And you believed your daughter at that time; is that
4  correct?
5  A    Yeah, I did at the time.
6  Q    And so after you resumed your relationship with
7  Mr. Torres, did he continue to live in your house?
8  A    Back and forth between my house and his mother's house.
9  Q    And did you ever leave him alone with your child?
10 A    No.
11 Q    Okay.  At some point during the relationship -- at some
12 point the relationship ended; is that correct?
13 A    Um-hum.
14 Q    And --
15       THE COURT:  Is that a yes?
16 A    Yes.
17 Q    Do you recall -- you said that would have been around the
18 same time as a terroristic threat?
19 A    Yes.
20 Q    What do you mean by that?
21 A    We had temporary custody of his daughter in Texas, and
22 things were happening back and forth between them that I was
23 unaware of, and I was supposed to -- she was supposed to be in
24 my custody at the time, because he wasn't present, and the
25 mother had came and taken the baby, and then I called him to

SAMANTHA SAENZ - AUGUST 24, 2022          27
Direct Examination by Ms. Thelwell

1   let him know, and he went after her and threatened her and
2   turned in that video for evidence that she had the baby, and
3   that's whenever they confiscated his phone in Texas and saw the
4   child pornography.
5   Q    Slow down.  Slow down one second.
6         So when you say he made some sort of threat to the
7   mother of his children, is it Debbi?
8   A    Yes.
9   Q    You indicated that he had a video or something on his
10  phone?
11  A    Yeah.  He was recording the mother of his child with the
12  baby, following her and threatening her and stuff.
13  Q    Do you know what happened -- what he did with that phone?
14  A    Yeah.  The police took it away from him.
15  Q    And do you know what, if anything, they found on that
16  phone?
17  A    Yeah.  That's when they discovered the child pornography.
18  Q    And how do you know that?
19  A    Because they took me in and questioned me and showed me
20  everything.
21  Q    At that point what did you do, once you found out that he
22  was in possession of child pornography?
23  A    Well, the relationship had already ended before that
24  because it was just too much stuff going back and forth between
25  court with his child and stuff, but whenever that happened, for

SAMANTHA SAENZ - AUGUST 24, 2022          28
Direct Examination by Ms. Thelwell

1   sure I was -- just made sure that there was no contact.  I let
2   my apartment complex know that he was not allowed on the
3   premises.  And that's whenever I told my daughter like she
4   cannot have no contact or that he wasn't allowed, or if he
5   tried to come around looking for me, not to open the door, and
6   stuff like that.
7   Q    So at some point did your daughter ever tell you that
8   Mr. Rivera Torres did in fact sexually abuse her?
9   A    Yes, that's -- whenever I had gave her that conversation,
10  let her know that he was dangerous, that I was aware of in a
11  different matter as far as threatening the mother of his child
12  and getting in trouble and stuff like that, that's when she
13  came forward, then she felt safe and she was assured by me that
14  he was never coming back into the home or that we weren't going
15  to be together no more, and that's when she came forth and let
16  me know her truth, as well as when -- the first incident that
17  she retracted because she was scared because he would threaten
18  that he was going to kill me if she told.
19  Q    Okay.  So according to the conversation you had with your
20  daughter, she told you that she changed her story initially
21  because she --
22  A    She was scared.
23  Q    -- felt threatened; is that correct?
24        THE COURT:  I'm sorry.  You all have to ask and then
25  answer separately and not on top of each other.

1        THE WITNESS:  Okay.
2        MS. THELWELL:  Yes, Your Honor.
3        THE COURT:  So start the question again,
4    Ms. Thelwell.
5    BY MS. THELWELL:
6    Q    So based on your conversation with your daughter, she
7    explained to you that she retracted her statement, her initial
8    statement back in 2018, because she was scared; is that
9    correct?
10   A    Yes.
11   Q    And what was she scared of?
12   A    For him to hurt me.
13   Q    Why did she think he would hurt you?
14   A    He always had a gun on him.
15   Q    I'm sorry?
16   A    He always had a gun on him.
17   Q    Had she seen the gun before?
18   A    Always.
19   Q    So she tells you that her initial complaint in 2018 did
20   in fact happen.  Did she tell you any other abuse occurred?
21   A    Yes.
22   Q    What did she tell you?
23   A    He would make her watch child pornography, and sometimes
24   when I was sleeping he would go into her room and perform
25   sexual intercourse on her, he would make her watch videos, or

1    if -- she stopped like showering at home whenever -- if
2    I wasn't around or if I wasn't awake, because he would slide
3    his phone underneath the door to try to catch videos of her and
4    then grab it right back.  Hugs were more than just hugs, he
5    would hold onto her tight and just push himself on her, push
6    his penis on her, make her -- make her grab like his penis
7    until he was finished.
8    Q    Did she indicate anything happened at the pool?
9    A    Yes, but she -- that's a -- she would tell me something
10   happened at the pool, but I don't know exactly what.  That's
11   something she shared with her therapist and the DA.
12   Q    When you say "the DA," are you talking about the district
13   attorney --
14   A    Yes.
15   Q    -- in Texas?
16   A    Um-hum.
17   Q    Okay.  So your daughter was interviewed -- or who
18   interviewed your daughter after -- well, what did you do after
19   you learned all this information?
20   A    I called the cops, and then investigators started reaching
21   out to me.
22   Q    Were you interviewed?
23   A    Yes.
24   Q    Was your daughter interviewed?
25   A    Yes.

1  Q    Were you present when your daughter was interviewed?

2  A    No.

3  Q    Do you know who interviewed her?

4  A    Jimmy Reynolds.

5  Q    Is that a law enforcement officer?

6        THE COURT:  I'm sorry, I didn't get the answer to

7  that question.  That's a law enforcement officer?

8        THE WITNESS:  Yes.

9  Q    Do you know if any child advocates assisted her during the

10 interview?

11 A    Yes.

12 Q    And you also mentioned, I guess, she spoke to the district

13 attorney; is that correct?

14 A    Yes, she did.

15 Q    So were both of you also interviewed by the district

16 attorney?

17 A    Yes.

18 Q    Were you present for her interview with the district

19 attorney?

20 A    No, they took her back to the back so she could feel more

21 comfortable going into detail.

22        MS. THELWELL:  One moment, Your Honor.

23        THE COURT:  Yes, ma'am.

24        MS. THELWELL:  I have no further questions at this

25 time.

1        THE COURT:  When you saw the pornography on the

2  cell phone, did you say you saw the pornography that was on the

3  cell phone when you went and talked to the investigators?

4        THE WITNESS:  Yeah, they told me that he had about --

5  like he had videos and stuff on the same app, on KIK or

6  Messenger.

7        THE COURT:  Did you see the images?

8        THE WITNESS:  Yeah, I did.

9        THE COURT:  And were any of them of your child?

10        THE WITNESS:  Some of them I couldn't really tell

11 because it was just plain children body, but they confirmed

12 that they assumed that none of them were from her except for

13 this one --

14        THE COURT:  I'm sorry.  They assumed that none were

15 from her or that they were from her?

16        THE WITNESS:  They were not.  But there was photos of

17 her in a blue bathing suit that also he continues to carry with

18 this case when he was sharing child pornography, like sharing

19 the same photo of my daughter in the blue bathing suit.

20        THE COURT:  And how is she displayed in that photo?

21        THE WITNESS:  There was one underwater in the pool

22 and there was another one just standing in a bathing suit.

23        THE COURT:  Outside of the course of the case, would

24 you have been offended by the photograph, if you just saw a

25 photograph like that on his phone of her at the pool?

1          THE WITNESS:  Yeah, because I didn't give it to him.

2          THE COURT:  But a random person looking at the

3     photograph, would they perceive the photograph as sexual in

4     nature?

5          THE WITNESS:  No.

6          THE COURT:  Mr. Nate, any questions of this witness?

7          MR. NATE:  Just one question, Your Honor.

8          Good morning, ma'am.

9               **CROSS-EXAMINATION OF SAMANTHA SAENZ**

10    **BY MR. NATE:**

11    Q    You never witnessed yourself any inappropriate contact

12    between your daughter and the defendant, Mr. Torres, correct?

13    A    No.

14         MR. NATE:  Thank you.  No further questions,

15    Your Honor.

16         THE COURT:  No, that's not correct, or, no, you never

17    witnessed it?

18         THE WITNESS:  No, of course I didn't witness any of

19    that.

20         THE COURT:  All right.  Any Redirect?

21         MS. THELWELL:  No, Your Honor.  Thank you.

22         THE COURT:  You may step down.  Thank you.

23         Any other argument or evidence from the Government as

24    to the two objections?

25         MS. THELWELL:  No, Your Honor.

1          THE COURT:  Would you like to be heard further,

2     Mr. Nate?

3          MR. NATE:  Yes, Your Honor, just to reiterate that

4     this witness cannot testify as a declarant as to the

5     allegations that the Government is trying to use to support the

6     enhancement, it's hearsay, she did not witness any conduct

7     herself, so everything is coming from the alleged victim in the

8     case in Texas who at one point retracted the allegations.

9     There's been no evidence put forward that the statements that

10    the alleged victim made to either the witness or other

11    law enforcement were under oath, the witness was not present

12    for that statement to law enforcement or the prosecutor, there

13    was no opportunity at any point for cross-examination, there

14    was -- the fact-finder in this case, which was the Court, was

15    not able to evaluate the demeanor and credibility of the

16    declarant that's making the allegations against Mr. Torres

17    Rivera, so for all those reasons, Your Honor, the allegations

18    lack corroboration, they're not reliable and they're not

19    trustworthy.  Thank you.

20         THE COURT:  And this, Mr. Nate, is as to the

21    enhancement on 43; is that right?

22         MR. NATE:  Well, it's being used in both paragraphs

23    43, Your Honor, and 54.  These allegations are listed in both

24    paragraphs, 43 and 54.

25         THE COURT:  But for the enhancement your challenge is

1   for them as to paragraph 43?  Because 54 is just a summation.
2         MR. NATE:  Well, it's different enhancements.
3   Paragraph 43 deals with the pattern enhancement related to
4   2G2.2(b)(5), that's the sole reliance for that five level
5   enhancement in paragraph 43, it deals with the allegation in
6   Texas, but also in paragraph 54 it's also listed as one of the
7   Chapter 4 occurrences to pursue that enhancement as well,
8   Your Honor.  So we object to any usage of that allegation to
9   support any enhancement, Your Honor.
10        THE COURT:  And, Mr. Nate, the fact that the
11  defendant admitted this behavior to the victim that is the
12  subject of the instant case, who would not have known about the
13  Texas incident but for the defendant's statement to her,
14  doesn't suffice to constitute an admission, even one presented
15  to the Court by hearsay?
16        MR. NATE:  What is the Court referring to?  I'm not
17  familiar with -- what admission, Your Honor?
18        THE COURT:  Paragraph 20, I believe.
19        MR. NATE:  I don't believe that's the same issue,
20  Your Honor.
21        THE COURT:  So this is another daughter?
22        MR. NATE:  I believe that's the case, Your Honor.
23        MS. THELWELL:  Correct, Your Honor.  It's a separate
24  child.  This is a child with a different woman who lives in
25  Texas.  It's his own child.

1         THE COURT:  Other objections to the presentence
2   report or the guideline calculations?
3         MR. NATE:  Not for the defense, Your Honor.
4         MS. THELWELL:  No, Your Honor.
5         THE COURT:  If the defense objections are sustained,
6   what would be the calculation for this defendant?
7         PROBATION:  The only objection, Your Honor, that
8   would impact the guideline calculations would be if it is
9   sustained that 4B1.5 does not apply, and the total offense
10  level then would be a total offense level 39, Criminal History
11  Category II, with a guideline range from 292 months to
12  365 months of imprisonment?
13        THE COURT:  Does the Government and the defense agree
14  that that would be the revised calculation?
15        MR. NATE:  That is correct, Your Honor.
16        MS. THELWELL:  Yes, Your Honor.
17        THE COURT:  All right.  I will take that matter under
18  advisement.
19        Are there any other issues with respect to the
20  guideline calculations or the presentence report from the
21  defense or the Government?
22        MS. THELWELL:  No, Your Honor.
23        MR. NATE:  No, Your Honor.
24        THE COURT:  Are there any victims present in the
25  courtroom who wish to make a statement, Ms. Thelwell?

1    MS. THELWELL:  Yes, Your Honor.  The victim's father
2  is present, Mr. Charlie Escobar.
3            THE COURT:  Have him come forward.
4            COURTROOM DEPUTY:  Please raise your right hand.
5            Do you solemnly swear or affirm, under penalty of
6  perjury, that the testimony you're about to give in this cause
7  will be the truth, the whole truth and nothing but the truth?
8            THE WITNESS:  Yes, ma'am.
9            COURTROOM DEPUTY:  Thank you.
10           Please state and spell your name for the record.
11           THE WITNESS:  It's Charlie Escobar.  Do you want me
12  to spell the whole name?  C-H-A-R-L-I-E, E-S-C-O-B-A-R.
13           COURTROOM DEPUTY:  Thank you.  You may take the
14  stand.
15           THE COURT:  Mr. Escobar, you're under oath, sir.  You
16  have to give truthful statements.  If you make any false
17  statements, you face penalties of perjury, false statement and
18  obstruction.  Do you understand that?
19           THE WITNESS:  Yes, ma'am.
20           THE COURT:  Do you wish to inquire or is he just
21  going to make a statement?
22           MS. THELWELL:  No, Your Honor, I have no questions.
23  I believe he wanted to speak to the Court directly.
24           THE COURT:  Yes, sir.  You may do so.
25           THE WITNESS:  Yeah.  I just wanted to just make

1  sure -- I wasn't present at the time when everything happened,
2  I got the phone call from Mike, and I just wanted to speak on
3  my daughter's behalf, because unfortunately they wouldn't allow
4  her to be here.  She wanted to be.
5            THE COURT:  Who wouldn't allow her to be here?
6            THE WITNESS:  They just think it wasn't the right
7  move, through the therapist and stuff, to bring back even his
8  picture, his face forward to her, so they didn't want her to do
9  it.  But she just wanted to make sure he gets all the time he
10  needs and never gets out ever again.  There ain't really much
11  to say that -- you know, he pretty much ruined her life,
12  you know.  She can't sleep at night.  She always has to sleep
13  with me now.  He's just a terrible person and hopefully never
14  gets out ever again, and hopefully he gets more than what you
15  guys are really looking for, and honestly I hope they just pass
16  him around while he's in there, in my opinion, because he
17  deserves everything he's getting.  And I don't know what else
18  to say, you know.
19           THE COURT:  Thank you, sir.
20           THE WITNESS:  Yes, sir.  Thank you.
21           THE COURT:  You may step down.
22           Any other persons who wish to testify, Ms. Thelwell?
23           MS. THELWELL:  One moment, Your Honor.
24           I just wanted to put on the record that Mr. Escobar
25  did file a written victim impact statement, it's included in

1   the PSR at page 30 and 31.  I know that -- there are no other
2   victim impact statements at this time, but we do have two
3   individuals that would like to speak in aggravation of the
4   sentence when we're talking about the history and
5   characteristics of the defendant.  I don't know if the Court
6   wants that at this time.
7                THE COURT:  Yes, ma'am.
8                MS. THELWELL:  Okay.  I would call Dana Martinez.
9                COURTROOM DEPUTY:  Please raise your right hand.
10               Do you solemnly swear or affirm, under penalty of
11  perjury, that the testimony you're about to give in this cause
12  will be the truth, the whole truth and nothing but the truth?
13               THE WITNESS:  Yes.
14               COURTROOM DEPUTY:  Thank you.  Please state and spell
15  your name for the record.
16               THE WITNESS:  Dana Martinez, D-A-N-A,
17  M-A-R-T-I-N-E-Z.
18               COURTROOM DEPUTY:  Okay.  You may take the stand.
19               THE COURT:  Ms. Martinez, you're under oath.  You
20  have to give truthful answers and statements.  If you make
21  false statements, you face penalties of perjury, false
22  statement and obstruction.  Do you understand that?
23               THE WITNESS:  Yes.
24               THE COURT:  And you'd like to make a statement of
25  some sort?

1                THE WITNESS:  Yes.
2                THE COURT:  In what regard?  What does it have to do
3   with?
4                THE WITNESS:  In regards to his daughter, and a --
5   I just wanted to bring -- I know it's --
6                THE COURT:  Well, I need to understand before you
7   make your statement what it's about, so that if there's any
8   objection, the defense can lodge its objection.  So you want to
9   speak about his daughter in what regard?
10               THE WITNESS:  In regards to a case that was filed
11  against her him, by their father, by Aby.
12               THE COURT:  A lawsuit that the father filed against
13  the daughter?
14               THE WITNESS:  It wasn't a lawsuit, it was a case that
15  was involved with Child Protective Services and the Sheriffs.
16               THE COURT:  Any objection?
17               MR. NATE:  I do, Your Honor.  I don't think it's
18  relevant for the purpose it's being offered, Your Honor.
19               THE COURT:  All right.  You may proceed.  Overruled
20  as to relevance.  You may proceed.
21               THE WITNESS:  Okay.  I just wanted to bring to the
22  Court's attention that I believe it was about two years ago
23  Child Protective Services had contacted me and the Sheriffs
24  came to my home to question my daughter, which is also his
25  firstborn child, D.M.R.  There was allegations in her name that

1  she was sexting the other mom that lives in Texas, which is
2  Debbi.  I just wanted to bring that to this -- you know, the
3  cases were -- or the allegations were dropped in regards to the
4  fact that my child did not have access to his cell phone.  This
5  was during the time of the pandemic, so there was no -- my
6  children don't have cell phones, to this day, and they don't
7  have access to be able to text or to be involved in any type of
8  sexting whatsoever, but, you know, I just feel that on behalf
9  of my daughter, who is not here today, there is a lot of things
10 that I have to clean up, right, and I think that it's
11 important, you know, in consideration of the sentence that that
12 information be shared, because as her mother and as his father,
13 I was advised by the deputy that came to question her that he
14 was the one who had filed the police report, and I had no idea
15 of this information whatsoever, and of course the information
16 wasn't -- was not true, because my children don't have
17 cell phones and they were at home and don't have access to that
18 type of information.
19         THE COURT:  So he filed a police report against your
20 daughter saying that your daughter was sexting?
21         THE WITNESS:  Yes.  Our daughter.
22         THE COURT:  His daughter as well?
23         THE WITNESS:  Correct.  That's his firstborn.
24         THE COURT:  And did he ever tell you what his
25 motivation was for doing that?

1          THE WITNESS:  No, ma'am.  I had no communication or
2  knowledge whatsoever until the Sheriff advised me who filed the
3  police report.
4          THE COURT:  And these texts were to Debbi in Texas?
5          THE WITNESS:  Yes.
6          THE COURT:  Any questions of this witness from the
7  Government or the defense?
8          MS. THELWELL:  No, Your Honor.
9          MR. NATE:  No, Your Honor.
10         THE COURT:  Thank you.  You may step down.
11 Anyone else?
12         MS. THELWELL:  Just Ms. Saenz, she -- for the Court,
13 I had -- she had provided on late Friday a written statement by
14 her and her daughter.  Monday morning we sent it over hard copy
15 under seal.  I wanted to make sure that the Court had received
16 it.
17         THE COURT:  I did.
18         MS. THELWELL:  Thank you.  But I do believe that she
19 intends to speak as well.
20         THE COURT:  Please call your witness.
21         MS. THELWELL:  Ms. Saenz, Samantha Saenz.
22         THE COURT:  Ms. Saenz, you're under oath again.
23 Please continue to give truthful statements.
24         THE WITNESS:  Okay.  I do have a statement from my
25 daughter and then I have a statement for myself as well.

```
1         THE COURT:  Are these the ones that you submitted in
2    writing to the Court?
3         THE WITNESS:  Yes.
4         THE COURT:  You may proceed.
5         THE WITNESS:  Before I read this statement, is it
6    okay if I tie in to what she had spoke about?
7         THE COURT:  What is your connection to that event?
8         THE WITNESS:  At the time that me and him were still
9    together, when he caught the terroristic threat against the
10   other mother, that's when everything started to come to light,
11   because he was claiming those false accusations against his
12   oldest daughter and it was never her, it was on that same KIK
13   app, and it was him pretending to be his daughter, with a
14   motive of getting full custody and getting his other mother of
15   his child in trouble, and that I did see, in the State of
16   Texas, I was shown proof of all that, so that's why videos of
17   child pornography started arising and everybody started -- like
18   my daughter started coming forward on things that he did and
19   stuff, because they confiscated his phone for that video.
20        THE COURT:  You may proceed.
21        THE WITNESS:  Okay.  So my daughter's statement
22   reads:  Honestly, I don't know how to start this off without
23   saying that I hate this man.  The things that he did to me live
24   in the back of my mind, and no matter how much I try to forget
25   about it, it never goes away, and it's a horrible feeling.
```

```
1    I just hope that he goes away for a long time so that he can
2    never hurt another little kid and their family again.
3         I hated coming home from -- I hated coming home from
4    school sometimes, knowing that my mom was going to be late from
5    work and I would have to spend hours alone with him, making me
6    do things such as watching videos of grown men doing things to
7    little girls while he holds me and he touches himself, and all
8    I could think about was how much I wanted to tell my mom but
9    I couldn't because I didn't want him to hurt her.  I couldn't
10   shower without my mom being home because if I did so, as soon
11   as I turned off the water he would slide his phone under the
12   door and hurrying to pull it back out.
13        The nights were the worst.  Once my mom was asleep he
14   would come into my room and ask for a hug and he would rub
15   himself against me.  And there was one night that he came into
16   my room and I pretended to be asleep so he could leave me
17   alone, and he didn't.  He moved my pajamas to the side and he
18   started to lick my private areas, and I laid there crying,
19   saying no.
20        There was a morning where my mom did go to the gym
21   and I was getting ready for school, and he came to my room and
22   he told me to give him a hug before I left.  So once I was done
23   getting ready, I went to go give him a hug, and he grabbed my
24   hand and he pulled his pants down and made me grab his private
25   part, and he just held my hand there for what felt like
```

1  forever.

2        These are the memories that I have to live with, and

3  more.  I hope that no other little girl has to go through

4  anything like this with him ever again, because it really does

5  hurt.

6        And my statement to you is:  My daughter was

7  molested.  She was tortured into watching --

8        THE COURT:  One second.  Ms. Saenz, take a second,

9  gather yourself.

10       THE WITNESS:  She was tortured into watching videos

11 of children being harmed the same way she was.  She was forced

12 to perform sexual acts and she was forced to commit unspeakable

13 acts for the pleasure of this man, an adult who was trusted, an

14 adult who should have been a protector, because while I was

15 helping raise his daughter in my home, he was sexually abusing

16 mine.

17       Most children who experience this don't grow up to

18 have normal adult relationships.  I have to worry about my

19 daughter falling into the statistics of life after children

20 getting sexually abused.  My daughter is an only child and she

21 was my one chance to talk about Prince Charming and finding

22 love, and talks like that don't exist in our home anymore

23 because he preyed on my child at the age of nine, when a child

24 is developing social skills, learning about relationships and

25 still maturing, and while she was supposed to be developing, he

1  came into our home and he stole her childhood away from her.

2  She has seen and experienced things that some adults haven't

3  experienced, and I now have an untrusting and anxiety-filled

4  daughter who believes that the whole world is ugly.  I have had

5  to pick my daughter up off the floor and into a therapist's

6  office for cutting herself because the pain was an outlet for

7  her to escape the evil that she endured under the roof of her

8  own home, where children are supposed to be the safest.

9        I had to hold my daughter many nights while she cried

10 in my arms, saying things like "I don't even want to be alive."

11 At the most horrible time in my life as a mother, I couldn't

12 even show my face in public.  My performance at work was

13 affected and I couldn't even sit at my desk without crying or

14 hurting or replaying events that my daughter shared with me and

15 shared with the DA.  I couldn't even have social media because

16 his mugshot and charges were being shared everywhere, because

17 for a long time my daughter's name was being dragged through

18 the mud, because her reputation was in his hands, and she

19 didn't even stand a chance.  Can you imagine your dignity being

20 taken from you everywhere you go?  It's like being stripped

21 naked.

22       My daughter was bullied at school.  She was bullied

23 by kids who didn't understand the difference between

24 participating and being forced against your own will.  I saw my

25 full-of-life, straight-A student slowly deteriorate and spiral

1   into a dark place because she didn't want to go to school
2   anymore and she hated everyone, because everybody knew.
3         For this case in Florida he did plead guilty, but for
4   the case in Texas my daughter has to take in all the trauma for
5   years now until he gets sentenced, because he chose to go to
6   trial.  And even while out on trial and out on bond, his habits
7   are continuous, and the threat of him losing his freedom was
8   not enough to stop him from harming his next victim.  He was
9   facing time for what he did to my daughter.  He traveled
10  through four states to run from these charges, and he knew
11  every day waking up and looking in the mirror that everything
12  he did in the dark came to light and there was still a
13  possibility that any minute, with God on our side, he would
14  have to serve time for what he did to my daughter, and he still
15  chose to do the exact same thing again while on trial in
16  another state to another little girl.  Why?  Because he's a
17  predator, an abuser.
18        My daughter and her entire support system have been
19  patiently waiting for a sentencing in Texas, and in the midst
20  of waiting, because he never should have been let free, he hurt
21  another child.
22        There are now unspoken rules that we set in our home
23  to avoid triggers for my 14-year-old daughter.  She doesn't
24  participate in sleepovers.  I can't open the door in the
25  morning and wake her up because she is easily startled out of

1   her sleep, thinking that it's him again, forcing his way into
2   her room.  She refuses to change any of her nieces' and
3   nephews' diapers because it reminds her of the child
4   pornography that she was forced to watch.  If the same make and
5   model white car that he had at the time is in the parking lot
6   with us, she has panic attacks.  She refuses to wear dresses
7   that are form-fitting in public because she said that adults
8   look at your body and it's uncomfortable.  She still has
9   nightmares from time to time and wakes up in the middle of the
10  night and cries with me, questioning why her every single time.
11  She has also told me that she no longer wants children when she
12  gets older because she chooses not to bring a child into this
13  life -- into this world.
14        At one point we had nothing but walls to come home to
15  because I had to sell all our furniture because couches
16  reminded her of where she was glued to the couch with him
17  forcing himself on her.
18        When I asked to appear in the -- when I was asked to
19  appear in this courtroom today, I was told that the goal was
20  life in prison, and all I ask is the jury to consider how that
21  doesn't even compare to the life that was taken out of these
22  little girls.  A life sentence for a predator doesn't even
23  compare to the pain and suffering that the victims and their
24  family have endured and have to live with for the rest of their
25  life.  I just ask the jury to stand in favor for our daughters,

1  to be their voice and to help protect our children and to serve
2  justice.
3          THE COURT:  Thank you.
4          Any questions of this witness from the defense?
5          MR. NATE:  No, Your Honor.
6          THE COURT:  Thank you.
7          Any other witnesses or evidence?
8          MS. THELWELL:  No, Your Honor.
9          THE COURT:  From the defense, any other argument, and
10 does the defendant wish to allocute, which is his right?
11         MR. NATE:  Your Honor, the defendant does not wish to
12 allocute.  The only remaining argument I have, Your Honor, is a
13 request for a two level variance related to the computer
14 enhancement referenced in paragraph 44.
15         As I noted -- as noted in the presentence report,
16 almost 95 percent of defendants receive this enhancement, and
17 we believe it does not distinguish between the seriousness of
18 offenses, it's inherent in the offense, Your Honor, and the
19 Court should consider the two level variance.
20         Thank you.
21         THE COURT:  The Court overrules the defense objection
22 to the presentence report both as to the pattern of activity in
23 regard to the Texas incident, incidents, and the conduct of the
24 defendant in respect to the child whose case brings us here.
25 The Court finds that the testimony of the mother, coupled with

1  the indictments in Texas, the similarities of the conduct of
2  the defendant with respect to the victim here and the victim in
3  Texas, all support a finding of reliability of the hearsay
4  that's offered to support the enhancement in this case.
5          The defendant has had an opportunity to challenge the
6  statements by his own testimony or cross-examination of the
7  witness or the offering of any additional information he would
8  like to offer and has declined to do so.
9          The Court is aware that the initial victim in Texas
10 originally made an allegation and recanted that allegation, but
11 the reasons for the recanting of the allegation are supported
12 by the background and history of the defendant, his displaying
13 firearms, and the child's concern about harm to the mother.
14 And so while in some circumstances recanting and realleging
15 might be supportive of a concern as to reliability, the Court
16 does not find that concern to be supported here.
17         The mother's observation of the child personally in
18 her response to the behavior that the child alleged is also
19 corroborative of the validity of the child's allegations, and
20 those are things she personally observed and has had to respond
21 to and are not the kinds of things that would be conjured up or
22 faked by the child, and so they further provide indicia of
23 reliability to the allegations the child has raised as
24 communicated by the mother, who had personal observation of
25 those things.

1       As such, the Court finds that the presentence report
2  properly scores the defendant in this case.
3       The Court also declines any request for a variance as
4  to use of a computer, because while some defendants are
5  overscored because of use of a computer, this defendant
6  purposely used a computer on multiple occasions and was a
7  producer of child pornography with the use of computer to the
8  extent that he photographed himself, and so the Court does not
9  believe under the circumstances of this case that the
10  enhancement for the use of computer overstates the defendant's
11  criminal history.
12       In accordance therewith, the Court adopts the factual
13  statements that are contained within the presentence report and
14  adopts the calculation of the guidelines, which are properly
15  scored, with the defendant facing a total offense level of 43,
16  a Criminal History Category II.  This calls for a period of
17  incarceration of 1,320 months, or life.  There is a one to
18  five year period of -- I'm sorry, there's a five to life period
19  of supervised release as to Counts One through Five.  The
20  restitution obligation is $5,000, the fine range is 50,000 to
21  $250,000, and there's a $500 special assessment.
22       This restitution is raised by -- is it Pia?
23       Is there any challenge to the restitution demand,
24  Mr. Nate?
25       MS. THELWELL:  Your Honor?

1       THE COURT:  Yes.
2       MS. THELWELL:  If I may, I've spoken with defense
3  counsel, I'm still pending a restitution amount for the victim
4  in this case, so we would like to bifurcate.  We believe that
5  we will likely be able to stipulate to a restitution amount,
6  but I do need additional time to gather that information.
7       THE COURT:  For the total restitution, or --
8       MS. THELWELL:  For the total restitution.
9       THE COURT:  All right.  The Court then withdraws the
10  restitution range and we will set that matter over to the side
11  for determination at a later time.
12       Does anyone know of any reason why the Court cannot
13  now proceed with the imposition of sentence?
14       MS. THELWELL:  No, Your Honor.
15       MR. NATE:  No, Your Honor.
16       THE COURT:  Mr. Torres, would you please stand.
17       The Court has asked the defendant why judgment should
18  not now be pronounced and there is no objection.  The Court
19  finds no reason to delay.  The parties have made statements on
20  their own behalf or in this case the defendant has waived the
21  opportunity to provide allocution.
22       Let me ask you, Mr. Torres, your lawyer tells me that
23  you wish to waive your right to allocute.  Do you know what
24  that means?
25       THE DEFENDANT:  No.

```
1              THE COURT:  I beg your pardon?
2              THE DEFENDANT:  Yes.  Yes.  Yes.
3              THE COURT:  Do you know what allocution means?
4              THE DEFENDANT:  Yes.
5              THE COURT:  It means to make a statement on your own
6   behalf.  Do you understand that?
7              THE WITNESS:  Yes.
8              THE COURT:  And you have decided not to do that; is
9   that right?
10             THE DEFENDANT:  Yes.
11             THE COURT:  And did anyone threaten you to get you to
12  waive your right to allocution?
13             THE DEFENDANT:  No.
14             THE COURT:  Did anyone promise you anything in
15  exchange for that?
16             THE DEFENDANT:  No.
17             THE COURT:  Are you making that decision of your own
18  free will?
19             THE DEFENDANT:  Yes.
20             THE COURT:  The Court finds that the defendant has
21  voluntarily waived the right to allocution, which is also his
22  right.
23             Pursuant to Title 18, United States Code,
24  Section 3551 and 3553, it is the judgment of this Court that
25  this defendant, Aby Raul Rivera Torres, is hereby committed to
```

```
1   the custody of the Bureau of Prisons to be incarcerated for a
2   term of life.  This term consists of life as to Counts -- is it
3   One through Five?  You have it written differently on the
4   presentence report.
5              PROBATION:  Your Honor, I believe that there's a
6   maximum statutory for each count that is lower than life.
7              THE COURT:  There's a 30 year maximum as to Count One
8   and 20 for Counts Two, Three, Four and Five; is that right?
9              PROBATION:  That's correct, Your Honor.
10             MS. THELWELL:  We would ask that he be sentenced to
11  the maximum on each count consecutively.
12             THE COURT:  All right.  In order to preserve any
13  challenge against an appeal, the Court believes the defendant
14  deserves to be pronounced life, but for the record the Court
15  imposes a sentence of 360 months as to Count One and 240 months
16  as to Counts Two, Three, Four and Five, all such terms to run
17  consecutively to each other.
18             If you are ever released, you will serve a ten year
19  period of supervised release.  This is ten years as to
20  Counts One, Two, Three, Four and Five, to run concurrently.
21             You may be seated.
22             While on supervised release you will comply with the
23  mandatory and standard conditions adopted by the Court in the
24  Middle District of Florida.  In addition, you will comply with
25  the following special conditions.
```

1           You will participate in a substance abuse program.
2   You will pay the cost of that.
3           You'll participate in mental health treatment.
4   You'll pay the cost of that.
5           You will register as a sex offender in any state
6   where you reside, visit or are employed, carry on a vocation or
7   are a student, as directed by Probation.  State officials will
8   be notified of your presence and you'll have to comply with all
9   applicable laws.
10          You will also have to participate in processing such
11  as photographing, fingerprinting and DNA collection.
12          You will have no contact with minors, those are
13  people under the age of 18, without an order from this Court.
14  Probation cannot even waive that requirement.  You will have to
15  get an order from the Court.
16          You will refrain from entering into any area where
17  children frequently congregate, including schools, daycare
18  centers, theme parks, playgrounds, et cetera.
19          You are prohibited from purchasing, subscribing to or
20  viewing any images, videos, magazines, literature or other
21  materials depicting children in the nude or in sexually
22  explicit positions.
23          While in prison the Court will allow the BOP to
24  determine your access to any computer device.
25          If you are released somehow, you will not have access

1   to any sort of computer, smartphone, handheld device, gaming
2   console or other electronic device capable of connecting to the
3   computer or an online service or an internet service provider
4   without an order from the Court as sought through the Office of
5   Probation.  This includes a computer whether it's yours or
6   someone else's, a public computer or private computer.  If you
7   have a computer, you must permit an inspection of that device
8   in any manner Probation deems appropriate.
9           You will also be subject to the maximum level of
10  search of your person, residence, place of business or storage
11  units, your computer, your vehicle, as necessary to ensure
12  compliance with terms and conditions of your order of release.
13  If you live with someone, they must be agreeable to having
14  their residence subject to search.  If you fail to submit to a
15  search, it is a ground for revocation.
16          You will provide access to Probation to any requested
17  financial information.
18          You're a convicted felon, so you must cooperate in
19  collection of your DNA as directed.
20          You will refrain from the unlawful use of any
21  controlled substance, and you must submit to up to 104 drug
22  tests per year.
23          The Court sets aside the matter of restitution to be
24  determined by either stipulation of the parties or presentation
25  to the Court in a separate proceeding or on paper, based upon

1    the parties' determination.

2            The Court waives the imposition of a fine.

3            The forfeiture order in this case will be made

4    permanent.

5            You will be required to pay the special assessment of

6    $500, which is -- is it 5,000 or 500 for the special

7    assessment?

8            PROBATION:  It is $100 for each count.  Five counts,

9    $500, Your Honor.

10           THE COURT:  $500 for the special assessment for each,

11   100 for each such count.

12           MS. THELWELL:  There is a $5,000 special assessment,

13   but that can be waived if the defendant is indigent.

14           THE COURT:  The Court waives the special assessment

15   due to the defendant's indigency.

16           Having considered the advisory sentencing guidelines

17   and all of the factors identified therein, the Court finds that

18   this sentence is sufficient but not greater than necessary to

19   comply with the statutory purposes of sentencing.

20           The Court does not take lightly its decision to

21   sentence the defendant in the manner that it has, but his

22   conduct is unforgivable and egregious and he is a predator, and

23   the only way the Court can ensure the community that the

24   community is safe is that he receive the maximum sentence

25   appropriate under law for the conduct that he has committed as

1    prescribed by law and recommended by the guidelines.

2            Is there an underlying indictment that needs to be

3    dismissed, Ms. Thelwell?

4            MS. THELWELL:  Yes, the original indictment.

5            THE COURT:  Is that a motion?

6            MS. THELWELL:  Yes.  At this time we'd move to

7    dismiss the original indictment in this case.

8            THE COURT:  The original indictment is dismissed.

9            Is the defendant requesting any special placement?

10           MR. NATE:  Yes, Your Honor.  Initially we were

11   requesting placement in either the Federal Medical Center at

12   Devons, Massachusetts or the United States Penitentiary in

13   Marion.  Both these facilities have the residential

14   sex offender treatment program that the defendant is

15   requesting, Your Honor.

16           THE COURT:  The Court will leave the placement of the

17   defendant to the discretion of the Bureau of Prisons.  There

18   are many prisons that permit sex offender treatment.

19           The defendant is remanded to the custody of the

20   United States Marshal to await designation by the BOP.

21           You have the right to appeal from this judgment and

22   sentence within 14 days of the entry of judgment.  If you fail

23   to appeal within the 14 day period, it will be a permanent

24   waiver of any right of appeal.  If the Government chooses to

25   appeal, it may do so as well.  You're entitled to the

```
1   assistance of counsel in taking an appeal, and if you cannot
2   afford a lawyer, one will be appointed for you.  If you are
3   unable to afford the filing fee, the Clerk of the Court will be
4   directed to accept the notice of appeal without a fee.
5           Is there anything further from the Government?
6           MS. THELWELL:  No, Your Honor.
7           THE COURT:  From the defense?
8           MR. NATE:  Yes, Your Honor.  I do believe I have to
9   put my objections on the record to the sentence.
10          THE COURT:  Yes.  I'm sorry.  I forgot to ask is
11  there any objection to the sentence or the manner in which it
12  was pronounced.
13          MS. THELWELL:  No, Your Honor.
14          THE COURT:  From the defenses?
15          MR. NATE:  Yes, from the defense, Your Honor.
16  Thank you.
17          We would object to the procedural substantive
18  unreasonableness of the sentence, Your Honor.  Specifically, we
19  would object to the pattern enhancements in paragraphs 43 and
20  54, and again, for the record, we would object to the Court's
21  previous denial of the defendant's motion to suppress.  That
22  denial was located in document 38, Your Honor.
23          Thank you.
24          THE COURT:  Record is so noted.
25          Thank you.  We are dismissed.
```

```
1                           - - - - -
2           (Proceedings concluded at 11:03 a.m.)
3                           - - - - -
```

```
 1              C E R T I F I C A T E

 2

 3        This is to certify that the foregoing transcript of

 4   proceedings taken in a sentencing hearing in the United States

 5   District Court is a true and accurate transcript of the

 6   proceedings taken by me in machine shorthand and transcribed by

 7   computer under my supervision, this the 18th day of October,

 8   2022.

 9

10

11                         /S/ DAVID J. COLLIER

12

13                      DAVID J. COLLIER

14                      OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```

# Doc. 78

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA**                    Case Number: **8:21-cr-397-MSS-JSS**

**v.**                                          USM Number: **74305-509**

**ABY RAUL RIVERA TORRES**                      **Adam Joseph Nate**, AFPD

_____

## JUDGMENT IN A CRIMINAL CASE

Defendant was found guilty to Counts One, Two, Three, Four, and Five of the Superseding Indictment. Defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Numbers |
|---|---|---|---|
| 18 U.S.C. §§ 2251(a) and (e) | Production of Child Pornography | August 2, 2021 | One |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | July 20, 2021 | Two |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | July 22, 2021 | Three |
| 18 U.S.C. §§ 2252(a)(2) and (b)(1) | Distribution of Child Pornography | August 2, 2021 | Four |
| 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) | Possession of Child Pornography of a Minor Who Had Not Attained Twelve Years of Age | November 13, 2021 | Five |

Defendant is sentenced as provided in the following pages of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The Original Indictment is dismissed on the motion of the United States.

**IT IS ORDERED** that Defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, Defendant shall notify the Court and United States Attorney of any material change in Defendant's economic circumstances.

Date of Imposition of Judgment:

August 24, 2022

Aby Raul Rivera Torres
8:21-cr-397-MSS-JSS

_____

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

September 2, 2022

## IMPRISONMENT

Defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **ONE THOUSAND THREE HUNDRED and TWENTY (1320) MONTHS**. This term consists of a 360-month term as to Count One and a 240-month term as to Counts Two, Three, Four, and Five, all such terms to run consecutively to each other.

Defendant is remanded to the custody of the United States Marshal to await designation by the Bureau of Prisons.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____

Deputy U.S. Marshal

Case 8:21-cr-00397-MSS-JSS   Document 78   Filed 09/02/22   Page 4 of 10 PageID 493
USCA11 Case: 22-12996     Document: 18     Date Filed: 01/17/2023     Page: 214 of 221
Page 4 of 8

Aby Raul Rivera Torres
8:21-cr-397-MSS-JSS

## SUPERVISED RELEASE

Upon release from imprisonment, Defendant will be on supervised release for a term of **TEN (10) YEARS**. This term consists of a 10-year term as to Counts One, Two, Three, Four, and Five, all such terms to run concurrently.

## MANDATORY CONDITIONS

1.  Defendant shall not commit another federal, state or local crime.
2.  Defendant shall not unlawfully possess a controlled substance.
3.  Defendant shall refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
4.  Defendant shall cooperate in the collection of DNA as directed by the Probation Officer.
5.  Defendant shall make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.

Defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

Defendant shall also comply with the additional conditions on the attached page.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

Aby Raul Rivera Torres
8:21-cr-397-MSS-JSS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, Defendant shall comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by Probation Officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  Defendant shall report to the Probation Office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the Probation Officer instructs you to report to a different Probation Office or within a different time frame. After initially reporting to the Probation Office, Defendant will receive instructions from the court or the Probation Officer about how and when Defendant must report to the Probation Officer, and Defendant must report to the Probation Officer as instructed.

2.  After initially reporting to the Probation Office, you will receive instructions from the court or the Probation Officer about how and when Defendant shall report to the Probation Officer, and Defendant shall report to the Probation Officer as instructed.

3.  Defendant shall not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the Probation Officer.

4.  Defendant shall answer truthfully the questions asked by your Probation Officer

5.  Defendant shall live at a place approved by the Probation Officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer in advance is not possible due to unanticipated circumstances, Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.

6.  Defendant shall allow the Probation Officer to visit you at any time at your home or elsewhere, and Defendant shall permit the Probation Officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  Defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the Probation Officer excuses you from doing so.  If you do not have full-time employment Defendant shall try to find full-time employment, unless the Probation Officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer at least 10 days in advance is not possible due to unanticipated circumstances, Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.

8.  Defendant shall not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, Defendant shall not knowingly communicate or interact with that person without first getting the permission of the Probation Officer.

9.  If you are arrested or questioned by a law enforcement officer, Defendant shall notify the Probation Officer within **72 hours**.

10.  Defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11.  Defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.  If the Probation Officer determines that you pose a risk to another person (including an organization), the Probation Officer may require you to notify the person about the risk and Defendant shall comply

**Aby Raul Rivera Torres**
**8:21-cr-397-MSS-JSS**

with that instruction.  The Probation Officer may contact the person and confirm that you have notified the person about the risk.

13.    Defendant shall follow the instructions of the Probation Officer related to the conditions of supervision.


**U.S. Probation Office Use Only**

A U.S. Probation Officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature:_____          Date:_____

## ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.  Defendant shall participate in a substance abuse program (outpatient and/or inpatient) and follow the Probation Officer's instructions regarding the implementation of this court directive.  Further, Defendant shall contribute to the costs of these services not to exceed an amount determined reasonable by the Probation Office's Sliding Scale for Substance Abuse Treatment Services. During and upon completion of this program, Defendant is directed to submit to random drug testing.

2.  Defendant shall be prohibited from incurring new credit charges, opening additional lines of credit, or making an obligation for any major purchases without approval of the Probation Officer. Defendant shall provide the Probation Officer access to any requested financial information.

3.  Defendant shall participate in a mental health program specializing in sex offender treatment and submit to polygraph testing for treatment and monitoring purposes.  Defendant shall follow the Probation Officer's instructions regarding the implementation of this court directive.  Further, Defendant shall contribute to the costs of such treatment and/or polygraphs not to exceed an amount determined reasonable by the Probation Officer base on ability to pay or availability of third-party payment and in conformance with the Probation Office's Sliding Scale for Treatment Services.

4.  Defendant shall register with the state sexual offender registration agency(s) in any state where you reside, visit, are employed, carry on a vocation, or are a student, as directed by your Probation Officer.  The Probation Officer will provide state officials with all information required under Florida sexual predator and sexual offender notification and registration statutes (F.S.943.0435) and/or the Sex Offender Registration and Notification Act (Title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109-248), and may direct you to report to these agencies personally for required additional processing, such as photographing, fingerprinting, and DNA collection.

5.  Defendant shall have no direct contact with minors (under the age of 18) without the written approval of the Probation Officer and shall refrain from entering into any area where children frequently congregate, including: schools, daycare centers, theme parks, playgrounds, etc.

6.  Defendant is prohibited from possessing, subscribing to, or viewing, any video, magazine, or literature depicting children in the nude and/or in sexually explicit positions.

7.  Defendant shall not possess or use a computer with access to any online service at any location (including employment) without written approval from the Probation Officer.  This includes access through any Internet service provider, bulletin board system, or any public or private computer network system.  Defendant shall permit routine inspection of your computer system, hard drives, and other medial storage materials, to confirm adherence to this condition.  This inspection shall be no more intrusive than is necessary to ensure compliance with this condition. Defendant shall inform your employer, or other third party who may be impacted by this condition, of this computer-related restriction and the computer inspection provision of the condition.

8.  Defendant shall submit to a search of your person, residence, place of business, any storage units under Defendant's control, computer, or vehicle, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release.  Failure to submit to a search may be grounds for revocation.  You shall inform any other residents that the premises may be subject to a search pursuant to this condition.

Aby Raul Rivera Torres
8:21-cr-397-MSS-JSS

## CRIMINAL MONETARY PENALTIES

Defendant must pay the following total criminal monetary penalties under the schedule of payments set forth in the Schedule of Payments.

| Assessment | Restitution | Fine | AVAA Assessment[*] | JVTA Assessment[*] |
|---|---|---|---|---|
| $500.00 | TBD | WAIVED | N/A | N/A |

## SCHEDULE OF PAYMENTS

Having assessed Defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

Special Assessment shall be paid in full and is due immediately.

Unless the Court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court, unless otherwise directed by the Court, the Probation Officer, or the United States attorney.

Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, and (9) penalties, and (10) costs, including cost of prosecution and court costs.

### FORFEITURE

Defendant shall forfeit to the United States those assets previously identified in the Order of Forfeiture, that are subject to forfeiture. **[SEE ATTACHED ORDER]**

---

[*] Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pu. L. No. 115-299.

[*] Justice for Victims of Trafficking Act of 2015, Pub.L. No. 114-22.

AO 245B (Rev. 09/19) Judgment in a Criminal Case

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:21-cr-397-MSS-JSS

ABY RAUL RIVERA TORRES

## PRELIMINARY ORDER OF FORFEITURE

THIS CAUSE comes before the Court upon the United States of America's Motion for a Preliminary Order of Forfeiture for a black Samsung Galaxy S20+ cell phone, seized from the Defendant's residence in or about November 2021.

The Court hereby finds that, based on the Defendant's guilty verdict on all counts at the bench trial and the fact that the cell phone was used or intended to be used to commit, or to promote the commission of, the production, distribution, and possession of child pornography, it is hereby:

ORDERED that the motion of the United States is GRANTED.

It is FURTHER ORDERED that, pursuant to 18 U.S.C. § 2253 and Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, the cell phone identified above is hereby forfeited to the United States for disposition according to law.

It is FURTHER ORDERED that the preliminary order of forfeiture becomes final as to the Defendant at sentencing.

The Court retains jurisdiction to address any third-party claim that may be asserted in these proceedings, and to enter any further order necessary for the forfeiture and disposition of such property.

DONE and ORDERED in Tampa, Florida, this 18th day of July, 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies to:
Suzanne C. Nebesky, AUSA
Counsel of Record

## CERTIFICATE OF SERVICE

I certify that on January 17, 2023, the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the United States Attorney's Office.


*/s/ Michelle R. Yard*
Michelle R. Yard, BCS
Research and Writing Attorney